**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| INTERNATIONAL BUSINESS MACHINES CORPORATION, | § § | |
| Plaintiff, | § § | |
| v. | § § | Civil Action No. 1:15-cv-00137-LPS-CJB |
| THE PRICELINE GROUP INC., et al., Defendants. | § § § § § | |

**OPENING BRIEF IN SUPPORT OF DEFENDANTS'
<u>MOTION TO DISMISS</u>**

Francis DiGiovanni (#3189)
Thatcher A. Rahmeier (#5222)
DRINKER BIDDLE & REATH LLP
222 Delaware Avenue, Suite 1410
Wilmington, DE 19801
Telephone: (302) 467-4200
francis.digiovanni@dbr.com
thatcher.rahmeier@dbr.com

Dan D. Davison
NORTON ROSE FULBRIGHT US LLP
2200 Ross Ave., Suite 3600
Dallas, TX 75201
Tel: 214.855.8000
Fax: 214.855.8200
dan.davison@nortonrosefulbright.com

Richard S. Zembek
NORTON ROSE FULBRIGHT US LLP
Fulbright Tower
1301 McKinney, Suite 5100
Houston, TX 77010
Tel: 713.651.5283
Fax: 713.651.5246
richard.zembek@nortonrosefulbright.com

Gilbert A. Greene
NORTON ROSE FULBRIGHT US LLP
98 San Jacinto Boulevard, Suite 1100
Austin, TX 78701
Tel: 512.474.5201
Fax: 512.536.4598
bert.greene@nortonrosefulbright.com

*Attorneys for Defendants The Priceline
Group Inc., Priceline.com LLC, KAYAK
Software Corporation, and OpenTable, Inc.*

Dated: May 4, 2015

## **TABLE OF CONTENTS**

_Toc418498198

I.    NATURE AND STAGE OF THE PROCEEDINGS ............................................................. 1

II.   SUMMARY OF THE ARGUMENT ................................................................................... 1

III.  STATEMENT OF THE FACTS ........................................................................................ 2

IV.  ARGUMENT ..................................................................................................................... 2

   A.   Applicable Legal Standard............................................................................................ 3

   B.   The Framework for the Section 101 Analysis ............................................................. 4

   C.   The Asserted Patents Do Not Claim Patent-Eligible Subject Matter ......................... 6

      1.   The Claims of the '346 Patent Are Not Patent-Eligible. .................................. 6

         a.   Claim 1 of the '346 Patent is Directed to an Abstract Idea. ...................... 7

         b.   Claim 1 of the '346 Patent Contains No Inventive Concept.................... 11

         c.   Claim 1 of the '346 Patent is Representative............................................ 13

      2.   The Claims of the '601 Patent Are Not Patent-Eligible. ................................ 14

         a.   Claim 1 of the '601 Patent Is Directed to an Abstract Idea. .................... 15

         b.   Claim 1 of the '601 Patent Contains No Inventive Concept.................... 18

         c.   Claim 1 of the '601 Patent Is Representative............................................ 19

      3.   The Claims of the '967 Patent Are Not Patent-Eligible. ................................ 20

         a.   Claim 1 of the '967 Patent Is Directed to an Abstract Idea. .................... 21

         b.   Claim 1 of the '967 Patent Does Not Contain an Inventive Concept. ..................... 23

         c.   Claim 1 of the '967 Patent Is Representative............................................ 24

      4.   The Claims of the '849 Patent Are Not Patent-Eligible. ................................ 25

         a.   Claims 1 and 8 of the '849 Patent Are Directed to Abstract Ideas. .......................... 26

         b.   Claims 1 and 8 of the '849 Patent Do Not Include an Inventive Concept............... 27

         c.   Claims 1 and 8 of the '849 Patent Are Representative. ........................... 29

V.   CONCLUSION................................................................................................................ 30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Accenture Global Servs. GmbH v. Guidewire Software, Inc.*,
  728 F.3d 1336 (Fed. Cir. 2013)................................................................................................5

*Advanced Auctions v. eBay, Inc.*,
  No. 13-cv-1612, 2015 WL 1415265 (S.D. Cal. Mar. 27, 2015) .......................................21, 27

*Alice Corp. Pty Ltd. v. CLS Bank Int'l*,
  134 S. Ct. 2347 (2014)...........................................1, 2, 3, 4, 5, 6, 12, 15, 18, 23, 24, 25, 28, 29

*Amdocs (Israel) Ltd. v. Openet Telecom, Inc.*,
  No. 1:10-cv-910, 2014 WL 5430956 (E.D. Va. Oct. 24, 2014) ...............................................9

*Bank of America v. Intellectual Ventures I, LLC*,
  CMB2014-00030, Paper No. 32 (P.T.A.B. Apr. 24, 2015) .............................................22, 27

*Bascom Research, LLC v. LinkedIn, Inc.*,
  No. 12-cv-06293, 2015 WL 149480 (N.D. Cal. Jan. 5, 2015).............................................8, 9

*In re Bilski*,
  545 F.3d 943 (Fed. Cir. 2008) (en banc)...............................................................12, 19, 24, 29

*Bilski v. Kappos*,
  561 U.S. 593 (2010).........................................................................................................4, 6

*buySAFE, Inc. v. Google, Inc.*,
  765 F.3d 1350 (Fed. Cir. 2014)..............................................................................................9

*buySAFE, Inc. v. Google Inc.*,
  964 F. Supp. 2d 331 (D. Del. 2013), *aff'd*, 765 F.3d 1350 (Fed. Cir. 2014) ....................11, 18

*Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat. Assn*,
  776 F.3d 1343 (Fed. Cir. 2014).................................................................3, 13, 14, 19, 23, 29

*Cyberfone Sys. v. CNN Interactive Grp., Inc.*,
  558 F. App'x 988 (Fed. Cir. 2014) (unpublished) ..................................................................30

*CyberSource Corp. v. Retail Decisions, Inc.*,
  654 F.3d 1366 (Fed. Cir. 2011).........................................................11, 12, 13, 18, 19, 24, 29

*Dealertrack, Inc. v. Huber*,
  674 F.3d 1315 (Fed. Cir. 2012)........................................................................................12, 18

*Gametek LLC v. Zynga, Inc.*,
No. CV-13-2546 RS, 2014 WL 1665090 (N.D. Cal. Apr. 25, 2014), *aff'd* No.
2014-1620, 2015 WL 1187562 (Fed. Cir. Mar. 17, 2015).......................................28

*Hewlett Packard Co. v. ServiceNow, Inc.*,
No. 14-CV-00570-BLF, 2015 WL 1133244 (N.D. Cal. Mar. 10, 2015)..........................22, 27

*Intellectual Ventures I v. Symantec Corp.*,
No. 10-1067-LPS, 2015 WL 1843528 (D. Del. Apr. 22, 2015) ..........................3, 8, 10, 17, 18

*Intellectual Ventures II LLC v. JP Morgan Chase & Co., et. al*,
No. 13-cv-3777, ECF No. 381, Slip Op. (S.D.N.Y. Apr. 28, 2015).........................................9

*Mayo Colab. Servs. v. Prometheus Labs., Inc.*,
132 S. Ct. 1289 (2012)...................................................................................4, 5, 24

*Morales v. Square, Inc.*,
No. 13-cv-1092, 2014 WL 7396568 (W.D. Tex. Dec. 30, 2014) ................................................4

*Morsa v. Facebook, Inc.*,
No. 14-cv-161, 2014 WL 7641155 (C.D. Cal. Dec. 23, 2014).........................................27, 30

*OpenTV, Inc. v. Apple, Inc.*,
No. 14-CV-01622-HSG, 2015 WL 1535328 (N.D. Cal. Apr. 6, 2015)................12, 13, 24, 29

*In re Roslin Inst. (Edinburgh)*,
750 F.3d 1333 (Fed. Cir. 2014).......................................................................................2

*Shortridge v. Payroll4Construction.com*,
No. 3-14-cv-04850, 2015 WL 1739256 (N.D. Cal. Apr. 14, 2015) .......................................23

*SiRF Tech., Inc. v. Int'l Trade Comm'n*,
601 F.3d 1319 (Fed. Cir. 2010)........................................................................................6

*TriPlay, Inc. v. WhatsApp Inc.*,
No. 13-1703-LPS, ECF No. 52, Slip Op. (D. Del. Apr. 28, 2015)....................3, 17, 22, 24, 27

