## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| INTERNATIONAL BUSINESS MACHINES CORPORATION, | § § § | |
| Plaintiff, | § § | |
| v. | § § | Civil Action No. 1:15-cv-00137-LPS |
| THE PRICELINE GROUP INC., KAYAK SOFTWARE CORPORATION, OPENTABLE, INC., AND PRICELINE.COM LLC, | § § § § § | **JURY TRIAL DEMANDED** |
| Defendants. | § | |

### THE PRICELINE GROUP'S FIRST AMENDED ANSWER TO COMPLAINT FOR PATENT INFRINGEMENT AND FIRST AMENDED COUNTERCLAIMS

The Priceline Group[1] files its First Amended Answer to Plaintiff International Business Machines Corporation's ("IBM") Original Complaint for Patent Infringement (D.I. No. 1) ("Complaint") and for the same would show the Court, together with its Amended Counterclaims, as follows:

### I.
### FIRST AMENDED ANSWER

To the extent that the various headings in IBM's Complaint are intended to constitute allegations, The Priceline Group denies them.

---

[1] Until April 1, 2014, The Priceline Group Inc. was known as priceline.com Incorporated.  On April 1, 2014, priceline.com LLC assumed the former operations of priceline.com Incorporated as they relate to the website www.priceline.com and related mobile apps, and The Priceline Group Inc. became the sole member of priceline.com LLC.  As The Priceline Group is used herein, it refers only to The Priceline Group Inc. and not Priceline.com LLC.

## INTRODUCTION

1.      The Priceline Group denies the allegations of Paragraph 1 of the Complaint as they pertain to The Priceline Group.   The third and fourth sentences of Paragraph 1 of the Complaint contain legal conclusions to which no response is required.   To the extent a response is deemed required, The Priceline Group denies the allegations in the third and fourth sentences of Paragraph 1 of the Complaint as they pertain to The Priceline Group.   The Priceline Group is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 1 of the Complaint, and therefore denies the allegations.

## NATURE OF THE CASE

2.      The Priceline Group admits that this action purports to be an action for patent infringement arising under 35 U.S.C. § 271.   The Priceline Group denies that it has infringed United States Patent Nos. 5,796,967 (the "'967 Patent"), 5,961,601 (the "'601 Patent"), 7,072,849 (the "'849 Patent"), and 7,631,346 (the "'346 Patent") (collectively the "Patents-In-Suit").

## THE PARTIES

3.      The Priceline Group is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 3 of the Complaint, and therefore denies the allegations.

4.      The Priceline Group denies that it provides online travel and related services to consumers and local partners.   The Priceline Group admits the remaining allegations of Paragraph 4 of the Complaint.

5.      Upon information and belief, the Priceline Group admits the allegations of Paragraph 5 of the Complaint.

6.      Upon information and belief, the Priceline Group admits the allegations of Paragraph 6 of the Complaint.

7.      Upon information and belief, the Priceline Group denies that OpenTable may be served through Corporation Service Company.  Upon information and belief, the Priceline Group denies that OpenTable's registered agent for service is Corporation Service Company at 2711 Centerville Rd Suite 400, Wilmington, Delaware 19808.  Upon information and belief, the Priceline Group admits the remaining allegations of Paragraph 7 of the Complaint.

## JURISDICTION AND VENUE

8.      The Priceline Group admits that this action purports to arise under the patent laws of the United States, Title 35, United States Code.  The Priceline Group admits that jurisdiction of this Court over the purported subject matter of this action is proper under 28 U.S.C. §§ 1331 and 1338(a).

9.      Solely for purposes of this case, The Priceline Group does not contest that venue is proper within this judicial district, but The Priceline Group denies that this district is the most convenient forum for IBM's action.

10.     Solely for purposes of this case, The Priceline Group does not contest that this Court has personal jurisdiction.  The Priceline Group admits that it is organized under the laws of the state of Delaware, and conducts business in Delaware through websites that are accessible in Delaware.   The Priceline Group denies the remaining allegations in Paragraph 10 of the

Complaint as they pertain to The Priceline Group.  The last sentence of Paragraph 10 of the Complaint contains a legal conclusion to which no response is required.  The Priceline Group is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 10 of the Complaint, and therefore denies the allegations.

### FACTUAL BACKGROUND

**A.    IBM's Alleged Recognition**

11.    The Priceline Group is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 11 of the Complaint, and therefore denies the allegations.

12.    The Priceline Group is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 12 of the Complaint, and therefore denies the allegations.

**B.    IBM's Alleged Use of The Patent System**

13.    The Priceline Group is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 13 of the Complaint, and therefore denies the allegations.

14.    The Priceline Group is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 14 of the Complaint, and therefore denies the allegations.

**C.      IBM's Alleged Licensing**

15.      The Priceline Group is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 15 of the Complaint, and therefore denies the allegations.

16.      The Priceline Group is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 16 of the Complaint, and therefore denies the allegations.

**D.      IBM's Allegation That It Invented Methods for Presenting Applications and Advertisements in an Interactive Service While Developing the PRODIGY Online Service.**

17.      The Priceline Group is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 17 of the Complaint, and therefore denies the allegations.

18.      The Priceline Group denies that the named inventors of the '967 Patent and the '849 Patent developed novel methods for presenting applications and advertisements in an interactive service.  The Priceline Group is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 18 of the Complaint, and therefore denies the allegations.

19.      The Priceline Group denies the last sentence of Paragraph 19 of the Complaint. The Priceline Group is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 19 of the Complaint, and therefore denies the allegations.

E. **IBM's Allegation That It Invented Methods of Preserving State Information in a Continuing Conversation Between a Client and Server Networked Via a Stateless Protocol**

20. The Priceline Group is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 20 of the Complaint, and therefore denies the allegations.

21. The Priceline Group denies that Arun K. Iyengar developed novel methods of recursively embedding state information into communications between clients and servers. The Priceline Group is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 21 of the Complaint, and therefore denies the allegations.

F. **IBM's Allegation That It Invented Methods for a Runtime User Account Creation Operation Using a Single-Sign-On Process in a Federated Computer Environment**

22. The Priceline Group is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 22 of the Complaint, and therefore denies the allegations.

23. The Priceline Group denies that the named inventors of the '346 Patent developed novel methods for systems interacting within a federated computing environment to trigger a single-sign-on operation on behalf of a user that would obtain access to a protected resource and create an account for the user. The Priceline Group is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 23 of the Complaint, and therefore denies the allegations.

**G.     IBM's Allegations Against Defendants**

24.     The Priceline Group admits it is a well-known company that has grown.  The Priceline Group admits that it is a Fortune 500 company with billions of dollars of revenue per year.  The Priceline Group denies the remaining allegations in Paragraph 24 of the Complaint as they pertain to The Priceline Group.  The Priceline Group is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 24 of the Complaint, and therefore denies the allegations.

25.     The Priceline Group denies the allegations of Paragraph 25 of the Complaint as they pertain to The Priceline Group.  The Priceline Group is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 25 of the Complaint, and therefore denies the allegations.

26.     The Priceline Group admits that IBM sent a letter to inform Priceline.com Incorporated that it was allegedly infringing the '967, '849, and '601 patents on October 13, 2011.  The Priceline Group admits that IBM has alleged Priceline.com LLC infringes the '346 patent.  The Priceline Group admits that IBM representatives have two made trips to Priceline's facilities.   The Priceline Group denies the remaining allegations of Paragraph 26 of the Complaint as they pertain to The Priceline Group.  The Priceline Group is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 26 of the Complaint, and therefore denies the allegations.

27.     The Priceline Group denies the allegations of Paragraph 27 of the Complaint as they pertain to The Priceline Group.  The Priceline Group is without knowledge or information

sufficient to form a belief as to the truth of the remaining allegations of Paragraph 27 of the Complaint, and therefore denies the allegations.

