## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| INTERNATIONAL BUSINESS | ) |
| MACHINES CORPORATION, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 15-137-LPS |
| | ) |
| THE PRICELINE GROUP INC., | ) |
| KAYAK SOFTWARE CORPORATION, | ) |
| OPENTABLE, INC., and | ) |
| PRICELINE.COM LLC, | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM ORDER

At Wilmington this **13th day of January, 2017**.

**WHEREAS**, the Court has considered the parties' letter submissions, (D.I. 271, 272,

275, 276, 283, 284, 288), relating to: (1) Defendants The Priceline Group Inc., priceline.com

LLC, Kayak Software Corporation and OpenTable Inc.'s (collectively, "Defendants") pending

discovery-related motion, (D.I. 267); and (2) certain disputes raised in Plaintiff International

Business Machines Corporation's ("IBM") pending discovery-related motion, (D.I. 267),[1] as well

as the parties' arguments made during the December 14, 2016 hearing with the Court, (D.I. 294

(hereinafter, "Tr."));

### NOW, THEREFORE, IT IS HEREBY ORDERED that:

1.      With regard to Defendants' request that the Court enter an order that: (1) compels

---

[1]      IBM's pending discovery-related motion raises disputes that are related to certain of those in Defendants' discovery-related motion. In this Order, the Court will take up all of the live disputes raised in Defendants' motion, as well as the related disputes raised in IBM's Motion. The Court will issue a separate order that will address the few remaining disputes raised by IBM's Motion.

IBM to search for and produce documents from 2004 pertaining to offers to sell a working

embodiment of United States Patent No. 7,631,346 (the "'346 patent"); (2) grants leave to allow

Defendants to take additional depositions of the IBM personnel involved with the Orange S.A.

("Orange") project; (3) grants leave for third party discovery, including of Orange; and (4) grants

leave to supplement Defendants' expert report to add and support the defenses that this discovery

elicits, (D.I. 272 at 2; *see also* D.I. 283 at 2 (requesting that the Court "compel IBM to respond to

Defendants' discovery requests [regarding the conception, reduction to practice, and prior offers

for sale of the invention of the '346 patent], including production of customer offers, agreements,

and communications, and grant leave to take discovery from other sources if IBM claims that it

no longer has same")), the Court GRANTS-IN-PART Defendants' request, as set out below.

      2.      As to the issue of prior offers for sale of the invention of the '346 patent,

documents produced in the case demonstrate that certain versions of a product relating to the

invention of the '346 patent were released to customers, including Orange, in 2004. *(See, e.g.*,

D.I. 272 at 2; D.I. 283 at 1; D.I. 284 at 2) However, though Defendant priceline.com LLC

propounded an interrogatory requesting that IBM "[d]escribe in detail all discussions,

disclosures, transactions, or other communications that occurred before the filing date of any

Patent-in-Suit concerning any proposed or actual sale or offer to sell (regardless of whether for

commercial or experimental purposes) . . . of any products, systems, or services whose use was

or may have been covered by any claim of the Patents-in-Suit[,]" (D.I. 283, ex. 4 at 6),[2] IBM's

responses were silent as to the '346 patent, *(id.*, ex. 6 at 5-6, 10). Furthermore, while Defendants

---

      [2]      Citations to certain exhibits in D.I. 271, D.I. 272, D.I. 283 and D.I. 284 will be to
the page numbers generated by the ECF system.