*Tuxis Techs., LLC v. Amazon.com, Inc.*,
No. 13-cv-1771-RGA, 2015 WL 1387815 (D. Del. Mar. 25, 2015) ............................3, 16, 23

*Tuxis Techs., LLC v. Amazon.com, Inc.*,
No. CV 13-1771-RGA, 2014 WL 4382446 (D. Del. Sept. 3, 2014) .......................................15

*Ultramercial, Inc. v. Hulu, LLC*,
772 F.3d 709 (Fed. Cir. 2014)................................3, 5, 9, 12, 16, 19, 20, 21, 22, 23, 24, 27, 29

*Walker Digital, LLC v. Google, Inc.*,
No. CV 11-318-LPS, 2014 WL 4365245 (D. Del. Sept. 3, 2014).....................................10, 18

**Rules and Statutes**

35 U.S.C. § 101 ...................................................................................................... *passim*

FED. R. CIV. P. 12(b)(6) ............................................................................................ 1, 2, 3

## I.      NATURE AND STAGE OF THE PROCEEDINGS

On February 9, 2015, International Business Machines ("Plaintiff") filed its Complaint asserting patent infringement claims against Defendants KAYAK Software Corporation, OpenTable, Inc., The Priceline Group Inc., and Priceline.com LLC (collectively "Defendants") on four patents: U.S. Patent Nos. 5,796,967 ("the '967 Patent"); 7,072,849 ("the '849 Patent"); 5,961,601 ("the '601 Patent"); and 7,631,346 ("the '346 Patent") (collectively "the Asserted Patents"). (D.I. 1.)

Defendants bring this Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) because, consistent with the Supreme Court's decision in *Alice Corp. Pty Ltd. v. CLS Bank Int'l*, 134 S. Ct. 2347 (2014), and 35 U.S.C. § 101, the claims of the Asserted Patents are directed to non-patent-eligible abstract ideas and none includes an inventive concept that would make the abstract idea patent-eligible.

## II.     SUMMARY OF THE ARGUMENT

The claims of the Asserted Patents are each directed towards abstract concepts similar to those covered in other patents recently invalidated by federal courts under Section 101. The generality of the concepts sought to be monopolized is apparent from the purported reach of the Asserted Patents. Despite the fact that Defendants are very different companies offering very different services via very different websites, Plaintiff alleges that the all of the Asserted Patents are nevertheless infringed by each of Defendants' respective websites.[1]

Using terms such as "federated website," "stateless protocol," "reception system," and "partition," the Asserted Patents purport to ground their claimed abstract concepts in specific

---

[1] The websites priceline.com, opentable.com and kayak.com are run independently by their respective owners priceline.com LLC, Open Table, Inc. and KAYAK Software Corporation. Those companies are under common ownership of defendant The Priceline Group, Inc., which does not operate any website alleged to infringe in this case.

computer requirements and components. But looking past the artificial complexity suggested by this jargon, it is apparent that the claims of the Asserted Patents are directed to well-known abstract concepts facilitated by generic computer hardware and software performing the basic functions of a computer—storage, transmission of data, and reliable execution of instructions. The Supreme Court recently made clear in *Alice* that, even when specified in great detail, merely "requir[ing] a generic computer to perform generic computer functions" cannot transform an abstract idea into patentable subject matter. *Alice*, 134 S. Ct. at 2359.

Because the Asserted Patents do not claim patentable subject matter, Plaintiff's Complaint fails to state a claim for relief and should be dismissed. Thus, Defendants respectfully request that the Court dismiss the Complaint with prejudice pursuant to Rule 12(b)(6).

## III.   STATEMENT OF THE FACTS

The '346 Patent is directed to a method and apparatus for allowing a user to access multiple websites on the internet using a single sign-on process. The '601 Patent is directed to saving the internet communication history between a server and client computer. Finally, the '967 and '849 Patents, which are related patents sharing similar specifications, are generally directed to methods for presenting applications and advertisements on a user's computer.

Plaintiff alleges that priceline.com, kayak.com, opentable.com—and all other similar websites under Defendants' control—infringe one or more claims of the Asserted Patents. (*See* D.I. 1, ¶¶ 30, 35, 40, and 45.)

## IV.   ARGUMENT

The claims of the Asserted Patents are directed to patent-ineligible abstract ideas and fail to add any inventive concept that would render the claims patent-eligible.

A.     **Applicable Legal Standard**

The issue of whether a patent is directed to ineligible subject matter is a question of law. *In re Roslin Inst. (Edinburgh)*, 750 F.3d 1333, 1335 (Fed. Cir. 2014). There is no dispute that a complaint for patent infringement can be dismissed under Rule 12(b)(6) where, viewing the patent claims in the light most favorable to the plaintiff—including accepting any of the plaintiff's proposed claim constructions—the claims do not cover patentable subject matter. *See, e.g., Tuxis Techs., LLC v. Amazon.com, Inc.*, No. 13-cv-1771-RGA, 2015 WL 1387815, at *2 (D. Del. Mar. 25, 2015) (hereinafter, "*Tuxis II*").

The Federal Circuit has held that a district court is not required to individually address claims not asserted or identified by the non-moving party in its analysis of patent-eligibility, so long as the court identifies a representative claim and "all the claims are substantially similar and linked to the same abstract idea." *Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat. Ass'n,* 776 F.3d 1343, 1348 (Fed. Cir. 2014) (internal quotation marks omitted).

Moreover, the patent-eligibility of patent claims should not be presumed. Judge Mayer's concurring opinion in *Ultramercial* stated that "while a presumption of validity attaches in many contexts, no equivalent presumption of eligibility applies in the section 101 calculus." *Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 721 (Fed. Cir. 2014) (Mayer, J., concurring). Consistent with this observation, the "clear and convincing evidence" standard—a burden of proof applicable to disputed issues of fact—is inapposite to resolving the instant motion to dismiss that arises in the context of determining patent-eligibility, a question of law.[2] *See TriPlay, Inc. v. WhatsApp Inc.*, No. 13-1703-LPS, ECF No. 52, Slip Op., p. 8 (D. Del. Apr. 28,

---

[2] This Court has recognized that Judge Mayer's concurring opinion is not controlling. *See Intellectual Ventures I v. Symantec Corp.*, No. 10-1067-LPS, 2015 WL 1843528, at *5 (D. Del. Apr. 22, 2015). Nonetheless, the Supreme Court has never mentioned—much less applied—any presumption of eligibility. *Ultramercial*, 722 F.3d at 721. And neither the Supreme Court nor the Federal Circuit have mentioned the "clear and convincing evidence" standard in applying *Alice*. *See, e.g., Alice*, 134 S. Ct. 2347; *Ultramercial*, 772 F.3d 709.

2015) ("[E]ven assuming that the clear and convincing evidence standard is applicable to Section 101 challenges, it would apply only to the resolution of factual disputes, not to the resolution of pure issues of law."). However, even if the clear and convincing evidence burden applies, the claims of the Asserted Patents are ineligible for the reasons set forth below.

### B.      The Framework for the Section 101 Analysis

Under Section 101, "whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefore, subject to the conditions and requirements of this title." 35 U.S.C. § 101. There are, however, three exceptions to the categories of patentable subject matter: laws of nature, physical phenomena, and abstract ideas. *Bilski v. Kappos*, 561 U.S. 593, 594 (2010).

In the recent decisions of *Mayo Colab. Servs. v. Prometheus Labs., Inc.*, 132 S. Ct. 1289 (2012), and *Alice*, 134 S. Ct. 2347 (2014), the Supreme Court established a two-part test for "distinguishing patents that claim laws of nature, natural phenomena, and abstract ideas from those that claim patent-eligible applications of those concepts" (hereinafter, "the *Alice* analysis"). *Alice*, 134 S. Ct. at 2355. At step one of the *Alice* analysis, a court must evaluate a representative claim to determine whether it is drawn to, as relevant here, an abstract idea. *Id.* The abstract idea can be, but need not amount to, a "method of organizing human activity" (such as a "longstanding commercial practice"). *Alice*, 134 S. Ct. at 2356–57. The abstract ideas category is "broad," encompassing any fundamental concept or longstanding practice. *See Morales v. Square, Inc.,* No. 13-cv-1092, 2014 WL 7396568, at *6 (W.D. Tex. Dec. 30, 2014). "In determining whether a claim is directed to an abstract idea, courts look past the claim language to the purpose of the claim—in other words, what the invention is trying to achieve." *Id.* (internal quotations omitted).