28.     The Priceline Group admits that IBM purports to seek royalties on The Priceline Group's revenue.  The Priceline Group denies the remaining allegations of Paragraph 28 of the Complaint as they pertain to The Priceline Group.  The Priceline Group is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 28 of the Complaint, and therefore denies the allegations.

## COUNT ONE
### INFRINGEMENT OF THE '967 PATENT

29.     The Priceline Group admits that the '967 Patent shows August 18, 1998 as its issue date and lists IBM as the assignee.  The Priceline Group admits that what purports to be a copy of the '967 Patent is attached to the Complaint as Exhibit A.  The Priceline Group denies that the '967 Patent duly and properly issued.  The Priceline Group is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 29 of the Complaint, and therefore denies the allegations.

30.     The Priceline Group denies the allegations of Paragraph 30 of the Complaint.

31.     The Priceline Group denies the allegations of Paragraph 31 of the Complaint.

32.     The Priceline Group denies the allegations of Paragraph 32 of the Complaint.

33.     The Priceline Group denies the allegations of Paragraph 33 of the Complaint.

## COUNT TWO
### INFRINGEMENT OF THE '849 PATENT

34.     The Priceline Group admits that the '849 Patent shows July 4, 2006 as its issue date and lists IBM as the assignee.  The Priceline Group admits that what purports to be a copy of the '849 Patent is attached to the Complaint as Exhibit B.  The Priceline Group denies that the '849 Patent duly and properly issued.  The Priceline Group is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 34 of the Complaint, and therefore denies the allegations.

35.     The Priceline Group denies the allegations of Paragraph 35 of the Complaint.

36.     The Priceline Group denies the allegations of Paragraph 36 of the Complaint.

37.     The Priceline Group denies the allegations of Paragraph 37 of the Complaint.

38.     The Priceline Group denies the allegations of Paragraph 38 of the Complaint.

## COUNT THREE
### INFRINGEMENT OF THE '601 PATENT

39.     The Priceline Group admits that the '601 Patent shows October 5, 1999 as its issue date and lists IBM as the assignee.  The Priceline Group admits that what purports to be a copy of the '601 Patent is attached to the Complaint as Exhibit C.  The Priceline Group denies that the '601 Patent duly and properly issued.  The Priceline Group is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 39 of the Complaint, and therefore denies the allegations.

40.     The Priceline Group denies the allegations of Paragraph 40 of the Complaint.

41.     The Priceline Group denies the allegations of Paragraph 41 of the Complaint.

42.     The Priceline Group denies the allegations of Paragraph 42 of the Complaint.

43.     The Priceline Group denies the allegations of Paragraph 43 of the Complaint.

## COUNT FOUR
### INFRINGEMENT OF THE '346 PATENT

44.     The Priceline Group admits that the '346 Patent shows December 8, 2009 as its issue date and lists IBM as the assignee.  The Priceline Group admits that what purports to be a copy of the '346 Patent is attached to the Complaint as Exhibit D.  The Priceline Group denies that the '346 Patent duly and properly issued.  The Priceline Group is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 44 of the Complaint, and therefore denies the allegations.

45.     The Priceline Group denies the allegations of Paragraph 45 of the Complaint.

46.     The Priceline Group denies the allegations of Paragraph 46 of the Complaint.

47.     The Priceline Group denies the allegations of Paragraph 47 of the Complaint.

48.     The Priceline Group denies the allegations of Paragraph 48 of the Complaint.

### DEMAND FOR RELIEF

49.     The Priceline Group denies that IBM is entitled to any of the relief requested in the Complaint.

### JURY DEMAND

50.     The Priceline Group admits that IBM has requested a trial by jury.

51.    To the extent not expressly admitted above, The Priceline Group denies the factual allegations contained in the Complaint.

## II.
## AFFIRMATIVE DEFENSES

Without admitting or acknowledging that The Priceline Group bears the burden of proof as to any of the following affirmative defenses, The Priceline Group asserts the following defenses.

### FIRST AFFIRMATIVE DEFENSE
### (NONINFRINGEMENT)

52.    The Priceline Group does not infringe and has not infringed, either literally or under the doctrine of equivalents, any claims of the Patents-In-Suit; therefore, The Priceline Group is not liable for any infringement thereof.

### SECOND AFFIRMATIVE DEFENSE
### (INVALIDITY)

53.    The claims of the Patents-In-Suit are invalid because they fail to satisfy one or more requirements of patentability under Title 35 of the UNITED STATES CODE, including, without limitation, 35 U.S.C. §§ 101, 102, 103, and/or one or more paragraphs of § 112.

### THIRD AFFIRMATIVE DEFENSE
### (PROSECUTION HISTORY ESTOPPEL AND DISCLAIMER)

54.    IBM is estopped by the doctrines of prosecution history estoppel and prosecution disclaimer from construing any valid claim of the Patents-In-Suit to be infringed literally or under the Doctrine of Equivalents due to admissions and/or statements made (a) to the U.S. Patent and Trademark Office during prosecution related to the Patents-In-Suit and/or (b) in the specification and claims of the Patents-In-Suit.

## FOURTH AFFIRMATIVE DEFENSE
### (MARKING)

55.     To the extent that IBM, any former assignee, or any of IBM's licensees failed to properly mark any of its relevant products as required by 35 U.S.C. § 287 or otherwise give proper notice that The Priceline Group's actions allegedly infringed any claim of the Patents-In-Suit, The Priceline Group is not liable to IBM for the acts alleged to have been performed before The Priceline Group received notice that it was allegedly infringing the Patents-In-Suit.

## FIFTH AFFIRMATIVE DEFENSE
### (STATUTE OF LIMITATIONS)

56.     IBM's claims for relief are barred, at least in part, by 35 U.S.C. § 286.

## SIXTH AFFIRMATIVE DEFENSE
### (LACHES)

57.     IBM's claims for relief are barred, in whole or in part, by the doctrine of laches.

## SEVENTH AFFIRMATIVE DEFENSE
### (NO IRREPARABLE HARM)

58.     IBM is not entitled to any injunctive relief because any injury to IBM is neither immediate nor irreparable, and IBM has adequate remedies at law.

## EIGHTH AFFIRMATIVE DEFENSE
### (SINGLE RECOVERY)

59.     IBM's claims against The Priceline Group are barred, in part or in whole, by the doctrines of full compensation, exhaustion, implied license, and/or first sale.  IBM has an adequate remedy at law and is not entitled to double recovery.

## NINTH AFFIRMATIVE DEFENSE
### (LICENSE)

60.     IBM's claims against The Priceline Group are barred because The Priceline Group and the accused products and conduct are licensed by IBM under prior licenses and agreements to which IBM is a party.

## TENTH AFFIRMATIVE DEFENSE
### (COVENANT NOT TO SUE)

61.     IBM's claims of infringement of the Patents-In-Suit are barred, in whole and/or in part, because IBM has covenanted not to sue licensees and bring suits based on licensees' products in prior licenses and agreements to which IBM is a party.  This covenant extends to and includes any claim for the alleged infringement of the Patents-In-Suit by the Accused Products.

## ELEVENTH AFFIRMATIVE DEFENSE
### (RELEASE)

62.     IBM's claims of infringement of the Patents-In-Suit are barred, in whole and/or in part, by the release granted to licensees and their products by IBM in prior licenses and agreements to which IBM is a party.  This release extends to and includes the Accused Products and bars any claim for the alleged infringement of the Patents-In-Suit by the Accused Products.

## TWELFTH AFFIRMATIVE DEFENSE
### (FAILURE TO STATE A CLAIM)

63.     The Complaint fails to plead a plausible claim upon which relief may be granted and/or fails to plead factual allegations with the sufficiency and particularity required to state a plausible claim.

**THIRTEENTH AFFIRMATIVE DEFENSE**
**(NO COSTS)**

64.     IBM failed to disclaim the claims of the Patents-In-Suit that are invalid before commencement of suit and therefore may recover no costs.