2

propounded Requests for Production of Documents seeking documents relating to this topic, (*id.*, ex. 5 at 9, 11 (Request Nos. 22, 23, 24, 36)), they assert that "IBM has not produced a single document evidencing when the first offer was made or when it was accepted" with respect to an embodiment of the invention described in the '346 patent, (D.I. 272 at 2; *see also* D.I. 283 at 1). Defendant priceline.com LLC is entitled to a supplemental interrogatory response that addresses the '346 patent, and Defendants are entitled to any responsive documents pertaining to offers to sell an embodiment of the invention in the '346 patent. Accordingly, the Court ORDERS that by no later than **January 27, 2017**, IBM shall provide supplemental responses to these discovery requests, including the production of any responsive documents relating to customer offers, agreements, and communications that regard offers for sale of the invention of the '346 patent. Furthermore, Defendants may thereafter serve supplemental expert reports limited to "add[ing] and support[ing] the defenses that this discovery elicits." (D.I. 272 at 2)[3]

3.      As to the issue of conception and reduction to practice of the invention of the '346 patent, on May 31, 2016, IBM produced an interrogatory response in which it stated that "the inventions of the '346 Patent were conceived no later than April of 2004 and reduced to practice *no later than April 1, 2005*." (D.I. 284, ex. 40 at 88-89 (emphasis added)) IBM further explained in the response that, *inter alia*, the "inventors' conception is documented in at least design documents related to the Tivoli Federated Identity Manager ('TFIM') product[,]" that the inventors' efforts in reducing the inventions of the patent to practice led to the launch of the TFIM product, and that the team working on the development of TFIM "created PRPQ versions

---

[3]      Relatedly, the Court GRANTS Defendants' request to modify their election of prior art theories with respect to the '346 patent to include the on-sale bar theory, if necessary, in light of these circumstances. (D.I. 272 at 2)

of the TFIM product to test its functionality, including one PRPQ version on or near July 2004 and a second PRPQ version on or near December 2004." (*Id.* at 89) The response then further cited to numerous documents, (*id.* at 89-91) "which explained that PRPQ releases were distributed to third-parties to solicit feedback[,]" including to Orange, (D.I. 284 at 2).[4] The Court agrees with IBM that its response gave Defendants the "ability to investigate" issues relating to conception and reduction to practice, (Tr. at 25-26), which Defendants indeed explored at the October 7, 2016 deposition of the '346 patent's lead inventor, Heather Hinton, (*see, e.g.*, D.I. 272, ex. 3 at 115-19; D.I. 284 at 3 (citing to various sections of Ms. Hinton's deposition transcript)).

4.      Defendants' primary complaint with respect to this issue is that on November 22, 2016 (almost one month after the October 25, 2016 fact discovery deadline in this case), IBM filed a Response in an ongoing *inter partes* review ("IPR") proceeding regarding the '346 patent, in which IBM further refined its position with respect to reduction to practice of the invention of the '346 patent. In that Response, IBM stated that certain claims of the '346 patent "were actually reduced to practice *no later than July 2004*" at which time "a pre-release version of TFIM . . . included the functionality of the challenged claims—including code for runtime account creation as claimed in the '346 patent." (D.I. 283, ex. 3 at 3 (emphasis added)) Defendants assert that this referenced source code was "first produced [by IBM] at the close of fact discovery" and "[t]his specific and new information *never* made it into IBM's interrogatory responses pertaining to when, how, and by whom the disclosed subject matter was allegedly conceived and reduced to

---

4       IBM served a supplemental response on October 25, 2016, in which it reiterated this information and cited to additional documents in support thereof, such as to several deposition transcripts (including transcripts of the deposition of lead inventor Heather Hinton). (D.I. 272, ex. 2 at 11-17)

practice." (*Id.* at 1 (emphasis in original)) This latest November 22, 2016 IPR disclosure did further crystallize IBM's position as to reduction to practice. But it is not clear how the disclosure justifies Defendants' requested relief with regard to this topic (such as Defendants' request for leave to allow Defendants to take additional depositions of IBM personnel involved with the Orange project and leave for third party discovery of Orange). This is because IBM's prior responses had similarly made clear that IBM had created (including in July 2004) pre-release versions of TFIM relating to the invention of the '346 patent, which IBM provided to Orange (among others). For this reason, Defendants' requests in this regard are DENIED.[5]

5.      Defendants make some additional broad requests with respect to the issues of conception, reduction to practice, and prior offers for sale of the invention of the '346 patent. These include Defendants' request for leave to take discovery from other sources if IBM claims that it no longer has documents relating to offers for sale, or their request that the trial be