If the claim is drawn to an abstract idea, the court moves to step two of the *Alice* analysis: determining whether the "additional elements" of the claim, beyond the abstract idea, provide an "inventive concept" "sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [abstract concept] itself." *Alice*, 134 S. Ct. at 2355. Additional substantive limitations must "narrow, confine, or otherwise tie down the claim so that, in practical terms, it does not cover the full abstract idea itself." *Accenture Global Servs. GmbH v. Guidewire Software, Inc.*, 728 F.3d 1336, 1341 (Fed. Cir. 2013).

The Supreme Court has observed that claims that merely implement an abstract idea on a computer fail to transform the subject matter into a patent-eligible invention. *See, e.g., Alice*, 134 S. Ct. at 2358 ("Given the ubiquity of computers . . . wholly generic computer implementation is not the sort of 'additional feature[e]' that provides any 'practical assurance that the process is more than a drafting effort designed to monopolize the [abstract idea] itself.'") (alteration in original) (*quoting* Mayo, 132 S. Ct. at 1297). Similarly, the Federal Circuit has explained that a claim's invocation of a computer network such as the Internet adds no inventive concept. *Ultramercial*, 772 F.3d at 716.

The failure of generic computer implementations to transform abstract ideas into patent-eligible inventions is apparent when applying the so-called machine-or-transformation test to the Section 101 analysis. This test seeks to determine patent-eligibility by asking if a claimed process: (1) is tied to a particular machine or apparatus; or (2) transforms a particular article into a different state or thing. *Id*. Though not the sole test governing a Section 101 patentability analysis, the machine-or-transformation test can provide a useful clue in the second step of the *Alice* analysis. *Id*. A claimed process that is tied only to a general purpose computer is not tied to any particular novel machine or apparatus even if that computer is connected to the Internet

- 5 -

because the Internet is "a ubiquitous information-transmitting medium, not a novel machine." *Id.* at 716–17. Further, "[a]ny transformation from the use of computers or the transfer of content between computers is merely what computers do and does not change the analysis." *Id*. at 717; *see also Intellectual Ventures I*, 2015 WL 1843528, at *5 ("To be 'a meaningful limit on the scope of the claims,' the addition of a machine 'must play a significant part in permitting the claimed method to be performed, rather than function solely as an obvious mechanism for permitting a solution to be achieved more quickly.'") (quoting *SiRF Tech., Inc. v. Int'l Trade Comm'n*, 601 F.3d 1319, 1332–33 (Fed. Cir. 2010)).

### C.    The Asserted Patents Do Not Claim Patent-Eligible Subject Matter

Looking past the chosen claim language, it is clear that the Asserted Patents are directed to various abstract ideas that reflect fundamental concepts and longstanding practices. Further, it is apparent that the claims do not amount to anything more than an improper attempt to monopolize these abstract concepts. That the claims disclose performing steps on a computer does not add a sufficient inventive concept to make them patent-eligible because the claims simply rely on generic computer functions—such as gathering, receiving, communicating, and displaying information—which this Court and others have routinely held do not add sufficiently more "to transform the claimed abstract idea into a patent-eligible application." *Alice*, 134 S. Ct. at 2357 (internal quotation omitted).

### 1.    The Claims of the '346 Patent Are Not Patent-Eligible.

The claims of the '346 Patent are directed to the abstract idea of using access rights in a first system to obtain access rights to a second system. Such a disembodied concept standing alone is not patentable; only the specific implementation of that concept in a particular machine or its use in a particular real-world implementation is, at best, arguably the proper subject of

patent protection. *Bilski*, 561 U.S. at 609. The claims of the '346 Patent do nothing more than require that this abstract idea be implemented on a generic computing device.

The '346 Patent has 20 claims, of which 3 are independent claims. Claim 1 is representative and recites:

> A method for managing user authentication within a distributed data processing system, wherein a first system and a second system interact within a federated computing environment and support single-sign-on operations in order to provide access to protected resources, at least one of the first system and the second system comprising a processor, the method comprising:
>
> (a) triggering a single-sign-on operation on behalf of the user in order to obtain access to a protected resource that is hosted by the second system, wherein the second system requires a user account for the user to complete the single-sign-on operation prior to providing access to the protected resource;
>
> (b) receiving from the first system at the second system an identifier associated with the user; and
>
> (c) creating a user account for the user at the second system based at least in part on the received identifier associated with the user after triggering the single-sign-on operation but before generating at the second system a response for accessing the protected resource, wherein the created user account supports single-sign-on operations between the first system and the second system on behalf of the user.

(D.I. 1, Ex. D ('346 Patent), claim 1.)

### a.      Claim 1 of the '346 Patent is Directed to an Abstract Idea.

The abstract idea of the '346 Patent is clear: using access rights to a first system to obtain access rights to a second system. Plaintiff's Complaint confirms this conclusion. Plaintiff pleads that the inventors' purported goal was to permit a user "[t]o access a protected resource at a service provider on the Internet . . . [while] requiring only one authorization operation during a particular user session." (D.I. 1, ¶ 22.) The Abstract of the '346 Patent describes the invention as a method, system, apparatus, and computer program product to support computing systems of different enterprises that interact within a "federated computing environment." (D.I. 1, Ex. D, ('346 Patent), Abstract.)

This is analogous to the computer networking patent claims ruled ineligible under Section 101 in several recent decisions. For instance, this Court has recently characterized as abstract a patent claim directed to a method for identifying characteristics of data file. *See Intellectual Ventures I*, 2015 WL 1843528, at *8–9. This Court characterized these claims as capturing the steps of: (1) receiving information related to a file form a querying computer; (2) characterizing the file based on the identifier and other stored identifiers; and (3) communicating a result of the characterization back to the querying computer. *Id.*, at *8.[3] This sequence is remarkably similar to the concepts described by claim 1 of the '346 Patent, whose steps can be described as: (1) requesting access to protected resource for a user; (2) receiving an identifier associated with the user; and (3) creating an account for the user based on the information received. Stated another way, the relevant *Intellectual Ventures I* patent claims essentially cover receiving information about a *file*, characterizing the *file*, and communicating results, while the '346 Patent claims recite receiving information about a *user*, characterizing the *user* (i.e., whether he has access rights), and communicating the result.

Other recent cases have found similar claims to be impermissibly abstract. In *Bascom Research, LLC v. LinkedIn, Inc.*, No. 12-cv-06293, 2015 WL 149480 (N.D. Cal. Jan. 5, 2015), the patents in suit were directed to methods for permitting a user of a computer network or the Internet to establish relationships between document objects and make those relationships accessible to other users. *Id.*, at *10.[4] The court found that the patents in *Bascom* were similar to

---

[3] The representative claim read: "A method for identifying characteristics of data files, comprising: (a) receiving, on a processing system, file content identifiers for data files from a plurality of file content identifier generator agents, each agent provided on a source system and creating file content IDs using a mathematical algorithm, via a network; (b) determining, on the processing system, whether each received content identifier matches a characteristic of other identifiers; (c) and outputting, to at least one of the source systems responsive to a request from said source system, an indication of the characteristic of the data file based on said step of determining."

[4] The representative claim read: "A method for providing a framework for document objects located on a network, the method comprising: (a) creating one or more link directories for storing link relationships between document

the patent claims for a method of distributing copyrighted media paid for by advertisers over the Internet that the Federal Circuit struck down under Section 101 in *Ultramercial,* 772 F.3d at 715–16. Analogizing to *Ultramercial*, the *Bascom* court held that "allowing users to generate relationships between document objects and storing those relationships separately from the document objects simply describes the abstract idea of creating, storing data, and using relationships between objects." *Bascom*, 2015 WL 149480, at *8.

Similar to creating and storing relationships between documents, claim 1 of the '346 Patent establishes and uses relationships between systems, i.e., users get access rights to a second system based on having access rights to a first system, and the claim is therefore directed to an abstract idea. *See id.*; *see also Amdocs (Israel) Ltd. v. Openet Telecom, Inc.,* No. 1:10-cv-910, 2014 WL 5430956, at *5-6 (E.D. Va. Oct. 24, 2014) (holding that computer product claim disclosing computer code for "receiving from a first source a first network accounting record," "correlating the record with accounting information available from a second source," and "using computer code to enhance the first accounting record using the accounting information from the second source" was directed to a patent-ineligible abstract idea); *Intellectual Ventures II LLC v. JP Morgan Chase & Co., et. al*, No. 13-cv-3777, ECF No. 381, Slip Op., p. 23 (S.D.N.Y. Apr. 28, 2015) (hereinafter, "*Intellectual Ventures II*") (holding claim to be directed to a patent-ineligible abstract idea because the "concept of protecting access to otherwise unprotected digital information or property by the enforcement of rules is a conventional concept").