**FOURTEENTH AFFIRMATIVE DEFENSE**
**(INEQUITABLE CONDUCT)**

65.     On information and belief, the '967 and '849 Patents are unenforceable based on the inequitable conduct and repeated breaches of the duty of candor by those with a duty of candor in connection with the prosecution of at least the applications that resulted in such patents and related applications.

66.     The supporting facts of The Priceline Group's inequitable conduct defense are set forth in detail in The Priceline Group's Ninth Counterclaim below and incorporated by reference as if fully set forth herein.

**FIFTEENTH AFFIRMATIVE DEFENSE**
**(MISJOINDER)**

67.     IBM's joinder of the Defendants in the same action is barred, at least in part, by 35 U.S.C. § 299 and FED. R. CIV. P. 20.

## III.
## FIRST AMENDED  COUNTERCLAIMS

The Priceline Group pleads the following counterclaims against IBM.

**PARTIES**

68.     The Priceline Group is a Delaware corporation with its principal place of business at 800 Connecticut Avenue, Norwalk, Connecticut 06854.

69.     IBM alleges that it is a corporation organized and existing under the laws of New York, with its principal place of business at 1 New Orchard Road, Armonk, New York 10504.

## JURISDICTION AND VENUE

70.     IBM has filed a Complaint in this Court against The Priceline Group for patent infringement.

71.     IBM alleges in its Complaint that it has standing to sue for infringement of the Patents-In-Suit.

72.     IBM alleges in its Complaint that The Priceline Group has infringed and continues to infringe the Patents-In-Suit.  The Priceline Group denies IBM's allegations.

73.     This Court has subject matter jurisdiction over this counterclaim under 28 U.S.C. § 1338(a), the Patent Laws of the United States, 35 U.S.C. § 100, et seq., and the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, as this action is based upon an actual controversy between IBM and The Priceline Group regarding the invalidity and/or non-infringement by The Priceline Group of the claims of the Patents-In-Suit.

74.     Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391(b), 1391(c) and 1400.

## FIRST COUNTERCLAIM
### DECLARATORY JUDGMENT OF NON-INFRINGEMENT OF THE '967 PATENT

75.     To the extent not inconsistent, The Priceline Group incorporates by reference the allegations of its Answer, Affirmative Defenses, and Counterclaims as if fully set forth herein.

76.     Pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. § 2201, et seq., The Priceline Group requests a declaration by the Court that it does not infringe any claim of the '967 Patent.

## SECOND COUNTERCLAIM
### DECLARATORY JUDGMENT OF NON-INFRINGEMENT OF THE '849 PATENT

77.     To the extent not inconsistent, The Priceline Group incorporates by reference the allegations of its Answer, Affirmative Defenses, and Counterclaims as if fully set forth herein.

78.     Pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. § 2201, et seq., The Priceline Group requests a declaration by the Court that it does not infringe any claim of the '849 Patent.

## THIRD COUNTERCLAIM
### DECLARATORY JUDGMENT OF NON-INFRINGEMENT OF THE '601 PATENT

79.     To the extent not inconsistent, The Priceline Group incorporates by reference the allegations of its Answer, Affirmative Defenses, and Counterclaims as if fully set forth herein.

80.     Pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. § 2201, et seq., The Priceline Group requests a declaration by the Court that it does not infringe any claim of the '601 Patent.

## FOURTH COUNTERCLAIM
### DECLARATORY JUDGMENT OF NON-INFRINGEMENT OF THE '346 PATENT

81.     To the extent not inconsistent, The Priceline Group incorporates by reference the allegations of its Answer, Affirmative Defenses, and Counterclaims as if fully set forth herein.

82.     Pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. § 2201, et seq., The Priceline Group requests a declaration by the Court that it does not infringe any claim of the '346 Patent.

## FIFTH COUNTERCLAIM
### DECLARATORY JUDGMENT OF INVALIDITY OF THE '967 PATENT

83.     To the extent not inconsistent, The Priceline Group incorporates by reference the allegations of its Answer, Affirmative Defenses, and Counterclaims as if fully set forth herein.

84.     The '967 Patent is invalid for failure to comply with one or more of the requirements of the patent laws, including, but not limited to, 35 U.S.C. §§ 101, 102, 103, and/or one or more paragraphs of § 112, and the rules and laws pertaining to those provisions.  These failures include, but are not limited to, those set forth in Defendants' Preliminary Invalidity Contentions and all supplements thereto, all of which The Priceline Group incorporates by reference as if fully set forth herein.

85.     Pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. § 2201, et seq., The Priceline Group requests a declaration by the Court that the claims of the '967 Patent are invalid for failure to comply with one or more of the requirements of the patent laws, including, but not limited to, 35 U.S.C. §§ 101, 102, 103, and/or one or more paragraphs of § 112, and the rules and laws pertaining to those provisions.

## SIXTH COUNTERCLAIM
### DECLARATORY JUDGMENT OF INVALIDITY OF THE '849 PATENT

86.     To the extent not inconsistent, The Priceline Group incorporates by reference the allegations of its Answer, Affirmative Defenses, and Counterclaims as if fully set forth herein.

87.     The '849 Patent is invalid for failure to comply with one or more of the requirements of the patent laws, including, but not limited to, 35 U.S.C. §§ 101, 102, 103, and/or one or more paragraphs of § 112, and the rules and laws pertaining to those provisions.  These failures include, but are not limited to, those set forth in Defendants' Preliminary Invalidity Contentions and all supplements thereto, all of which The Priceline Group incorporates by reference as if fully set forth herein.

88.     Pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. § 2201, et seq., The Priceline Group requests a declaration by the Court that the claims of the '849 Patent are invalid for failure to comply with one or more of the requirements of the patent laws, including, but not limited to, 35 U.S.C. §§ 101, 102, 103, and/or one or more paragraphs of § 112, and the rules and laws pertaining to those provisions.

## SEVENTH COUNTERCLAIM
### DECLARATORY JUDGMENT OF INVALIDITY OF THE '601 PATENT

89.     To the extent not inconsistent, The Priceline Group incorporates by reference the allegations of its Answer, Affirmative Defenses, and Counterclaims as if fully set forth herein.

90.     The '601 Patent is invalid for failure to comply with one or more of the requirements of the patent laws, including, but not limited to, 35 U.S.C. §§ 101, 102, 103, and/or one or more paragraphs of § 112, and the rules and laws pertaining to those provisions.  These failures include, but are not limited to, those set forth in Defendants' Preliminary Invalidity Contentions, all supplements thereto, and IPR Nos. 2016-00604 and 2016-00605, all of which The Priceline Group incorporates by reference as if fully set forth herein.

91.     Pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. § 2201, et seq., The Priceline Group requests a declaration by the Court that the claims of the '601 Patent are invalid for failure to comply with one or more of the requirements of the patent laws, including, but not limited to, 35 U.S.C. §§ 101, 102, 103, and/or one or more paragraphs of § 112, and the rules and laws pertaining to those provisions.

## EIGHTH COUNTERCLAIM
### DECLARATORY JUDGMENT OF INVALIDITY OF THE '346 PATENT

92.     To the extent not inconsistent, The Priceline Group incorporates by reference the allegations of its Answer, Affirmative Defenses, and Counterclaims as if fully set forth herein.

93.     The '346 Patent is invalid for failure to comply with one or more of the requirements of the patent laws, including, but not limited to, 35 U.S.C. §§ 101, 102, 103, and/or one or more paragraphs of § 112, and the rules and laws pertaining to those provisions.  These failures include, but are not limited to, those set forth in Defendants' Preliminary Invalidity Contentions, all supplements thereto, and IPR Nos. 2016-00608, and 2016-00609, all of which The Priceline Group incorporates by reference as if fully set forth herein.