---

[5]      In their initial discovery dispute letter, Defendants also claimed that a late-produced document entitled "Tivoli Access Manager Orange Scenario Design Document" (the "Tivoli Access Manager document") raises "a derivation/inventorship issue[,]" in that it reveals that "IBM's inventors may not even be the correct inventors" and that individuals at Orange at least contributed to the invention claimed in the '346 patent. (D.I. 272 at 2 (citing *id.*, ex. 5)) Defendants assert that due to "IBM's document production failures[,]" they were unable to take discovery on (and assert) related defenses such as improper inventorship and inequitable conduct. (*Id.*) Presumably, as part of their request here for leave to take additional discovery relating to Orange, Defendants are seeking to further explore such defenses. However, as IBM notes, "a substantively identical version of" the Tivoli Access Manager document was produced in May 2016. (D.I. 275 at 2) And while Defendants complained at oral argument that they received this May 2016 version as part of a large "data dump," (Tr. at 13; *see also id.* at 10), in their supplemental letter brief they did not further press this issue, (D.I. 283). In the end, Defendants have not sufficiently made a record demonstrating that: (1) they propounded written discovery requests relating to inventorship to which IBM failed to sufficiently respond, or that (2) anything relating to IBM's production of versions of the Tivoli Access Manager document was improper. For these reasons, the Court DENIES Defendants' requests as they relate to the issue of derivation/inventorship.

5

postponed if the additional discovery processes granted to them cannot be completed prior to the filing of dispositive motions. (D.I. 272 at 2; D.I. 283 at 2)  These requests are either premature or not warranted at this time.  Should Defendants feel there is a basis to renew these requests following their having obtained the above-permitted discovery, they may do so at that time.

6.     With regard to Defendants' request with respect to United States Patent No. 5,961,601 (the "'601 patent"), for leave to assert four new invalidity theories that they did not reference in their preliminary election of prior art, (D.I. 272 at 2-3), the Court GRANTS-IN-PART that request.  The Court agrees with Plaintiffs that this is a request to modify the Scheduling Order pursuant to Federal Rule of Civil Procedure 16(b), (*see* D.I. 275 at 3), for which Defendants must make a showing of good cause.[6]  *See Paoli v. Stetser*, Civil Action No.

---

[6]     Thus, the Court rejects Defendants' argument that they need not show good cause because their proposed modifications do not require alterations to the Scheduling Order.  (D.I. 272 at 3; Tr. at 46-49)  Each of the four prior art theories that Defendants now seek leave to press against the '601 patent, (D.I. 276 at 2), and that were listed on Defendants' ("Corrected") final election of prior art, (D.I. 271, ex. 8 at 77) were not listed in Defendants' preliminary election of prior art (served on June 8, 2016), (*id.*, ex. 3 at 26).  Yet Paragraph 12 of the Scheduling Order was clear that Defendants' final election of asserted prior art against each patent could only include reference to seven invalidity theories "*from among the . . . 14 previously identified*" invalidity theories laid out in Defendants' preliminary election of prior art. (D.I. 65 at ¶ 12 (emphasis added))  The Scheduling Order also very clearly stated that an invalidity theory "is either an anticipation theory based on a single reference, an obviousness theory based on a single reference, or an obviousness theory based on a primary reference and up to three secondary references in combination with the primary reference" such that, for example, "the combination of primary reference A with secondary reference B and/or C counts as three theories, i.e., A+B, A+C, and A+B+C." (*Id.* at 10 n.3)  So, taking this all together, Paragraph 12 is explicit that Defendants' final election of prior art was to be limited only to a subset of those particular invalidity theories that were disclosed in their preliminary election of prior art.