As this Court has recognized, another way of assessing whether the claims of a patent are directed to an abstract idea is to consider if all of the steps of the claim could be performed by

---

objects located on the network, wherein the one or more link relationships are separate from the document objects; (b) creating a link relationship between a first document object located on the network and a second document object located on the network; (c) assigning attributes describing the link relationship, wherein the attributes are stored with the link relationship; (d) presenting the link relationship with one or more of the attributes describing the link relationship."

human beings in a non-computerized "brick and mortar" context. *Intellectual Ventures I*, 2015 WL 1843528, at *9 (citing *buySAFE, Inc. v. Google, Inc.*, 765 F.3d 1350, 1353 (Fed. Cir. 2014)). Such is the case here. Consider, for instance, a scenario where the "first system" is a members–only grocery store and the "second system" is a members–only electronics store. The abstract idea of the '346 Patent claims can be applied here as a rule that "all people who get access to the grocery store also get access to the electronics store, and vice versa." An employee at the electronics store, Jane Clerk, might perform all the steps as follows for a user named Joe Shopper:

| Step of '346 Claim 1 | Corresponding Routine Step Performed to Provide Access to a Sister Store |
|---|---|
| triggering a single-sign-on operation on behalf of the user in order to obtain access to a **protected resource** that is hosted by the second system, wherein the **second system** requires **a user account** for the user to complete the single-sign-on operation prior to providing access to the protected resource; | Jane Clerk begins to create a membership on behalf of Joe Shopper in order for Joe Shopper to obtain access to the electronics merchandise [**protected resource**] that is hosted by the electronics store [**second system**] wherein the electronics store requires membership [**a user account**] prior to providing access to the merchandise. |
| receiving from the **first system** at the second system **an identifier associated with the user**; | Jane Clerk receives from the grocery store [**first system**] a list of all the grocery store's members (including Joe's name) [**an identifier associated with Joe**]. |
| and creating a **user account** for the user at the second system based at least in part on the received **identifier associated with the user** after **triggering the single-sign-on** operation but before generating at the second system a response for accessing the **protected resource**, wherein the created **user account** supports single-sign-on operations between the **first system** and the **second system** on behalf of the user. | Jane Clerk completes the membership creation for Joe Shopper [**user account**] based at least in part on the received list from the grocery store [**identifier associated with user**]. She completes the membership after she began the process [**triggering the single-sign-on**] but before providing Joe access to the electronics store's merchandise [**protected resource**]. Joe may use his membership [**user account**] to access the grocery store [**first system**] and electronics store [**second system**]. |

Where a claim's limitations simply lay out an interaction that can be and routinely is performed by humans, this demonstrates that the claim is directed to an abstract idea and not

rooted in computer technology. *See Intellectual Ventures I*, 2015 WL 1843528, at *9; *Walker Digital, LLC v. Google, Inc.*, No. CV 11-318-LPS, 2014 WL 4365245, at *6, *9 (D. Del. Sept. 3, 2014) (invalidating under Section 101 patent claims directed to controlled exchange of information which had steps that could be and routinely were performed by humans); *see also CyberSource Corp. v. Retail Decisions, Inc.*, 654 F.3d 1366, 1373 (Fed. Cir. 2011) (observing that where all the claims steps "can be performed in the human mind or by a human using a pen and paper," the claim is directed to "unpatentable mental processes"). This is the case even where the claims purport to require computer technology. *See buySAFE, Inc. v. Google Inc.*, 964 F. Supp. 2d 331, 335 (D. Del. 2013) ("A computer is not a significant part [of] the process if that process can be performed without a computer."), *aff'd*, 765 F.3d 1350 (Fed. Cir. 2014).

### b.   Claim 1 of the '346 Patent Contains No Inventive Concept.

Moving to the second step of the *Alice* analysis, the limitations of representative claim 1 do not add an inventive concept to the abstract idea to render it patent-eligible. For example, the claim does not disclose any specific hardware or detail regarding how the second system "receives" an identifier, how it "creat[es] a user account," or how it "trigger[s] the single-sign-on operation." (D.I. 1, Ex. D, ('346 Patent), claim 1.) The claims are instead directed to online transactions requiring "conventional computer technology and the Internet." *buySAFE*, 964 F. Supp. 2d at 336. The specification states that the invention can be implemented using "a conventional Web server including typical Internet connections" (*see* D.I. 1, Ex. D ('346 Patent), 13:61–62), "a traditional database management system (DBMS)" (*id.* at 12:63), "a standard browser" (*id.* at 16:11–12), "conventional CGI programs" (*Id.* at 13:3), and "well known" Java programming (*id.* at 16:17). The generic "first system" and "second system" are described in the specification as including commonly known devices such as "mainframes, personal computers, personal digital assistants, etc." (*Id.* at 4:45–48.) Similarly the "distributed data processing

system" of the preamble is defined as including well known technical solutions, such as the Internet and familiar protocols to communicate. (*Id.* at 4:51–58.) As the specification explains, these examples are not limiting but instead represent that the invention "could be implemented on a variety of hardware platforms and software environments." (*Id.* at 5:5–6.)

Accordingly, claim 1 of the '346 Patent amounts to "nothing significantly more than an instruction to apply the abstract idea" of using access rights to a first system to obtain access rights to a second system "using some unspecified, generic" computer hardware. *See Alice*, 134 S. Ct. at 2360; *Dealertrack, Inc. v. Huber*, 674 F.3d 1315, 1333–34 (Fed. Cir. 2012) (limiting claimed method of managing credit applications to electronically-processed applications did not impose sufficiently meaningful limits on the abstract idea in claim). Thus, claim 1 of the '346 Patent seeks to monopolize every concrete application of using access rights to a first system to obtain access rights to a second system, and allowing such a patent claim to survive "would tend to impede innovation rather than promote it, thereby thwarting the primary object of the patent laws." *Alice*, 134 S. Ct. at 2354 (internal quotations omitted).

Application of the machine-or-transformation test confirms the conclusion that claim 1 is patent-ineligible. The method of claim 1 of the '346 Patent generally describes the organization and exchange of intangible information; it does not "transform a particular article into a different state or thing." *In re Bilski*, 545 F.3d 943, 954 (Fed. Cir. 2008) (en banc); *see also CyberSource*, 654 F.3d at 1370 ("The mere collection and organization of data . . . is insufficient to meet the transformation prong of the test."). Further, just as with the exchange of information on the Internet using general purpose computers at issue in *Ultramercial*, "nowhere does the ['346 Patent] tie the claims at issue to a novel machine." *Ultramercial*, 772 F.3d at 717; *see also OpenTV, Inc. v. Apple, Inc.*, No. 14-CV-01622-HSG, 2015 WL 1535328, at *5 (N.D. Cal. Apr.

6, 2015) (patent reciting method for routing user information using identification codes and a "provider component for broadcasting" and a "reception component for storing" did not meet the machine-or-transformation test). Claim 1 thus fails the machine-or-transformation test.

### c.    Claim 1 of the '346 Patent is Representative.

Claim 1 is representative of the other claims in the '346 Patent. While the Plaintiff has not yet specified which claims are allegedly infringed by the Defendants, the Court may still dismiss under Section 101 Plaintiff's cause of action for infringement of the '346 Patent because all the claims are "substantially similar, linked to the same general abstract ideas," and fail to add sufficiently "more" to render the claims patent-eligible. *Content Extraction*, 776 F.3d at 1347.

For example, independent claims 15 and 18 of the '346 Patent respectively implement the claimed invention as a computer program product on a computer-readable medium and an apparatus. This does not alter the Section 101 analysis or conclusion. *See CyberSource*, 654 F.3d at 1374 ("Regardless of what statutory category ('process, machine, manufacture, or composition of matter,' 35 U.S.C. § 101) a claim's language is crafted to literally invoke, we look to the underlying invention for patent-eligibility purposes."); *OpenTV*, 2015 WL 1535328, at *6 (dismissing system claims that were simply the patent-ineligible method claims implemented on a system for performing the method).