94.     Pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. § 2201, et seq., The Priceline Group requests a declaration by the Court that the claims of the '346 Patent are invalid for failure to comply with one or more of the requirements of the patent laws, including, but not limited to, 35 U.S.C. §§ 101, 102, 103, and/or one or more paragraphs of § 112, and the rules and laws pertaining to those provisions.

**NINTH COUNTERCLAIM**
**DECLARATORY JUDGMENT OF UNENFORCEABILITY OF THE '967 AND '849 PATENTS DUE TO INEQUITABLE CONDUCT**

95.     To the extent not inconsistent, The Priceline Group incorporates by reference the allegations of its Amended Answer, Amended Affirmative Defenses, and Amended Counterclaims as if fully set forth herein.

96.     The '849 Patent is a division of Application Ser. No. 07/388,156, filed Jul. 28, 1989, now U.S. Pat. No. 5,347,632.   U.S. Pat. No. 5,347,632 is a continuation in part of Application Ser. No. 07/328,790 filed Mar. 23, 1989 and abandoned.   Application Ser. No. 07/328,790 is a continuation in part of Application Ser. No. 07/219,931 filed Jul. 15, 1988 and abandoned.

97.     The '967 Patent is a division of Application Ser. No. 07/388,156 filed Jul. 28, 1989, now U.S. Pat. No. 5,347,632.   U.S. Pat. No. 5,347,632 is a continuation in part of Application Ser. No. 328,790, filed Mar. 23, 1989 and abandoned.   Application Ser. No. 328,790 is a continuation in part of application Ser. No. 219,931, filed Jul. 15, 1988 and abandoned.

98.     The earliest priority date that the '967 Patent or '849 Patent can claim is July 15, 1988.

99.     Public use of the claimed subject matter of the '967 Patent prior to July 15, 1987, renders that claimed subject matter invalid.

100.    Commercial offers to sell the claimed subject matter of the '967 Patent prior to July 15, 1987, renders that claimed subject matter invalid.

101.    Printed publications describing the claimed subject matter of the '967 Patent prior to July 15, 1987, renders that claimed subject matter invalid.

102.    Public use of the claimed subject matter of the '849 Patent prior to July 15, 1987, renders that claimed subject matter invalid.

103.    Commercial offers to sell the claimed subject matter of the '849 Patent prior to July 15, 1987, renders that claimed subject matter invalid.

104.    Printed publications describing the claimed subject matter of the '849 Patent prior to July 15, 1987, renders that claimed subject matter invalid.

105.    IBM claims to have developed online service technology for "presenting applications and advertisements in an interactive service that would take advantage of the computing power of each user's PC."  Compl. D.I. 1 at ¶ 18.   That technology was initially developed by IBM's Trintex venture, an IBM venture with Sears and CBS.   *See* Michael Weinstein, System Flexibility Held Key to Videotex Success; Officer of Consortium About to Enter Field Assesses the Service's Prospects, AMERICAN BANKER, Oct. 2, 1984, at 8.  And, the Trintex technology was the basis for the Prodigy online service.  *See* Compl. D.I. 1 at ¶ 17; *see also* Bill Saporito, *Are IBM and Sears Crazy? Or Canny?*, FORTUNE, Sep. 28, 1987 (describing the evolution of Prodigy from Trintex).

106.    IBM and Trintex aimed to and did commercialize the Trintex technology through advertising.  *See* Weinstein, at 8 (noting that Trintex expected its service "to be supported by advertisers"); Saporito, ("Prodigy expects to collect most of its revenue by sending to users

commercial messages from 60-odd advertisers"). This commercialization occurred prior to July 17, 1987.

107. IBM and Trintex publicly used and disclosed the Trintex technology. This public use and disclosure occurred prior to July 17, 1987, in sufficient detail to allow one of ordinary skill in the art to make and use what Trintex, IBM, and the inventors later sought to patent.

108. Numerous printed publications were publically accessible prior to July 17, 1987, which described the Trintex technology in sufficient detail to allow one of ordinary skill in the art to make and use what Trintex, IBM, the prosecuting attorneys, and the inventors later sought to patent.

109. For example, as early as 1984, IBM began to attract advertisers to its service through its Trintex venture. *See* Weinstein,  at 8 ("Mr. Warwick's presence at the speaker's rostrum at the National Retail Merchants Association conference indicates that Trintex is already trying to increase its visibility among department stores and specialty stores.").

110. By April 6, 1987, Trintex was "approaching advertisers with the promise of a 1988 start-up."  Cleveland Horton, *IBM, Sears Shooting for '88 Entry; New Life for Videotex*, ADVERTISING AGE, Apr. 6, 1987, at 1.  Specifically, Trintex was "soliciting charter advertisers" and had already signed "[a]t least one major food company." *Id.*

111. These pre July 17, 1987, Trintex solicitations included specific terms for the delivery of advertisements. *See id.* (reporting that Trintex was basing its advertising rate model "on the number of subscribers viewing a particular ad").  These offers were commercial in

nature, requiring advertisers to pay to publish its advertisements, where Trintex would practice the Trintex technology to publish those advertisements.

112.    Pre July 17, 1987, Trintex also offered a special program for direct marketers, based "on the number of orders placed through the service," and touted the platform's ability to partition the user's screen to display advertisements alongside content.  *Id.*  (noting "about 20% of the screen is occupied by a teaser, or 'leader ad'" that the user can interact with "to reveal additional screens of advertising").  Trintex, IBM, the prosecuting attorneys, and the inventors would seek to patent these same concepts more than one later than the offers of sale. Specifically, Trintex, IBM, the prosecuting attorneys, and the inventors sought to protect these same concepts in the '967 Patent and '849 Patent and related patents, which have an earliest possible priority date claim of July 15, 1988.

113.    Trintex also "approach[ed] national advertisers, financial services and retailers as potential advertisers."  *Id.* ; *see also Trintex to Aim On-Line Ads at Demographic Segments*, AMERICAN BANKER, Jun. 30, 1987, at 10 (describing benefits of the Trintex system from the company's presentation at a retailers' conference in May 1987, including how the interface is partitioned so that "ads are displayed as subscribers view the editorial sections"); Arthur Markowitz, *Trintex Interactive Videotex Service Will Feature Magazine-Type Format*, DISCOUNT STORE NEWS, Jun.  22, 1987, at 2 (describing "'peeks' at the service" that Trintex offered during "three separate presentations" to marketing conferences, revealing, among other things, that an advertisement could be partitioned into editorial content).

114.    Trintex's offers to sell advertising services to third parties were commercial offers to sell, including commercial offers to actually perform the processes later claimed in the '967 Patent and '849 Patent and related patents for consideration.

115.    The commercial nature of Trintex's advertising sales efforts are confirmed by public statements, including a May 1987 announcement that Trintex would feature a flat monthly fee to encourage greater consumer interest,  and that Trintex would be able to subsidize that fee because "[t]he service [would] be supported largely by commercial clients and advertisers." David O. Tyson, *Meter Won't Run on Trintex Videotex; IBM-Sears Partnership Will Charge Only Flat Monthly Fee*, AMERICAN BANKER, May 20, 1987, at 6.

116.    Prior to July 15, 1987, Trintex not only commercially offered to sell but actually commercially sold advertising services to be delivered by performing the processes and using the apparatuses claimed in the '967 Patent and '849 Patent and related patents.

117.    For example, by May 26, 1987, Trintex announced that it had "signed Levi Strauss & Co. and Chanel to be among its first advertisers when the system starts operating." *See, e.g.*, Ellen Forman, *Sears and Chanel Signed for Trintex Shopping Plan*, WOMEN'S WEAR DAILY, May 26, 1987, at 14.   But these were only two "among the initial 42 clients for Trintex," which also included "Florsheim shoes, several sporting goods companies, . . . and household product companies." *Id.*    By June 3, 1987, Trintex acknowledged that Volkswagen and Bally had also committed to purchase advertisements.   Janet Key, *Trintex's Aim: Retail Revolution*, CHICAGO TRIBUNE, Jun. 3, 1987.   And, by late June 1987 the list of "already signed" advertisers – i.e., accepted commercial offers of sale – had grown to include "Aetna Insurance, Dean Witter Reynolds, NEC Home Electronics, . . . and Showtime."