Defendants argue otherwise, first noting that Paragraph 17 of the Scheduling Order included a separate deadline for the parties to "finally supplement . . . the identification of . . . all invalidity references." (*Id.* at ¶ 17)  Defendants assert that the inclusion of Paragraph 17 somehow muddies the waters as to what Paragraph 12's requirements really called for, and as to whether the four invalidity theories now at issue are truly "new" theories pursuant to the

12-66-GMS-CJB, 2013 WL 2154393, at *2 (D. Del. May 16, 2013); *Venetec Int'l, Inc. v. Nexus Med., LLC*, 541 F. Supp. 2d 612, 618 (D. Del. 2008). Whether Rule 16(b)'s good cause requirement is met depends on the diligence of the party seeking modification, rather than on prejudice to the non-moving party. *Paoli*, 2013 WL 2154393, at *2; *Venetec Int'l, Inc.*, 541 F. Supp. 2d at 618.

7.    Defendants focused their argument in their briefs almost exclusively on one of their new invalidity theories: their request to narrow a previously-asserted obviousness theory based on the prior art reference "HTML and CGI Unleashed" ("Unleashed") and another reference ("Danish"), to an anticipatory theory based on Unleashed alone. (D.I. 276 at 2) Defendants argue that good cause exists for this modification because IBM's Preliminary

Scheduling Order's meaning. (D.I. 272 at 3; Tr. at 46-47)  However, there can be no good argument that Paragraph 17 somehow was meant to blunt the clear meaning of and rationale behind Paragraph 12's language—language that set out a process for narrowing invalidity theories and thus "narrow[ing] the case so that the parties can focus on the most important [invalidity] issues for trial." (D.I. 271 at 2)  At most (in light of the clear wording of and intent behind Paragraph 12), Paragraph 17 could be said to have allowed for Defendants to add a new invalidity theory after the preliminary election of prior art—based on a newly identified prior art reference—only in certain limited circumstances.  That is, perhaps if Plaintiff had identified a new infringement argument late in the case, or if the District Court had unexpectedly issued a claim construction ruling not sought or anticipated by any of the parties, then such circumstances, pursuant to Paragraph 17, might have warranted Defendants' identification of a new relevant prior art reference after the submission of their preliminary election of prior art.  But even if that were so, Paragraph 17 would not have application to this dispute, since here none of the four new invalidity theories at issue rely on "invalidity references" that were "identifi[ed]" for the first time after the submission of Defendants' preliminary election of prior art.

Defendants also argue, (D.I. 272 at 3; Tr. at 46-47), that the deadline in Paragraph 7(b) of the Scheduling Order for them to provide "final invalidity contentions[,]" (D.I. 65 at ¶ 7(b)), supports their position here.  The Court disagrees, as it is even easier to read Paragraph 7(b) in harmony with Paragraph 12.  The idea behind Paragraph 7(b) was clearly that by the deadline referenced therein, Defendants would provide their final invalidity contentions—i.e., explaining *how* Defendants were asserting, pursuant to each of their *particular*, *previously-identified* invalidity theories, that the claims of the patents were invalid. (D.I. 275 at 3)

7

Infringement Contentions did not focus on certain limitations (the "identifying" limitation and the "recursively embedding" limitation) of the claims of the '601 patent, and that only as the case progressed were Defendants able to piece together IBM's infringement theory as to these claim limitations (based on IBM's discovery requests, IBM's claim construction positions, and IBM's discovery responses). (D.I. 283 at 2; Tr. at 39-41) This led to Defendants' decision to elevate Unleashed to an anticipatory reference, one that Defendants claim "mirror[s] IBM's apparent theory." (D.I. 283 at 2; *see also* Tr. at 39-41) In other words, Defendants suggest that if IBM's Preliminary Infringement Contentions had been clearer as to the infringement position IBM was taking with respect to these limitations, then Defendants would have been able to earlier assert an invalidity theory based on "Unleashed" alone.