The dependent claims also add insufficient additional limitations to transform the abstract idea into patentable subject matter. Several of the dependent claims relate to data gathering steps.[5] The Federal Circuit has explained that these kind of activities do not make an otherwise

---

[5] *See* dependent claim 3 (sending a message to pull authentication information); dependent claim 4 (receiving message to push authentication information); dependent claims 5, 17, and 20 (sending a message and receiving a response; dependent claim 6 (employing a front channel information retrieval mechanism); dependent claim 7 (using http for the front channel information retrieval mechanism); dependent claim 8 (employing a back-channel information retrieval mechanism to obtain user attribute information); dependent claim 11 (retrieving user information from a fourth system by first system); dependent claim 13 (prompting user by the service provider to

non-statutory claim statutory. *CyberSource*, 654 F.3d at 1370. The remaining dependent claims of the '346 Patent specify conventional functions that fail to transform the corresponding claim into a patent-eligible application of the otherwise ineligible abstract idea.[6] *Content Extraction*, 776 F.3d at 1349. Accordingly, all the claims fall together under Section 101.

### 2.   The Claims of the '601 Patent Are Not Patent-Eligible.

The claims of the '601 Patent are directed to the abstract idea of keeping track of prior communications during a conversation between computers. Just as a human might do the same thing with pen and paper, the "invention" of the '601 Patent does nothing more than require that this familiar activity be implemented on generic computing devices. The '601 Patent has 68 claims, of which 6 are independent claims. Claim 1 is representative and states:

> A computerized method for preserving state information in a conversation between a client adapted to request services from one or more servers which are networked via a stateless protocol to the client, said services including one or more of data and programs which the client may request, wherein the conversation is a sequence of communications between the client and one or more servers for said services wherein each response from the server includes one or more continuations which enable another request for said services and wherein the client must invoke one of the continuations to continue the conversation, the method comprising the steps of:
>
> (a) the client initiating the conversation with the server using the stateless protocol;
>
> (b) detecting when the request for a service requires preservation of the state information;
>
> (c) performing said service and identifying all continuations in an output from said service, in response to said step of detecting;
>
> (d) recursively embedding the state information in all identified continuations; and communicating the output to the client, in response to said step of embedding;
>
> (e) wherein the state information is preserved and provided to all services for the duration of the conversation.

---

select an identifier); dependent claim 14 (sending request to fourth system to retrieve user attribute information); and dependent claims 17 and 20 (sending a message and receiving a response).
[6] *See* dependent claim 9 (using simple object access protocol in back channel information); dependent claim 10 (preforming preliminary and concluding user account creation); dependent claim 12 (first system supports identity provider, second system supports service provider); and dependent claims 2, 16, and 19 (creating an alias).

(D.I. 1, Ex. C ('601 Patent), claim 1.)

### a.  Claim 1 of the '601 Patent Is Directed to an Abstract Idea.

Once again, Plaintiff's allegations make clear that the claims attempt to monopolize an abstract idea—in this instance, keeping track of prior communications during a conversation between computers. Plaintiff's Complaint alleges that that the invention is directed to "preserving state information in Internet communications," with "state information" being described as "allow[ing] clients and servers to keep track of prior communications during a conversation." (*See* D.I. 1, ¶ 20.) A suggested application is "keep[ing] track of a client's product and service selections while the client is shopping and then us[ing] that information when the client decides to make a purchase." (*Id.*) Thus, the Complaint makes plain that the '601 Patent is not only directed to "an abstraction—an idea having no particular concrete or tangible form," but further to the type of abstract idea at issue in *Alice* that was "a fundamental economic practice long prevalent in our system of commerce." *Alice*, 134 S. Ct. at 2356.

The limitations of claim 1—initiating a conversation, detecting when responding requires keeping track of prior output, and including the output in all responses for the entire conversation—can be applied to any number of data exchange scenarios and is analogous to the steps in a great number of patent claims that have been recently recognized as directed to abstract concepts under Section 101. For example, in *Tuxis Techs., LLC v. Amazon.com, Inc.*, No. CV 13-1771-RGA, 2014 WL 4382446 (D. Del. Sept. 3, 2014) (hereinafter, "*Tuxis I*"), the challenged method included steps for: (1) establishing a communication via an electronic communication device; (2) obtaining primary transaction data; (3) generating an upsell offer; (4) obtaining a second data element relating to the user; (5) determining at least one item for a prospective upsell," and (6) offering the item to the customer and receiving an acceptance of the offer. *Tuxis*

*I*, 2014 WL 4382446, at \*2. The court agreed with the defendant's contention that the claim merely deconstructed the concept of upselling into "a series of constituent and inherent steps" and was therefore directed to an abstract idea. *See id*., at \*3.

The steps at issue in *Tuxis I* are analogous to the steps recited by claim 1 of the '601 Patent. Similar to steps for collecting information about a customer's *prior* purchase history, claim 1 of the '601 Patent is—according to the Complaint—directed to steps for keeping track of the items in a *current* purchase. (*See* D.I. 1, ¶ 20.) Claim 1 merely deconstructs that task into its constituent and inherent steps. Clearly, where the concept at the heart of the claim at issue in *Tuxis I*—"keep[ing] written or mental notes about a customer's purchase history"—was deemed "well understood, routine, conventional activity," *Tuxis II*, 2015 WL 1387815, at \*3 (internal quotations omitted), the same is true for the subsidiary concept of keeping track of the items comprising a customer's present order.

The Federal Circuit's decision in *Ultramercial*, 772 F.3d 709, is also instructive. There the challenged method included a litany of steps involved in showing an advertisement before delivering free content. *Id*. at 714–715.[7] Several steps implicitly and explicitly involved keeping track of prior communications between computers, including steps for determining the number of times an ad had been played, whether the consumer requested to view an advertisement, whether the consumer completed viewing the advertisement, and updating an activity log. *Id*. at 715. The Federal Circuit concluded that "the ordered combination of steps recited an abstraction." *Id*. It is clear that the same conclusion applies to the analogous steps of claim 1 of

---

[7] The Federal Circuit summarized the eleven steps as: (1) receiving copyrighted media from a content provider; (2) selecting an ad after consulting an activity log to determine whether the ad has been played less than a certain number of times; (3) offering the media for sale on the Internet; (4) restricting public access to the media; (5) offering the media to the customer in exchange for watching the selected ad; (6) receiving a request to view the ad from the consumer; (7) facilitating display of the ad; (8) allowing the consumer access to the media; (9) allowing the consumer access to the media fi the ad is interactive; (10) updating the activity log; and (11) receiving payment from the sponsor of the ad. *Id*. at 714-715.

the '601 Patent. Claim 1 does not, for example, specify the structure of the information or communications between the client and server or how the information is recursively embedded and preserved into "continuations."[8] Accordingly, the steps "describe an abstract idea, devoid of a concrete or tangible application." *Id*. at 715; *see also TriPlay*, Slip Op., p. 20 (holding claim abstract where steps did not specify the structure for messages to be delivered or how the message was to be delivered).

Once again, considering whether the claim could be performed by human beings in a non-computerized "brick and mortar" context confirms that the claims are directed to an abstract idea. *Intellectual Ventures I*, 2015 WL 1843528, at *9. Just as with the '346 Patent, we can imagine two humans, a customer and a merchant, playing the roles of client and server in the '601 Patent, as demonstrated in the following analogy:

| Step of '601 Claim 1 | Corresponding Routine Step Performed to Process Customer Order |
|---|---|
| the client **initiating the conversation with the server** using the **stateless protocol**; | A customer calls a merchant's place of business [**initiating conversation with a server**] using the telephone [a **stateless protocol**]. |
| **detecting** when the **request for a service requires preservation of the state information**; | The customer makes a request to purchase several goods [**request for a service**] and the merchant understands [**detects**] that the request requires saving information from the client [**preservation of state information**]. |
| **performing said service** and **identifying all continuations in an output** from said service, in response to said step of detecting; | The merchant initiates an order for the first item [**performing said service**] and asks the client if he wants any additional items, if that completes his order, or for shipping information [**identifying all continuations in an output**]. |
| **recursively embedding the state information** in all **identified continuations**; and | Each time the customer orders an additional item, asks to complete the order, or specifies shipping details [**identified continuations**], the merchant |

---

[8] The specification of the '601 Patent explains that continuations are simply any request that a client may send to a server: "A continuation is a new request which a client may send to a server. Whenever a client requests something from a server, the server may include one or more continuations in its response. The continuations could represent any valid requests. However, useful continuations are generally logically related to the original request." (D.I. 1, Ex. C ('601 Patent), 6:60-66.)

| Step of '601 Claim 1 | Corresponding Routine Step Performed to Process Customer Order |
|---|---|
| | writes it down **[recursively embedding the state information].** |
| **communicating the output** to the client, in response to said step of embedding; wherein the **state information is preserved** and **provided to all services** for the **duration of the conversation**. | The merchant communicates the details of the order to the customer **[communicating the output]** and has the information in writing available to use in all other requests to purchase items and for the duration of the call [**preserved** and **provided to all services for the duration of the conversation**]. |

Because the claim limitations simply lay out an interaction that can be and routinely is performed by humans, the claim is directed to patent-ineligible subject matter. *Intellectual Ventures I*, 2015 WL 1843528, at *9; *Walker Digital*, 2014 WL 4365245, at *6; *see also CyberSource*, 654 F.3d at 1373. Interjecting "conventional computer technology and the Internet" does not change the analysis or the result. *buySAFE*, 964 F. Supp. 2d at 336.