118.    The named inventors of the '967 and '849 Patents had a duty of candor and good faith in dealing with the Patent Office.  That duty includes a duty to disclose to the Patent Office all information known to be material to patentability.

119.    IBM admits that the named inventors of the '967 and '849 Patents have knowledge regarding "the subject matter of [the '967 and '849 Patents], their file histories, the conception and reduction to practice of the inventions contained therein, and products incorporating the '967 and '849 patents."

120.    The named inventors' knowledge necessarily includes knowledge of the development of Prodigy.

121.    On information and belief, the named inventors had knowledge of IBM's pre July 15, 1987, commercialization of Prodigy.

122.    Trintex, IBM, the prosecuting attorneys, and the named inventors withheld these commercial offers for sale from the Patent Office during the prosecution of the '967 Patent and '849 Patent and related patents and applications.

123.    These commercial offers to sell were material to the patentability of the '967 Patent and the '849 patent, as well as the other patents with which the '967 Patent and the '849 patent share a priority claim or claim priority from.  Specifically, these offers were to practice the processes and commercially exploit the systems that Trintex would seek to patent more than one year later.  Indeed, IBM admits that the '967 Patent and the '849 patent were intended to protect Trintex, as later rebranded as Prodigy.  Compl. D.I. 1 at ¶ 17.

124.    If these commercial offers and their subject matter were submitted during the prosecution of the '967 Patent and the '849 patent, as well as the other patents with which the '967 Patent and the '849 patent share a priority claim or claim priority from, these patents would not have issued.

125.    Because these commercial offers to sell occurred prior to July 15, 1987, and would preclude issuance of the '967 Patent, the '849 Patent, and related patents, it is reasonable to infer that they were intentionally withheld with an intent to deceive the patent office.  Indeed, the reasonable nature of this inference was confirmed during the prosecution of the '849 Patent and related applications.

126.    In addition to its commercial offers to sell, Trintex and IBM published articles and made public presentations regarding the technology that it later sought to patent.  Indeed, during prosecution of the '849 Patent, the Board of Patent Appeals and Interferences ("BPAI") was forced to independently locate these articles and related information describing just a few exemplary public disclosures (collectively, the "Trintex NEXIS Articles").

127.    The BPAI, itself, was forced to locate this sampling of pre-critical date articles describing the Trintex service.  The BPAI correctly recognized that the Trintex NEXIS Articles it discovered were material to patentability, and rejected numerous pending claim claims in light of the Trintex NEXIS Articles.  These materially findings apply equally to other related patents, including U.S. Patent Nos. Nos. 5,347,632; 5,594,910; 6,195,661; 5,442,771; 6,195,661; 5,758,072; 6,182,123; 6,199,100; 6,275,852; and the '967 Patent.  The Trintex NEXIS Articles were not disclosed in U.S. Patent Nos. 5,347,632; 5,594,910; 6,195,661; 5,442,771; 6,195,661; 5,758,072; 6,182,123; 6,199,100; 6,275,852; and the '967 Patent; and, if they were, those patents

would not have properly issued because the Trintex NEXIS Articles anticipated the claimed subject matter or rendered the claimed subject matter obvious.

128.    The BPAI expressed concerns not only about what was withheld but also what else was withheld that it did not itself identify:  "In addition to the value of the [Trintex] articles for what they teach on their face as prior art, the NEXIS articles, especially those published before the critical date, which cannot be sworn back of or otherwise overcome, raise questions of what else may have been publicly disclosed or on sale that has not been disclosed to the U.S. Patent and Trademark Office (USPTO)."  '849 Prosecution History – Feb. 27, 2002 BPAI Opn. at 34.

129.    The BPAI further explained that: "***These articles raise a question of exactly what else was disclosed about the Trintex service to the public in these speeches before the critical date***, apparently without any conditions of confidentiality (since the information found its way into some NEXIS articles), which would have a bearing on the issue of public use.  ***Appellants have not disclosed these presentations to the USPTO or what else was disclosed at the presentations.***" *Id*  (emphases added).

130.    Confirming an intent to deceive and failure to comply with the duty to disclose, in response to the BPAI's concerns, IBM replaced its prosecuting attorney Paul Scifo and filed a petition to expunge the BPAI's expressed concerns related to the Trintex NEXIS Articles and public use.  In addition to withholding the Trintex commercial offers of sale, Trintex public use, and Trintex NEXIS Articles, the individuals at IBM, who will be identified during discovery, that controlled prosecution and selection of counsel sought to further burry this materially finding.  '849 Prosecution History – Apr. 17, 2002 Power of Attorney by Assignee of Entire

Interest.  Specifically, they sought to expunge from the file history the BPAI's concern regarding the failure to disclose pre-critical date public presentations that anticipated and rendered obvious the subject matter later sought to be patented.  '849 Prosecution History – Apr. 29, 2002 Petition to Commission in the Person of the Chairman of the Board of Appeals and Interferences.  Not only did IBM and the prosecuting attorneys seek to bury these expressed concerns, but none of IBM, Trintex, the prosecuting attorneys, or named inventors ever disclosed the actual pre-critical date presentations during the prosecution of the 967 Patent, '849 patent, or patents and applications that share a priority claim or claim priority from these patents.

131.    As another example, the attorney IBM originally hired to prosecute the '967 and '849 Patents, Paul Scifo ("Scifo"), withheld and misrepresented, with the intent to deceive the Patent Office, IBM client commitments in excess of $1.0 million resulting from IBM's commercialization of the Prodigy system prior to the critical date.  Withholding this information prevented the examiners of the '967 and '849 Patents from properly issuing a rejection based upon the on-sale bar.  Additionally, Scifo, with the intent to deceive the Patent Office, hid the prosecution of the co-pending applications from their respective examiners.  In doing so, Scifo prohibited both examiners from having a clear picture of the prior art, including prior art that anticipate and render obvious one or more of the issued claims.  Also in doing so, Scifo prevented both examiners from developing an understanding of the claims IBM was seeking so that one or both examiners could issue a proper double patenting rejection.

132.    Had these exemplary materials been dutifully disclosed to the Patent Office, neither the '967 Patent nor the '849 Patent would have issued.

133.     As shown below, IBM's attorney, Paul Scifo, misrepresented and withheld IBM's invalidating commercialization of the Prodigy System from the Patent Office with the intent of deceiving the Patent Office.

134.     Scifo prosecuted the '967 Patent from application to issuance.  In this capacity, Scifo had a duty of candor and good faith in dealing with the Patent Office.  That duty includes a duty to disclose to the Patent Office all information known to be material to patentability.

135.     Scifo prosecuted the '849 Patent from application until 2002.  In this capacity, Scifo had a duty of candor and good faith in dealing with the Patent Office.  That duty included a duty to disclose to the Patent Office all information known to be material to patentability.

136.     On information and belief, as shown in the following paragraphs, Scifo withheld material information from the Patent Office with the intent to deceive the Patent Office.

137.     Scifo did not disclose to the Patent Office IBM's pre-critical date commercialization of technology covered by the '967 and '849 Patents.  This commercialization constitutes an invalidating commercial offer for sale within the meaning of the on-sale bar.

138.     The earliest possible critical date for the '967 and '849 Patents is July 15, 1987.

139.     In the 1980s, IBM was a member of Trintex, a joint venture to develop technology in the online services field.

140.     Trintex's successor was Prodigy.  IBM was a member of Prodigy.  Prodigy ultimately developed the Prodigy online service.