8.      The Court agrees that Defendants have established good cause to be permitted to press a theory of anticipation based solely on the Unleashed reference. In doing so, the Court agrees with Defendants that Plaintiff's initial contentions were vague as to how the above-referenced limitations were met by the Accused Instrumentalities, (D.I. 283, ex. 10 at 8-11), and were only meaningfully fleshed out later during the *Markman* process, (*see, e.g.*, D.I. 199 at 135-40), and thereafter. In turn, the Court can understand why Defendants, though diligent, would not have earlier been in a position to identify this particular prior art theory as potentially sufficient to render the relevant claims invalid. (D.I. 283 at 2)

9.      Furthermore, although prejudice is not a factor explicitly considered in the "good cause" analysis, it is still worth noting that the Court's decision here should not prejudice IBM.[7]

---

[7]      With the possible exception of Defendants' reliance on certain allegedly late-produced source code, an issue further discussed below.

8

For one, it is not as if Defendants seek to modify their election of prior art to add Unleashed as an entirely newly-disclosed reference—rather, the reference has been known to IBM for some time. On June 8, 2016, for example, Defendants disclosed Unleashed in their Preliminary Election of Asserted Prior Art, (D.I. 271, ex. 3 at 26), and on July 29, 2016, Defendants served their Third Supplemental Preliminary Invalidity Contentions in which they provided an *anticipatory* mapping of Unleashed, (D.I. 283, ex. 14).[8] On September 27, 2016, Defendants notified IBM that they wished to promote Unleashed to an anticipatory reference (providing a corresponding chart), (D.I. 272, ex. 6), and on October 25, 2016, IBM supplemented its interrogatory answers, in order to detail its view as to why Unleashed does not, *inter alia*, anticipate the '601 patent, (D.I. 276, ex. 1 at 152-54). Moreover, the only specific example of prejudice that IBM points to is that Defendants are now relying on Unleashed's source code as a central part of their theory, and "IBM can no longer take discovery as to how that source code functioned at the time of the invention or whether it was in fact available back in 1996." (D.I. 275 at 3) But Defendants' production in July 2016 directed IBM to pages of the Unleashed textbook that "disclose[] specific CGI program code to run on a server and perform functions[.]" (D.I. 283, ex. 14 at 7; *see also id.* at 10-11, 13) And so it is not clear on this record why, prior to the October 25, 2016 discovery deadline, IBM was unable to take any discovery with respect to at least those portions of the source code *referenced in the textbook*. Nor is it clear why IBM waited until six weeks after it was served with the Unleashed anticipatory theory to object, (D.I. 272 at 3; D.I. 276 at 2); had it done so earlier, perhaps there could have been room to adjust the schedule to allow for

---

[8]      And even these submissions would not be IBM's first exposure to Unleashed; the reference is cited in the '601 patent itself. (*See* D.I. 1, ex. C, col. 4:36-40)

9

whatever discovery it needed with respect to this portion of the source code.

10. There is one aspect of Defendants' anticipatory theory with respect to Unleashed, however, that may be problematic. IBM asserts that "Defendants produced a source code that allegedly was related to the 'Unleashed' reference on November 15, 2016, weeks after the close of discovery" and that "Defendants' expert is relying heavily on that untimely produced source code." (D.I. 271 at 3); *see also* Fed. R. Civ. P. 16(f)(1)(C). The parties dispute whether the content of this disclosure merely reflects "an electronic reproduction of what is printed on the cited pages" of the Unleashed reference, as Defendants contend, (D.I. 276 at 3; *see also* Tr. at 43-44), or whether "the source code Defendants produced contains more than the text in the previously produced text book[,]" as IBM argues, (IBM's Discovery Dispute Hearing Slides at 2; Tr. at 49, 55; *see also* D.I. 284 at 3). If what was produced amounts solely to the former, then Defendants may rely on it at trial; if what was produced (or some portion of it) amounts to the latter, then even Defendants are not suggesting that they should be permitted to later rely on it. The Court does not have enough information on this record to assess which party is right. Accordingly, by no later than **January 20, 2017**, the parties shall provide a joint letter of no more than four (4) single-spaced pages, in which: (1) IBM shall set out its view as to what content, if any, contained on the late-produced Unleashed source code CD goes beyond what is printed in the textbook; and (2) Defendants shall set out their response to the contrary. And aside from the narrow issue of whether Defendants' modified prior art theory may include reference to certain source code content on this CD, the Court GRANTS Defendants' request to modify their election of prior art with respect to the '601 patent to rely on Unleashed as an anticipatory reference, but