### b.    Claim 1 of the '601 Patent Contains No Inventive Concept.

Step two of the *Alice* analysis proceeds as described above. First, like the claims of the '346 Patent, the representative claim of the '601 Patent provides no further limiting disclosure regarding, for example, how the client "initiat[es] the conversation," "detect[s] when the request for a service requires preservation of the state information," or "identif[ies] all continuations in an output from a said service." The claims of the '601 Patent only recite using unspecified generic computer hardware. The patent defines a "client" as "a computer which issues commands to the server which performs the task associated with the command," and a "server" as "any computer that performs a task at the command of another computer . . . ." (D.I. 1, Ex. C ('601 Patent), 1:44–50.) The patent itself concedes the generality of these devices, noting that "[t]he client-server model constitutes one of the dominant paradigms in network programming." (*Id.* at 3:44–45.) Accordingly, the claim amounts to "nothing significantly more than an instruction to apply the abstract idea" of keeping track of prior communications during a

conversation between computers by "using some unspecified, generic" computer hardware. *See Alice*, 134 S. Ct. at 2360; *Dealertrack*, 674 F.3d at 1333–34. Thus claim 1 of the '601 Patent seeks to monopolize every concrete application of keeping track of prior communications during a conversation between computers, and allowing such a patent claim to survive "would tend to impede innovation rather than promote it, thereby thwarting the primary object of the patent laws." *Alice*, 134 S. Ct. at 2354 (internal quotations omitted).

Finally, the machine-or-transformation test confirms the patent ineligibility of claim 1 of the '601 Patent. The method of claim 1 describes the organization and exchange of intangible information; it does not "transform a particular article into a different state or thing." *Bilski*, 545 F.3d at 954; *see also CyberSource*, 654 F.3d at 1370. And as discussed above, "nowhere does the ['601 Patent] tie the claims at issue to a novel machine." *Ultramercial*, 772 F.3d at 717.

### c.    Claim 1 of the '601 Patent Is Representative.

Once again, despite the failure of the Complaint to specify which claims are asserted, the Court may dismiss Plaintiff's cause of action for infringement of the '601 Patent because all the claims are "substantially similar, linked to the same general abstract ideas," and fail to add sufficiently "more" to render the claims patent-eligible. *Content Extraction*, 776 F.3d at 1347.

For example, independent claims 14 and 60 implement the claimed invention as a program storage device readable by a computer, while independent claims 27 and 40 implement the claimed invention as a computer system. (D.I. 1, Ex. C ('601 Patent), claims 14, 27, 40, and 60.) Independent claim 51 rewords the limitations of claim 1 without materially altering its scope. (*See id.*, claim 51.) As before, these variations do not alter the Section 101 analysis or conclusion. *See CyberSource*, 654 F.3d at 1374.

The dependent claims also add insufficient additional limitations to transform the abstract idea into patentable subject matter. Several of the dependent claims recite insignificant data

storage and organization steps.[9] *Id.* at 1370. The remaining dependent claims of the '601 Patent recite generic Internet limitations,[10] which add no inventive concept to the claims. *See Ultramercial*, 772 F.3d at 716.

### 3.      The Claims of the '967 Patent Are Not Patent-Eligible.

The claims of the '967 Patent are directed to the abstract, non-patent-eligible ideas of local storage of information and resources at a user's computer and presenting a partitioned display. The '967 Patent has 17 claims, of which 16 claims depend from independent claim 1, a method claim. claim 1 recites:

> A method for presenting interactive applications on a computer network, the network including a multiplicity of user reception systems at which respective users may request a multiplicity of available applications, the respective reception systems including a monitor at which the applications requested can be presented as one or more screens of display, the method comprising the steps of:
>
> (a)  generating a screen display at a respective reception system for a requested application, the screen display being generated by the respective reception system from data objects having a prescribed data structure, at least some of which objects may be stored at the respective reception system, the screen display including a plurality of partitions, the partitions being constructed from objects, the objects being retrieved from the objects stored at the respective reception system, or if unavailable from the objects stored at the respective reception system, then from the network, such that at least some of the objects may be used in more than one application;
>
> (b)  generating at least a first partition for presenting applications; and
>
> (c)  generating concurrently with the first partition at least a second partition for presenting a plurality of command functions, the command functions including at least a first group which are selectable to permit movement between applications.

(D.I. 1, Ex. A ('967 Patent), claim 1.)

---

[9] *See* dependent claims 2, 15, 28, 41, 52, and 61 (using a server to embed information), dependent claims 3, 16, 29, 42, 53, and 62 (storing information on a server), dependent claims 4, 17, 30, 43, 54, and 63 (downloading information to the client), dependent claims 5, 18, 31, 44, 55, and 64 (storing information at the client), and dependent claims 6, 7, 19, 20, 32, 33, 45, 56, and 65 (organizing information).

[10] *See* dependent claims 8–13, 21–26. 34–39, 46–50, 57–59, and 66–68 (claiming use of the World Wide Web, http, and hyperlinks).

### a.     Claim 1 of the '967 Patent Is Directed to an Abstract Idea.

The stated aim of the '967 Patent is to apply an abstraction—local storage of information—to computer files, particularly for use in implementing another generic idea: generating a partitioned display. According to the Complaint, the benefit of storing data and program code and allowing local processing was to make the Prodigy system more efficient than conventional systems:

> By harnessing the processing and storage capabilities of the user's PC, applications could then be composed on the fly from objects stored locally on the PC, reducing reliance on Prodigy's server and network resources.

(D.I. 1, ¶ 18.) Thus, the abstract idea of local storage is applied by the '967 Patent as a method for generating a partitioned display to a user.

Humans have applied the concept of local storage and performed this type of method in a variety of contexts. For example, someone may create a copy of a document that is also stored in a file room so as to avoid having to visit the file room each time she needs to use the document. The Complaint describes how Plaintiff took the abstract idea and applied it to the networked computer context. (*See id*.) Even when applied to the networked computer context, however, the concept still recites an abstraction—an idea having no particular concrete or tangible form.

The same data storage, transmission, and display concepts at the heart of the claims appeared in several other patent claims that have recently been held directed to abstract ideas under Section 101. Simply disclosing storage, organization, and/or transmission of information, even in facilitating a display on a computer screen, is not patent-eligible. *See, e.g.*, *Ultramercial*, 772 F.3d at 712, 715 (holding that claim reciting step of "facilitating the display of a sponsor message to the consumer" was directed to patent-ineligible abstract idea); *Advanced Auctions v. eBay, Inc.*, No. 13-cv-1612, 2015 WL 1415265, at *1, *3-4 (S.D. Cal. Mar. 27, 2015) (holding that claim reciting step of "using a computer to produce information representing a webpage

indicative of an electronic auction" was directed to a patent-ineligible abstract idea); *Hewlett Packard Co. v. ServiceNow, Inc.*, No. 14-CV-00570-BLF, 2015 WL 1133244, at *1–2, *5 (N.D. Cal. Mar. 10, 2015) (holding that claim reciting step of "display instructions for displaying, on a display device . . . a graphical display populated with representations of service tickets" was directed to a patent-ineligible abstract idea).