141.   IBM admits that the Prodigy service was for "presenting applications and advertisement in an interactive service" in ¶ 18 of the Complaint.

142.   In ¶ 17 of the Complaint, IBM admits that the '967 and '849 Patented technology was developed as part of the efforts to launch the Prodigy online service.

143.   Scifo, was aware of and conveyed to the Patent Office that the supposed inventions of the '967 and '849 Patents related to the Prodigy service.   *See, e.g.*, '849 Prosecution History – Oct. 24, 1994 Information Disclosure Statement.

144.   Through both the Trinex and Prodigy phases, IBM aimed to commercialize its technology through advertising.

145.   Beginning as early as 1984, IBM attempted to attract advertisers to its service through its Trintex venture.

146.   Before April 6, 1987, IBM's Trintex venture was approaching national advertisers, financial services providers, and retailers as potential advertisers with the promise of a 1988 start-up.

147.   Prior to April 6, 1987, Trintex solicited charter advertisers and had already signed at least one major food company.   These solicitations included specific terms and were predicated on the service's ability to deliver advertising content to a large group of users quickly. Trintex also offered a special program for direct marketers, based on the number of orders placed through the service, and touted the platform's ability to partition the user's screen to display advertisements alongside content.

148.    IBM announced in May 1987 that Trintex would feature a flat monthly fee to encourage greater consumer interest, and that Trintex would be able to subsidize that fee because the service would be supported largely by commercial clients and advertisers.  To this end, IBM's Trintex venture began signing-up more advertisers.  Before May 26, 1987, the IBM-backed venture announced that it had signed Levi Strauss & Co. and Chanel to be among its first advertisers when the system starts operating.  These were only two among the initial 42 clients for Trintex, which also included Florsheim Shoes, several sporting goods companies, and household product companies.

149.    By June 3, 1987, Trintex acknowledged that Volkswagen and Bally had also signed-on, and by late June, the list of signed advertisers had grown to include Aetna Insurance, Dean Witter Reynolds, NEC Home Electronics, and Showtime.

150.    By June 15, 1987, at least three dozen of Trintex's initial advertising clients had made an average financial commitment of between $30,000 to $40,000.  Thus, from these initial clients alone, Trintex amassed around $1.25 million in financial commitments before June 15, 1987.

151.    Additionally, by June 15, 1987, Trintex had entered into numerous multiyear agreements with its initial advertising clients.

152.    All in all, prior to the earliest possible critical date of July 15, 1987, IBM's online Prodigy/Trintex venture had attained approximately 60 advertising clients for its initial launch.

153.    On information and belief, Scifo had knowledge of these pre-critical date commercialization efforts at least by October 21, 1994, through his investigation of the

development and commercialization of the Prodigy service that resulted in a 34-page Information Disclosure Statement he submitted to the Patent Office on October 21, 1994, describing the development and commercialization of the Prodigy service.

154.    As explained in the following paragraphs Scifo intentionally drafted the October October 21, 1994, Information Disclosure Statement in such a way as to be misleading by omitting the details of any pre-July 17, 1987 commercialization of Prodigy to advertisers and, instead, focusing solely on end-user purchases through the Prodigy system that occurred after July 17, 1987.

155.    The October 21, 1994, information disclosure statement did not contain information relating to Prodigy/Trintex's 60 advertising clients prior to the earliest possible critical date.  Nor did it contain information regarding the extent of the financial commitments from those advertising clients.

156.    Scifo never disclosed Prodigy/Trintex's approximately 60 advertising clients from prior to the earliest possible critical date.  Nor did he disclose the extent of the financial commitments from those advertising clients.

157.    In the information disclosure statement, instead of disclosing IBM's extensive advertising clients and over $1 million in commitments, Scifo disclosed only around $149,650 in end-user purchases which occurred after July 15, 1987, and claimed that all commercial activity from before filing was "minimal and wholly incidental to the experimental nature of testing."

158.    Scifo had knowledge of Prodigy/Trintex's pre-critical date commercializing efforts in 2002 when, during prosecution of the '849 Patent, the Board of Patent Appeals and

Interferences informed Scifo that it independently located the Trintex NEXIS Articles which described some of the commercialization efforts from before the critical date.

159.     Following the Board's identification of these articles, Scifo did not submit a correction to his earlier information disclosure statement.

160.     As shown below, Scifo deceptively withheld prior art that anticipated claims of the '967 Patent from the Patent Office with the intent of deceiving the Patent Office.

161.     The pattern of intentional withholding of material art with an intent to deceive during the prosecution of the '967 Patent, '849 Patent and related patents and applications was not limited to the pre-critical date Trintex public use, commercial offers of sale, and publications. For example, during the prosecution of the '967 Patent, Scifo had knowledge of U.S. Patent No. 4,688,167 issued to Arun K. Agarwal ("Agarwal reference"), a copy of which is attached hereto as Exhibit 1.

162.     The Agarwal reference is prior art to the '849 and '967 Patents.

163.     The Agarwal reference is material to the patentability of the '967 Patent.

164.     Scifo was aware of the Agarwal reference and its materiality at least as early as October 27, 1997, when the examiner of the '849 Patent application rejected certain '849 Patent claims in light of the Agarwal reference.

165.     Despite receiving this rejection several months before the '967 Patent issued, Scifo never disclosed the Agarwal reference to the Patent Office during prosecution.

166.    The Agarwal reference is not cumulative of the art that was before the examiner of the '967 Patent.   Indeed, the Agarwal reference anticipates and/or renders obvious one or more claims of the '967 Patent.   A chart mapping the claims of the '967 Patent to the Agarwal reference is attached as Exhibit 3 and incorporated by reference as if fully set forth herein.

167.    As shown below, Scifo hid office actions rejecting similar claims in co-pending applications from the examiner of the '967 Patent with the intent of deceiving the Patent Office.

168.    Scifo also prosecuted U.S. Patent No. 5,347,632 ("'632 Patent") and the '849 Patent.  The '632 Patent is the parent patent of the '967 Patent.

169.    The '967 Patent and the '849 Patent purport to be divisionals of the '632 Patent.

170.    Scifo filed applications for the '967 Patent and '849 Patent on November 26, 1993.

171.    The '967 and '849 Patent applications were examined by different examiners at the Patent Office.

172.    The '967 Patent and the '849 Patent have similar claims.   Exhibit 4 is a chart mapping claim 13 of the '967 Patent to claim 1 of the '849 Patent and showing that the two patents claim obvious variations of the same alleged invention.   As such, information that is material to the patentability of one is material to the patentability of the other.

173.    The '849 Patent application is material to the patentability of the '967 Patent.

174.    Through his prosecution of the '967 Patent, Scifo had knowledge of all office actions and notices relating to the '967 Patent application.

175.    Through his prosecution of the '849 Patent, Scifo had knowledge all office actions and notices relating to the '849 Patent application until at least 2002.

176.    Scifo did not disclose to the examiner of the '967 Patent application the existence of the co-pending '849 Patent application.  Thus, Scifo did not give the examiner of the '967 Patent application the information to necessary to determine whether the '967 Patent application was for claims that were patentably distinct from the '849 Patent applications' claims.

177.    Scifo did not disclose to the examiner of the '967 Patent application the numerous office actions rejecting the '849 Patent application's claims that were issued prior to the issuance of the '967 Patent.  These office actions included:

     a.  An April 19, 1994, office action rejecting all claims of the '849 Patent application;

     b.  A June 15, 1995, office action rejecting all claims of the '849 Patent application;

     c.  An April 30, 1996, office action finally rejecting all claims of the '849 Patent; and

     d.  An October 27, 1997, office action rejecting all claims of the '849 Patent.

178.    The office actions listed in the preceding paragraph were material to the patentability of the '967 Patent.

179.    For example, the June 15, 1995, office action rejecting claims of the '849 Patent application reads directly on the claims of the '967 Patent.