10

DENIES the request as to the other three theories at issue.[9]  Defendants should, by no later than

**January 20, 2017**, serve on Plaintiff a revised final election of prior art that identifies no more

than seven prior art theories for this patent and that, with the exception of the permitted inclusion

of the Unleashed anticipation theory, lists only theories earlier disclosed in their preliminary

election of prior art.[10]

11.    With regard to Defendants' request for a court order compelling IBM to produce a

comprehensive privilege log, (D.I. 272 at 3-4), and with regard to IBM's request for a court order

compelling Defendants to produce a privilege log of documents that were withheld or redacted

on grounds of privilege relating to any analysis performed by or for Defendant priceline.com

LLC concerning infringement, validity, or enforceability of the patents-in-suit, (D.I. 271 at 1-2),

_____

[9]       Though the Court has focused above on the Unleashed reference, Defendants also
apparently wish to narrow three other reference combinations with respect to the '601 patent.
The effect of this, if permitted, is that two prior art references (Danish and Ibrahim) would no
longer be relied upon for certain obviousness arguments.  (D.I. 272 at 2; D.I. 276 at 2)  However,
in their initial brief and thereafter, Defendants never articulated with sufficient specificity why
good cause supports these three additional requested amendments to the Scheduling Order.  (D.I.
272 at 3; D.I. 276 at 2)  As they did with the Unleashed anticipation theory, Defendants did argue
that a showing of good cause was not necessary as to these three theories, since the amendments
*narrow* Defendants' invalidity combinations, and because (in Defendants' view) the Scheduling
Order gave Defendants the ability to freely amend those combinations in this way up until the
final election of prior art.  (*See, e.g.*, D.I. 272 at 3; Tr. at 46-49)  Yet for reasons the Court has set
out above, it disagrees with Defendants' arguments.  And otherwise, the most that Defendants
said as to why good cause exists to permit these three amendments was to cite "intervening
discovery and case development."  (D.I. 272 at 3)  Such a vague assertion does not amount to a
showing of good cause.  Therefore, the Court will deny Defendants' request as to these three new
theories.

[10]       For the same reasons, with regard to IBM's request that the Court enter an order
compelling Defendants to limit their final election of prior art to theories selected from
Defendants' preliminary election of prior art, (D.I. 271 at 2-3), the Court DENIES the request as
to Defendants' theory of anticipation relating to Unleashed alone, and GRANTS the request as it
relates to any other election.

11

the Court declines to decide the matter at this time.  Instead, in light of the parties' willingness to further discuss whether they could reach agreement on the exchange of privilege logs on targeted subject matters, (Tr. at 64-65, 70-71; D.I. 283 at 2-3), the Court ORDERS that by no later than **January 20, 2017**, the parties shall:  (1) further meet and confer to see if they can resolve the issue, if they have not already done so; and (2) submit a joint letter of no more than two single-spaced pages that informs the Court as to whether the parties have reached agreement on the issue (or, if not, what are the current issues of remaining disagreement that require action by the Court).

12.     Because this Memorandum Order may contain confidential information, it has been released under seal, pending review by the parties to allow them to submit a single, jointly proposed, redacted version (if necessary) of the Order.  Any such redacted version shall be submitted no later than **January 20, 2017** for review by the Court, along with a motion for redaction that includes a clear, factually-detailed explanation as to why disclosure of any proposed redacted material would "work a clearly defined and serious injury to the party seeking closure." *Pansy v. Borough of Stroudsburg*, 23 F.3d 772, 786 (3d Cir. 1994) (internal quotation marks and citation omitted).  The Court will subsequently issue a publicly-available version of its Memorandum Order.

Christopher J. Burke
UNITED STATES MAGISTRATE JUDGE