Claim 1 of the '967 Patent is analogous to the patent claims that the Patent and Trademark Board ("PTAB") recently found were directed to a patent-ineligible abstract idea in *Bank of America v. Intellectual Ventures I, LLC*, CMB2014-00030, Paper No. 32 (P.T.A.B. Apr. 24, 2015) (Attached as Exhibit 1). The relevant claims were directed to providing and generating web pages. For instance, claim 7 disclosed a method for providing a web page including: (1) generating a plurality of data streams each associated with a particular portion of the web page, and (2) changing at least one particular portion of the web page as a function of time. (*Id.* at 4–5.) Relying particularly on the lack of concrete or tangible details regarding how the screen displays were generated, the PTAB held the claims were directed to an abstract idea—specifically, tailoring a web page based on user data. (*See id.* at 9-10.)

The same analysis and conclusion necessarily applies here to claim 1 of the '967 Patent, which also relates to generating screen displays in discrete portions. As in *Bank of America*, the claim limitations do not provide details regarding how, for example, the claimed data objects generate the display, the underlying structure of the objects (apart from the tautology that they have a prescribed structure), or the way the displays are generated concurrently. Accordingly, the steps "describe an abstract idea, devoid of a concrete or tangible application." *Ultramercial*, 772 F.3d at 715; *see also TriPlay*, Slip Op., p. 20 (holding claim abstract where steps had no concrete

form and did not specify the structure for messages to be delivered or how the message was to be delivered).

That claim 1 is arguably directed to a plurality of abstract ideas (local storage of data objects at a computer combined with presenting a partitioned display) does not change the outcome of the analysis. As one court has recently explained, "merely combining two or three abstract ideas [does not] bring a patent within the scope of Section 101." *See Shortridge v. Payroll4Construction.com*, No. 3-14-cv-04850, 2015 WL 1739256, at *11 (N.D. Cal. Apr. 14, 2015) (citing *Content Extraction*, 776 F.3d at 1347).

### b. Claim 1 of the '967 Patent Does Not Contain an Inventive Concept.

Moving to the second step of the *Alice* analysis, the limitations of representative claim 1 do not add an inventive concept to the abstract idea to render it patent-eligible. As discussed above, the claim does not disclose any specific hardware. The specification concedes that "[i]nteractive computer networks are not new" (D.I. 1, Exhibit A, ('967 patent), 1:36) and explains that the recited reception systems of the claims may be "a conventional personal computer . . . which has been provided with application software" (*id.* at 4:63–65). As discussed above, patent claims directed to storage, organization, and transmission of data using a generic computer have repeatedly been held to have no inventive concept. *See, e.g., Alice*, 134 S. Ct. at 2358; *Ultramercial*, 772 F.3d at 716.

With respect to the claimed generating of a display, this district has recently held that "displaying an image" over a network, such as the Internet, is "a basic computer function that adds nothing of practical significance" to an otherwise abstract idea for the purposes of Section 101. *See Tuxis II*, 2015 WL 1387815, at *4 (holding method directed at upselling over the Internet was not sufficiently limited by requiring display of an image of the item over the

Internet) (internal citation and quotation omitted). Claim 1 of the '967 Patent presents no basis to deviate from this ruling as the claim provides no details on the claimed data objects and their prescribed structure, i.e., there is no disclosure of a particular way of storing or constructing objects. *See TriPlay*, Slip Op., p. 31 (finding no inventive concept where claim did not contain specific functionality by for example limiting itself to any specific way of converting a message from one layout to another).

Instead of reciting a specific way to use locally stored data on a computer to generate a partitioned display, claim 1 instead improperly attempts to preempt nearly every application of the idea. Avoiding this type of monopolization, which would tie up abstract ideas and inhibit their use in making further discoveries, drives the exclusion of abstract ideas from patent-eligible subject matter. *See Alice*, 134 S. Ct. at 2354.

Application of the machine-or-transformation test once again confirms the conclusion that the claim is patent-ineligible. The method of claim 1 of the '967 Patent generally describes the organization and exchange of intangible information; it does not "transform a particular article into a different state or thing." *Bilski*, 545 F.3d at 954; *see also CyberSource*, 654 F.3d at 1370. Further, just as with the exchange of information on the Internet using general purpose computers at issue in *Ultramercial*, "nowhere does the ['967 Patent] tie the claims at issue to a novel machine." *Ultramercial*, 772 F.3d at 717; *see also OpenTV*, 2015 WL 1535328, at *5.

**c.**     **Claim 1 of the '967 Patent Is Representative.**

Claim 1 is representative of the 17 claims of the '967 Patent. The additional limitations in dependent claims 2–17 are repetitive and add nothing inventive to meaningfully limit the scope of claim 1. For example, several of the dependent claims recite "well-understood, routine,

conventional" computer-related elements,[11] which add nothing to the claims' eligibility. *Mayo*, 132 S. Ct. at 1298. The remaining dependent claims merely claim routine steps of storing, transferring, and displaying information over a computer network performed by a generic computer[12] or conventional steps related to switching between applications.[13] The "application switching" elements are analogous to the "electronic recordkeeping" claims held to be invalid in *Alice* in that each are "the most basic functions of a computer." *Alice*, 134 S. Ct. at 2359. As explained above, these types of limitations directed to the use of a generic computer do nothing to create patent-eligible subject matter. *See id.* at 2358.

### 4.    The Claims of the '849 Patent Are Not Patent-Eligible.

Like the '967 Patent, the claims of the '849 Patent are directed to the abstract ideas of using local storage of information and resources at a computer and presenting a partitioned display. In addition, the '849 Patent is also directed to the abstract idea of presenting a user with targeted advertising that is stored on the user's computer. The specification for the '849 Patent is substantially identical to that of the '967 Patent.

The '849 Patent has 21 method claims, of which Claims 1, 8, 13, 14, and 21 are independent claims. Claims 1 and 8 are representative. Claim 1 is directed to the concept of partitioned displays used to present advertising and recites:

> A method for presenting advertising obtained from a computer network, the network including a multiplicity of user reception systems at which respective users can request applications, from the network, that include interactive services, the respective reception systems including a monitor at which at least the visual portion of the applications can be presented as one or more screens of display, the method comprising the steps of:

---

[11] *See* dependent claim 2 (claiming "a header and one or more command structures"), and dependent claims 12 and 14–17 (generating partitions and displaying information in those partitions).

[12] *See* dependent claims 3, 4, 10, 11, and 13 (claiming "objects are stored at the respective reception systems in accordance with a predetermined plan").

[13] *See* dependent claims 2–11 (claiming functions allowing movement between applications).

      (a) structuring applications so that they may be presented, through the network, at a first portion of one or more screens of display; and

      (b) structuring advertising in a manner compatible to that of the applications so that it may be presented, through the network, at a second portion of one or more screens of display concurrently with applications, wherein structuring the advertising includes configuring the advertising as objects that include advertising data and;

      (c) selectively storing advertising objects at a store established at the reception system.

(D.I. 1, Ex. B ('849 Patent), claim 1.)

      Claim 8, which is directed to the idea of presenting targeted advertising to a user, recites:

      A method for presenting advertising in a computer network, the network including a multiplicity of user reception systems at which respective users can request applications that include interactive services, the method comprising the steps of:

      (a) compiling data concerning the respective users;

      (b) establishing characterizations for respective users based on the compiled data; and

      (c) structuring advertising so that it may be selectively supplied to and retrieved at the reception systems for presentation to the respective users in accordance with the characterizations established for the respective reception system users, wherein structuring advertising includes supplying advertising data to the reception system and storing a predetermined amount of the advertising data in a store established at the respective reception systems.

(D.I. 1, Ex. B ('849 Patent), claim 8.)

## a. Claims 1 and 8 of the '849 Patent Are Directed to Abstract Ideas.

As with the '967 Patent, the same portion of the Complaint makes clear that the '849 Patent, as represented by claim 1, is directed to the abstract idea of using local storage of information and resources and applying it to computer files, particularly for use in implementing another generic idea: generating a partitioned display. (*See* D.I. 1, ¶ 18.) In addition, claim 8 represents another focus of the '849 Patent: the concept of presenting a user with targeted advertising that is locally stored at the user's computer.

- 26 -

Claim 1 of the '849 Patent is bereft of any concrete or tangible application of the abstract idea. The claim recites steps phrased as results, for example, "structuring applications so that they may be presented . . . at a first portion of one or more screens of display," and "configuring the advertising as objects that include advertising data." Claim 8 is just as sparse, with steps such as "compiling data concerning the respective users," and "establishing characterizations for respective users." These steps describe nothing more than an abstraction, "devoid of a concrete or tangible application." *Ultramercial*, 772 F.3d at 715; *see also TriPlay*, Slip Op., p. 20.