180.    As an additional example, the October 27, 1997, office action rejecting claims of the '849 Patent application was based on two particularly material prior art references – the

anticipatory Agarwal reference and U.S. Patent No. 4,805,134 issued to Seraphin B. Calo ("Calo reference"), a copy of which is attached as Exhibit 2.

181.     The Calo reference is prior art to the '849 and '967 Patents.

182.     The October 27, 1997, office action rejecting claims of the '849 Patent application was at least the second rejection of a member of the '967 Patent family based upon the Calo reference.

183.     On March 11, 1994, an office action rejecting claims of the '632 Patent, based on part on the Calo reference, was issued.  This office action was material to the patentability of the '967 Patent.

184.     Scifo did not disclose the examiner of the '967 Patent application the fact that two separate examiners rejected two co-pending, related applications based in part on the Calo reference.

185.     As shown below, Scifo hid the co-pending '849 Patent application from the examiner examining the '967 Patent application and the co-pending '967 Patent application from the examiner examining the '849 Patent application with the intent of deceptively avoiding a double patenting rejection and extending IBM's monopoly power over the same invention for years longer than permitted by statute.

186.     Scifo did not disclose to the examiner of the '967 Patent application the existence of the co-pending '849 Patent application.

187.    Scifo did not give the examiner of the '967 Patent application the information necessary to determine whether the '967 Patent application was for claims that were patentably distinct from the '849 Patent applications' claims.

188.    Scifo did not disclose to the examiner of the '849 Patent application the existence of the co-pending '967 Patent application.

189.    Scifo did not disclose to the examiner of the '849 Patent application the allowance of the co-pending '967 Patent application.

190.    Scifo did not give the examiner of the '849 Patent application the information necessary to determine whether the '849 Patent application was for claims that were patentably distinct from the '967 Patent applications' claims.

191.    As shown in Exhibit 4, at least some claims of the '967 and '849 Patents are not patentably distinct from each other.

192.    By withholding the existence of the co-pending applications from the other application's examiners, Scifo hid from the examiners the fact that IBM was applying for multiple patents on the same subject matter.

193.    The issuance of both the '967 and '849 Patents has, therefore, resulted in monopoly power for IBM over the same invention for years longer than permitted by the United States Patent Laws.

194.    The single most reasonable inference that can be drawn from Scifo's misrepresentation and repeated withholding of material information from the Patent Office and

the respective examiners of the '849 and '967 Patent applications is that Scifo withheld and misrepresented material information with the intent to deceive.

195.    As shown below, Scifo commited inequitable conduct in prosecuting a related Prodigy patent – U.S. Patent No. 5,758,072.

196.    U.S. Patent No. 5,758,072 (the "072 Patent") is a division of application Ser. No. 158,026, filed Nov. 26, 1993, which issued as U.S. Pat. No. 5,594,910.  U.S. Pat. No. 5,594,910 is a division of Application Ser. No. 07/388,156, filed Jul. 28, 1989, now U.S. Pat. No. 5,347,632.  U.S. Pat. No. 5,347,632 is a continuation in part of Application Ser. No. 07/328,790 filed Mar. 23, 1989 and abandoned.  Application Ser. No. 07/328,790 is a continuation in part of Application Ser. No. 07/219,931 filed Jul. 15, 1988 and abandoned.

197.    Scifo prosecuted the '072 Patent from application to issuance.

198.    At least claim 1 of the '072 Patent is not patentably distinct from claim 1 of the '967 Patent.  Claim 1 of the '072 Patent, therefore, renders claim 1 of the '967 Patent invalid under the doctrine of double patenting.

199.    Indeed, confirming that claim 1 of the '967 Patent is not patentably distinct from claim 1 of the '072 Patent, after the '967 and '072 Patents issued, the examiner of the '072 Patent application rejected claims of another Prodigy patent – U.S. Patent No. 6,275,852 – that also has a claim 1 that is not patentably distinct from the claim 1 of the '967 Patent under the doctrine of double patenting.

200.    The '967 and '072 Patent applications were examined by different examiners at the Patent Office.

201.     Scifo did not disclose to the examiner of the '072 Patent application the existence of the co-pending '967 Patent application.

202.     Scifo did not give the examiner of the '072 Patent application the information necessary to determine whether the '072 Patent application was for claims that were patentably distinct from the '967 Patent applications' claims.

203.     Scifo did not disclose to the examiner of the '967 Patent application the existence of the co-pending '072 Patent application.

204.     Scifo did not give the examiner of the '967 Patent application the information necessary to determine whether the '967 Patent application was for claims that were patentably distinct from the '072 Patent applications' claims.

205.     Office actions rejecting the claims of the '967 Patent application were material to the patentability of the '072 Patent.

206.     Scifo did not disclose any of the office actions rejecting the claims of the '967 Patent application to the examiner of the '072 Patent application.

207.     Office actions rejecting the claims of the '072 Patent application were material to the patentability of the '967 Patent.

208.     Scifo did not disclose any of the office actions rejecting the claims of the '072 Patent application to the examiner of the '967 Patent application.

209.     Scifo did not disclose the notice allowance of the '967 Patent to the examiner of the '072 Patent.

210.     Because these co-pending applications were for claims covering the same subject matter and therefore preclude issuance of both patents absent a terminal disclaimer and because the office actions rejecting the similar claims of one application were material to the other, it is reasonable to infer that Scifo intentionally withheld the '967 Patent and its prosecution with an intent to deceive the patent office.

211.     Because at least claim 1 of the '967 Patent is not patentably distinct from at least claim 1 of the '072 Patent, the '072 Patent would not have issued but-for Scifo's withholding the existence of the '967 Patent and its prosecution from the examiner of the '072 Patent application.

212.     As shown below, IBM, its agents, and/or others with a duty of candor to the Patent Office intentionally and deceptively withheld from the Patent Office the prior public uses and disclosures of the technology that IBM sought to patent with the '967 and '849 applications.

213.     The members of and inventors involved with the Prodigy/Trintex service held public trials of the system and gave public interviews and presentations about the system.

214.     Articles that describe the Prodigy/Trintex service trials, interviews, and presentations include, but are not limited to:

    a.  Paul Hurly et al., The Videotex and Teletext Handbook (Harper & Row, Publ. 1985), pp. i-xi, 11-93 (Chaps. 1-3), 130-159 (Chap. 5), 231-255 (part of Chap. 9), 282-291 (part of Chap. 10), and 380-381 (Appendix B).

    b.  Cleveland Horton, IBM, Sears shooting for '88 entry; New life for videotex, Advertising Age, April 6, 1987, p. 1.

    c.  Ellen Forman, Surge seen for electronic shopping, Women's Wear Daily, Vol. 153, p. 1, May 21, 1987.

    d.  Jerrold Ballinger, Trintex Signs up 42 Advertising Clients; Is Hoping for Launch in Early '88, VP Says, DM News, June 1, 1987, p. 8.

    e.  Cleveland Horton, Big advertisers link to videotex venture, Advertising Age, June 15, 1987, p. 72.

    f.  Arthur Markowitz, Trintex interactive videotex service will feature magazine-type format, Discount Store News, Vol . 26, p. 2, June 22, 1987.

    g.  Trintex to Aim On-Line Ads At Demographic Segments, The American Banker, June 30, 1987, p. 10.

    h.  Inside Trintex; Technology & Operations supplement, Women's Wear Daily, Vol. 154, p. S1, September 8, 1987.

    i.  David Kiley, Trintex: Videotex ·Gets Personalized, Adweek, October 12, 1987, Eastern Edition.

    j.  Scott Mace, Trintex System Offers Access To Variety of Consumer Services, InfoWorld, p. 5, November 30, 1987.

(collectively, the "Trintex NEXIS Articles").