As discussed above with respect to the sibling '967 Patent, a computer-implemented method of local storage as applied to files and applications and using the computer objects to present a display to a user do not transform the abstract concept into something concrete or otherwise patentable.[14] Adding that the local storage is of advertising that has been selected specifically for the user does not change the analysis or conclusion. *See Morsa v. Facebook, Inc.,* No. 14-cv-161, 2014 WL 7641155, at *9 (C.D. Cal. Dec. 23, 2014) (holding that claim reciting steps for targeting customers based on demographics or geographic criteria was directed to a patent-ineligible abstract idea).

### b.  Claims 1 and 8 of the '849 Patent Do Not Include an Inventive Concept.

As with the '967 Patent, none of the limitations of the '849 Patent claims supply an inventive concept beyond the abstract ideas. Claims 1 and 8 of the '849 Patent do not go beyond reciting a general instruction to configure advertising as a computer object and to store it on a

---

[14]*See, e.g.*, *Ultramercial*, 772 F.3d at 715 (holding that claim reciting the step of facilitating the display of a sponsor message to the consumer" was directed to a patent-ineligible abstract idea); *Advanced Auctions*, 2015 WL 1415265, at *1, *3-4 (holding that claim reciting the step of "using a computer to produce information representing a webpage indicative of an electronic auction" was directed to a patent-ineligible abstract idea); *Hewlett Packard*, 2015 WL 1133244, at *1-2, *5 (holding that claim reciting the step of "display instructions for displaying, on a display device . . . a graphical display populated with representations of service tickets" was directed to a patent-ineligible abstract idea); *Bank of America*, CMB2014-00030, Paper No. 32, at *9 (holding that claim reciting step of "generating a plurality of data streams . . . associated with a particular portion of the web page" was directed to a patent-ineligible abstract idea).

computer and to generate a display using data objects. As with the substantially similar specification for the '967 Patent, the '849 Patent teaches use of "a conventional personal computer . . . which has been provided with application software to constitute a reception system." (D.I. 1, Exhibit B ('849 Patent), 4:64–67.) Such reference to "unspecified, generic" computer hardware is nothing more than an instruction to apply the abstract idea. *Alice*, 134 S. Ct. at 2360.

With respect to the limitations directed to targeting advertising, the specification explains the lack of novelty in the approach, stating that "conventional marketing analysis techniques can be employed to establish the user characterizations" recited in claim 8. (D.I. 1, Exhibit B ('849 Patent), 10:24–27.)

Further, with respect to the limitation that the user be able to simultaneously view content and advertisements, this too adds no particularity to the generic concept and does not render the claim valid. Patent claims directed to methods for presenting advertising alongside other content were recently invalidated under Section 101 for failure to add a sufficient inventive concept to the abstract idea of allowing online purchases during a game. *See Gametek LLC v. Zynga, Inc.,* No. CV-13-2546 RS, 2014 WL 1665090, at *6–7 (N.D. Cal. Apr. 25, 2014) (invalidating patent directed to presenting objects for sale during a video game without interrupting game play), *aff'd* No. 2014-1620, 2015 WL 1187562 (Fed. Cir. Mar. 17, 2015). As in *Gametek*, claims 1 and 8 cannot be saved by mere reference to a general purpose computer or a computer network for presenting a display where there is no description of a special purpose machine "being part of the solution, being integral to the performance of the method, or containing improvements in computer technology." *See id.* at 6 (internal quotation and citation omitted).

Again, the claims evoke serious concerns regarding preemption of the abstract ideas of

using local storage of information and resources on a computer to present a partitioned display and presenting a user with targeted advertising that is locally stored on the user's computer, because instead of reciting a specific way to accomplish these concepts, claims 1 and 8 instead improperly attempt to preempt nearly every application of these ideas. As noted above, the patent laws do not allow this result. *See Alice*, 134 S. Ct. at 2354.

Finally, application of the machine-or-transformation test also confirms the conclusion that the '849 Patent claims lack an inventive concept. The method claims of the '849 Patent generally describe the organization and exchange of intangible information; they do not "transform a particular article into a different state or thing." *Bilski*, 545 F.3d at 954; *see also CyberSource*, 654 F.3d at 1370. Further, just as with the exchange of information on the Internet using general purpose computers at issue in *Ultramercial*, "nowhere does the ['849 Patent] tie the claims at issue to a novel machine." *Ultramercial*, 772 F.3d at 717; *see also OpenTV*, 2015 WL 1535328, at *5.

### c.   Claims 1 and 8 of the '849 Patent Are Representative.

Claims 1 and 8 are representative of the 21 claims of the '849 Patent. All the claims are "substantially similar, linked to the same general abstract ideas," and fail to add sufficiently "more" to render the claims patent-eligible. *Content Extraction*, 776 F.3d at 1347.

For example, independent claims 13 and 14 recite the same method claimed in claim 1 with insignificant changes in wording.[15] Independent claim 21 similarly recites the same method in claim 8 with immaterial changes.[16]

---

[15] Independent claim 13 describes the method as "presenting advertising *in* a computer network," whereas claim 1 reads "presenting advertising *obtained* from a computer network." Element b of claim 1 is separated into two elements, b and c, in claim 13—a change that does not alter the substance of claim 13. Independent claim 14 similarly recites the method of claim 1 while merely using the phrase "user requested application" instead of "application." As with claim 13, claim 14 breaks down element b of claim 1 into two elements.

[16] Claim 21 substitutes "obtained from a computer network" with "in a computer network." Additionally, claim 21 splits element c of claim 8 into two elements.

The dependent claims of the '849 Patent add nothing sufficient to "transform the claimed abstract idea into a patent-eligible application." *Alice*, 134 S. Ct. at 2357 (internal quotation omitted). For example, several of the dependent claims recite data transfer steps wherein a data store is periodically replenished.[17] This is analogous to the data transmission claims held invalid in *Cyberfone Sys. v. CNN Interactive Grp., Inc.*, 558 F. App'x 988, 993 (Fed. Cir. 2014) (unpublished). The remaining dependent claims specify which category of user data is collected so that it may be used in targeted advertising,[18] which adds nothing inventive to the independent claims. *See Morsa*, 2014 WL 7641155, at *9 (invalidating under Section 101 patent claims directed to targeting customers based on demographics or geographic criteria, and similarly dismissing claims directed to data gathering).

## V.   CONCLUSION

For the reasons set forth above, the claims of all of the Asserted Patents are directed to patent-ineligible subject matter under Section 101. Accordingly, Defendants' Motion to Dismiss should be granted.

---

[17] *See* dependent claims 2, 9–12, 15, and 22–25 (claiming "replenishing the store of advertising objects from the network when the store . . . falls below a predetermined level").

[18] *See* dependent claims 3 and 16 (storing data based on user characterizations), dependent claims 4 and 17 (applications requested by the user), dependent claims 5 and 18 (user's demographics), dependent claims 6 and 19 (user's geographic location), and dependent claims 7 and 20 (the applications requested and demographics).

Dated:  May 4, 2015

*/s/ Francis DiGiovanni*
Francis DiGiovanni (#3189)
Thatcher A. Rahmeier (#5222)
DRINKER BIDDLE & REATH LLP
222 Delaware Avenue, Suite 1410
Wilmington, DE 19801
Telephone: (302) 467-4200
francis.digiovanni@dbr.com
thatcher.rahmeier@dbr.com

Dan D. Davison
NORTON ROSE FULBRIGHT US LLP
2200 Ross Ave., Suite 3600
Dallas, TX 75201
Tel: 214.855.8000
Fax: 214.855.8200
dan.davison@nortonrosefulbright.com

Richard S. Zembek
NORTON ROSE FULBRIGHT US LLP
Fulbright Tower
1301 McKinney, Suite 5100
Houston, TX 77010
Tel: 713.651.5283
Fax: 713.651.5246
richard.zembek@nortonrosefulbright.com

Gilbert A. Greene
NORTON ROSE FULBRIGHT US LLP
98 San Jacinto Boulevard, Suite 1100
Austin, TX 78701
Tel: 512.474.5201
Fax: 512.536.4598
bert.greene@nortonrosefulbright.com

*Attorneys for Defendants The Priceline*
*Group Inc., Priceline.com LLC, KAYAK*
*Software Corporation, and OpenTable, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on May 4, 2015, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to all registered participants.

*/s/ Francis DiGiovanni*
Francis DiGiovanni