215.    Those who owed a duty of candor to the Patent Office in connection with the prosecution of the '967 and '849 Patents did not disclose the Trintex NEXIS Articles to the Patent Office in connection with the prosecution of the '967 and '849 Patents.

216.    The Patent Office did not consider the Trintex NEXIS Articles while examining the '967 Patent.

217.    Those who owed a duty of candor to the Patent Office in connection with the prosecution of the '967 and '849 Patents did not disclose information regarding most, if not all, of the trials, presentations, and interviews described in the Trintex NEXIS Articles to the Patent Office in connection with the prosecution of the '967 and '849 Patents.

218.    The Patent Office did not consider most, if not all, of the trials, presentations, and interviews described in the Trintex NEXIS Articles while examining the '967 and '849 applications.

219.    As shown below, the claims of the '967 and '849 Patents would not have issued if IBM, its agents, and/or others with a duty of candor to the Patent Office had dutifully disclosed the material information and prior commercialization, public uses, and public disclosures of the technology IBM sought to patent with the '967 and '849 applications.

220.    As shown below, the material information Scifo, IBM, its agents, and/or others with a duty of candor to the Patent Office withheld from the Patent Office satisfies the "but-for" materiality test for showing inequitable conduct.

221.    If Scifo, IBM, its agents, and/or others with a duty of candor to the Patent Office had disclosed the material prior art, co-pending applications, office actions, prior public uses, and prior public disclosures to the Patent Office, the claims of the '967 and '849 Patents would not have issued.

222.     For instance, had Scifo disclosed to the Patent Office the fact that Prodigy/Trintex had approximately 60 advertising clients prior to the earliest possible critical date and over $1 million in financial commitments from its advertising clients, the Patent Office would not have issued the '967 and '849 Patents.   This is because this pre-critical date commercialization constitutes an invalidating commercial offer for sale within the meaning of the on-sale bar.

223.     Additionally, had Scifo disclosed the material information he intentionally withheld, one or more claims of the '967 Patent would not have issued for at least the following reasons:

     a.   The Agarwal reference anticipates and/or renders obvious one or more claims of the '967 Patent.   A chart mapping the claims of the '967 Patent to the Agarwal reference is attached as Exhibit 3 and incorporated by reference as if fully set forth herein.

     b.   Disclosing the office actions from the related '632 and '849 Patent applications based on the Calo reference would have prevented Scifo from making arguments about differences between the prior art and the claims of the '967 Patent.   As an example, the rejection of the '632 Patent in light of Calo included rejection of a claim for a reception system that had a means for storing objects and an explicit finding that Calo taught the use of terminals (i.e., reception systems).   *See* '632 Prosecution History – March 11, 1994 Office Action, at 5.   The '632 Patent examiner's finding with regard to Calo is directly contrary to Scifo's subsequent arguments to the '967 Patent examiner that a fundamental distinction claimed over the art is displaying partitions generated from objects stored at the reception

system.  *See* '967 Prosecution History – July 22, 1997 Response to Office Action, at 7-8.  The examiner was persuaded by this argument and allowed the claims.  If the Calo office action had been disclosed to the Patent Office, this argument would not have been available.

     c.  Had Scifo disclosed to the examiner of the '967 Patent application the '849 Patent application, one or more claims of the '967 Patent would not have issued because they would have been subject to a double patenting rejection over the '849 Patent application.  A chart mapping claim 1 of the '849 Patent to claim 13 of the '967 Patent is attached as Exhibit 4 and incorporated by reference as if fully set forth herein.

224.    Additionally, the Trintex NEXIS Articles are material to the patentability of the '967 Patent, at least for the reasons explained by the Patent Office's Board of Patent Appeals and Interferences when they discovered them during prosecution of the sibling '849 Patent and in its December 23, 2005, decisions.  '849 Prosecution History – Feb. 27, 2002 BPAI Opn. at 33-36; '849 Prosecution History – Dec. 23, 2005 BPAI Opn. at 34-61.

225.    For these reasons, the '967 and '849 Patents are unenforceable under the doctrine of inequitable conduct due to repeated breaches of the duty of candor by those who owed a duty of candor to the Patent Office, including Scifo, made with the intent of deceiving the Patent Office in conjunction with the prosecution of the applications that resulted in the '967 and '849 Patents.

226.    Additionally, the inequitable conduct associated with the '967 Patent described herein stems in part from Scifo's handling of the co-pending '849 Patent application.  Scifo's

hiding of '849 Patent application claims, office actions, and asserted prior art from the examiner of the '967 Patent application creates an immediate and necessary relation between the inequitable conduct associated with the '967 Patent and the enforcement of the related '849 Patent.  Therefore, the inequitable conduct associated with the '967 Patent renders the '849 Patent unenforceable under the doctrine of inequitable conduct.

227.    Additionally, the inequitable conduct associated with the '072 Patent described herein stems in part from Scifo's handling of the co-pending '967 Patent application.  Scifo's hiding of '967 Patent application claims, office actions, and asserted prior art from the examiner of the '072 Patent application creates an immediate and necessary relation between the inequitable conduct associated with the '072 Patent and the enforcement of the related '967 and '849 Patents.  Therefore, the inequitable conduct associated with the '072 Patent renders the '967 and '849 Patents unenforceable under the doctrine of inequitable conduct.

228.    Therefore, pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. § 2201, et seq., The Priceline Group requests a declaration by the Court that the '967 and '849 Patents are unenforceable due to inequitable conduct.

## **PRAYER FOR RELIEF**

The Priceline Group respectfully requests that a final judgment be entered as follows:

1.  Denying IBM any of the relief requested in its Complaint;

2.  Declaring that The Priceline Group has not infringed any claim of the Patents-In-Suit;

3.  Declaring that the claims of the Patents-In-Suit are invalid;

4.  Declaring that the '967 and '849 Patents are unenforceable; and

5.   Awarding to The Priceline Group of such other and further relief, both general and special, at law or in equity, as the Court may deem just and proper.

## <u>JURY DEMAND</u>

The Priceline Group requests a jury trial for all triable issues in IBM's Complaint and The Priceline Group's Counterclaims to the extent allowed by the United States Constitution and the FEDERAL RULES OF CIVIL PROCEDURE.

Dated: June 16, 2016

*Of Counsel:*

Dan D. Davison
NORTON ROSE FULBRIGHT US LLP
2200 Ross Ave., Suite 3600
Dallas, TX 75201
Tel: 214.855.8000
Fax: 214.855.8200
dan.davison@nortonrosefulbright.com

Richard S. Zembek
NORTON ROSE FULBRIGHT US LLP
Fulbright Tower
1301 McKinney, Suite 5100
Houston, TX 77010
Tel: 713.651.5283
Fax: 713.651.5246
richard.zembek@nortonrosefulbright.com

Gilbert A. Greene
Marwan Elrakabawy
NORTON ROSE FULBRIGHT US LLP
98 San Jacinto Boulevard, Suite 1100
Austin, TX 78701
Tel: 512.474.5201
Fax: 512.536.4598
bert.greene@nortonrosefulbright.com
marwan.elrakabawy@nortonrosefulbright.com

*/s/ Francis DiGiovanni*
Francis DiGiovanni (#3189)
Thatcher A. Rahmeier (#5222)
DRINKER BIDDLE & REATH LLP
222 Delaware Avenue, Suite 1410
Wilmington, DE 19801
Telephone:  (302) 467-4200
francis.digiovanni@dbr.com
thatcher.rahmeier@dbr.com

*Attorneys for Defendants The Priceline Group Inc., Priceline.com LLC, Kayak Software Corporation, and OpenTable, Inc.*

**CERTIFICATE OF SERVICE**

I certify that on June 16, 2016, all counsel of record were served with this Amended

Answer to Complaint for Patent Infringement and Counterclaims.


/s/ Francis DiGiovanni
Francis DiGiovanni