**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| INTERNATIONAL BUSINESS MACHINES CORPORATION, | ) ) ) | |
| Plaintiff/Counterclaim-Defendant, | ) ) ) ) | |
| v. | ) ) | Civil Action No. 15-137-LPS-CJB |
| THE PRICELINE GROUP INC., KAYAK SOFTWARE CORPORATION, OPENTABLE, INC. AND PRICELINE.COM LLC, | ) ) ) ) ) | |
| Defendants/Counterclaim-Plaintiffs. | ) ) | |

## REPORT AND RECOMMENDATION

Pending before the Court in this patent case is a motion filed pursuant to Federal Rules of Civil Procedure 12(b)(6) and 12(f) by Plaintiff/Counterclaim-Defendant International Business Machines Corporation ("IBM"), seeking dismissal of Defendants'/Counterclaim-Plaintiffs' The Priceline Group, Inc., priceline.com LLC (collectively, "Priceline"), Kayak Software Corporation ("Kayak") and OpenTable, Inc.'s ("OpenTable") (collectively, "Defendants") Amended Counterclaims and to strike Defendants' Affirmative Defenses directed to inequitable conduct (the "Motion"). (D.I. 120) For the reasons that follow, the Court recommends that the Motion be GRANTED-IN-PART and DENIED-IN-PART.

## I.   BACKGROUND

### A.   Procedural History

This is a patent case arising from IBM's allegations that Defendants infringe IBM's United States Patent Nos. 7,631,346 (the "'346 patent"), 5,961,601 (the "'601 patent"), 5,796,967

(the "'967 patent") and 7,072,849 (the "'849 patent") (collectively, the "Asserted Patents" or the "patents-in-suit"). IBM filed the action on February 9, 2015. (D.I. 1) Chief Judge Leonard P. Stark has referred to the Court for resolution certain types of motions in the case, including the instant Motion. (D.I. 9; D.I. 125; D.I. 126; July 13, 2016 Order)

Defendants each answered IBM's original Complaint on April 13, 2016, and therein each asserted an affirmative defense and counterclaim relating to inequitable conduct. (D.I. 77-80) In response, on May 23, 2016, IBM moved to dismiss those counterclaims and to strike the corresponding affirmative defenses. (D.I. 88) In response to that, Defendants each amended their Answers and Counterclaims on June 16, 2016. (D.I. 103-06)

The Defendants' First Amended Answers and First Amended Counterclaims are nearly identical. Each include a nearly identical Fourteenth Affirmative Defense of Inequitable Conduct as to the '967 patent and the '849 patent ("Fourteenth Affirmative Defense"), as well as a nearly identical Ninth Counterclaim seeking a "Declaratory Judgment of Unenforceability of the '967 and '849 Patents Due to Inequitable Conduct" (the "Ninth Counterclaim"). (*Id.*; *see, e.g.*, D.I. 103 at ¶¶ 65-66, 95-228)[1]

IBM filed the instant Motion on July 5, 2016. (D.I. 120) Briefing on the Motion was complete as of August 1, 2016. (D.I. 149)

## B.   Defendants' Inequitable Conduct-Related Defenses and Counterclaims

As noted above, the inequitable conduct allegations at issue relate to the '967 patent and

---

[1]      As a result, unless otherwise noted, the Court will cite herein solely to Defendant Kayak's First Amended Answer and First Amended Counterclaims for ease of reference. (D.I. 103) If the allegations in that pleading rise or fall, the allegations in the remaining Defendants' pleadings would do so as well.

the '849 patent.  The '967 patent application was filed on November 26, 1993 and the patent

issued on August 18, 1998; the '849 patent application was filed on November 26, 1993 and the

patent issued on July 4, 2006.  (D.I. 1 at ¶¶ 29, 34; *id.*, ex. A at 1; *id.*, ex. B at 1; D.I. 121 at 5)

In its Complaint, IBM alleges that the inventors of those two patents developed the

patented technology as part of IBM's efforts to launch the PRODIGY online service ("Prodigy"),

a forerunner to today's Internet, in the late 1980s.  (D.I. 1 at ¶ 17)  The inventors, as part of their

work on Prodigy, developed allegedly novel methods for presenting applications and

advertisements in an interactive service that would take advantage of the computing power of

each user's personal computer ("PC"), and thereby reduce demand on host servers, such as those

used by Prodigy.  (*Id.* at ¶ 18)  This technology, patented in the '967 patent and the '849 patents,

is alleged to have been utilized in and embodied by Prodigy when it launched in the late 1980s.

(*Id.* at ¶ 19; D.I. 103 at ¶ 105)

In the Ninth Counterclaim,[2] Defendants explain that the '967 patent and the '849 patent

are related patents that are divisions of an application that resulted in a common parent patent:

non-asserted United States Patent No. 5,347,632 (the "'632 patent").  (D.I. 103 at ¶¶ 96-97)  They

allege that the earliest possible priority date that the '967 patent and the '849 patent can claim is

July 15, 1988.  (*Id.* at ¶ 98)  Thus, they assert, any (1) public use of or (2) commercial offers to

sell or (3) printed publications describing the claimed subject matter of those two patents, prior to

July 15, 1987 (the "critical date"), would render the claimed subject matter invalid.  (*Id.* at ¶¶

---

[2]      The Fourteenth Affirmative Defense incorporates by reference all of the facts set
out in the Ninth Counterclaim.  (*See, e.g.*, D.I. 103 at ¶ 66)  For this reason, to the extent that the
Court below refers to Defendants' "counterclaim" or to the "Ninth Counterclaim," that should
also be understood as a reference to the Fourteenth Affirmative Defense.

98-104)

Defendants allege that the technology that IBM describes as being patented in the '967

patent and the '849 patent (set out above) was initially developed by IBM's Trintex venture,

which was an IBM venture with Sears and CBS. (*Id.* at ¶ 105)  They then assert that IBM and

Trintex, prior to July 15, 1987,[3] aimed to and did:  (1) commercialize the Trintex technology

through advertising (that is, through commercial offers to perform the processes claimed in the

two patents at issue); (2) publicly used and disclosed the Trintex technology in sufficient detail to

allow one of ordinary skill in the art make and use the patented invention; and (3) disseminated

printed publications that allowed for the same. (*Id.* at ¶¶ 106-08, 114)

With regard to the commercial offers referenced above, it is alleged that some of them

resulted in the actual sale of advertising services. (*Id.* at ¶ 116)  In total, these are said to have

amounted to approximately $1.25 million in financial commitments from Trintex's initial

advertising clients, made prior to June 15, 1987. (*Id.* at ¶ 150)  Defendants allege that the named

inventors of these patents "had knowledge of IBM's pre July 15, 1987 commercialization of

Prodigy[,]" but that "Trintex, IBM, the prosecuting attorneys, and the named inventors withheld

these commercial offers for sale from the [United States Patent and Trademark Office, or 'PTO']

during the prosecution of the '967 Patent and the '849 Patent and related patents and

applications." (*Id.* at ¶¶ 121-22)  More specifically, Defendants' allege that prosecuting attorney

Paul Scifo withheld, with the intent to deceive the PTO, information about these financial

commitments. (*Id.* at ¶ 131)  As one example of such conduct, it is alleged that Mr. Scifo

---

[3]      At times in their pleadings, Defendants make reference to the critical date as "July
17, 1987" (not July 15, 1987). (*See, e.g.*, D.I. 103 at ¶¶ 107-08, 111-12)  The Court assumes this
is a mistake and that the reference is meant to be to July 15, 1987.

intentionally drafted an October 21, 1994 Information Disclosure Statement ("Disclosure Statement") in such a way as to misleadingly "omit the details of any pre-July [15], 1987 commercialization of Prodigy to advertisers and, instead, focus[] solely on end-user purchases through the Prodigy system that occurred after July [15], 1987." (*Id.* at ¶ 154)

Defendants also allege that Trintex and IBM published a number of articles (and also made public presentations) describing the technology at issue here, prior to July 15, 1987. The articles will be referred to as the "Trintex NEXIS Articles." (*Id.* at ¶ 126) It is alleged that these articles were unknown to the PTO until the Board of Patent Appeals and Interferences ("BPAI") independently located certain of them them during the prosecution of the '849 patent. (*Id.*) Defendants assert that (1) the BPAI recognized that the Trintex NEXIS Articles were material to patentability; (2) after locating the articles, the BPAI rejected numerous pending claims of what became the '849 patent in light of the articles; and (3) had the articles previously been disclosed to the PTO, the '967 patent would not have issued (since the articles anticipated the claimed subject matter of that patent or rendered it obvious). (*Id.* at ¶ 127) The BPAI thereafter expressed concern not only that the Trintex NEXIS Articles were not previously disclosed, but that their discovery "'raise[s] questions of what else may have been publicly disclosed or on sale that has not been disclosed to the [PTO,]" (*id.* at ¶ 128), such as "*what else was disclosed at the [public] presentations*" that are described in those Trintex NEXIS articles, (*id.* at ¶ 129 (emphasis in original)). In response, it is alleged that IBM replaced its prosecuting attorney, Mr. Scifo, and filed a petition to expunge the BPAI's expressed concerns relating to these articles and public use from the file history. (*Id.* at ¶ 130)

Defendants also assert that Mr. Scifo withheld other material information during "the

5

prosecution of the '967 Patent, '849 Patent and related patents and applications[.]" (*Id.* at ¶ 161) For example, they allege that during prosecution of the '967 patent, Mr. Scifo had knowledge of United States Patent No. 4,688,167 ("Agarwal" or the "Agarwal reference"), a prior art reference that was allegedly material to the patentability of the '967 patent. (*Id.* at ¶¶ 161-63) Mr. Scifo became aware of the Agarwal reference in October 1997, when the examiner of the '849 patent application rejected certain claims in light of Agarwal. (*Id.* at ¶ 164) But despite having received that rejection several months before the '967 patent issued in 1998, Mr. Scifo did not disclose the Agarwal reference to the PTO during prosecution of the '967 patent. (*Id.* at ¶ 165)

Additionally, it is alleged that Mr. Scifo "hid office actions rejecting similar claims in co-pending applications from the examiner of the '967 Patent with the intent of deceiving the [PTO]." (*Id.* at ¶ 167) More specifically, it is explained that the '967 patent and the '849 patent have similar claims, and thus, "information that is material to the patentability of one is material to the patentability of the other." (*Id.* at ¶ 172) However, the '967 patent and '849 patent applications were "examined by different examiners" at the PTO, and Mr. Scifo did not disclose to the examiner of one application the existence of the other application, and vice versa. (*Id.* at ¶¶ 171, 176-77, 188) Therefore, for example, Mr. Scifo did not disclose to the examiner of the '967 patent a number of office actions that rejected the '849 patent application's claims, though these office actions (including the one relating to the Agarwal reference) were issued prior to the issuance of the '967 patent. (*Id.* at ¶¶ 177-82) Defendants allege that by hiding the co-pending patent applications from the respective examiners, Mr. Scifo acted with "the intent of deceptively avoiding a double patenting rejection and extending IBM's monopoly power over the same invention for years longer than permitted by statute." (*Id.* at ¶ 185) And they claim that Mr.

Scifo withheld and misrepresented this material information with the intent to deceive. (*Id.* at ¶ 194)

It is also alleged that Mr. Scifo prosecuted United States Patent No. 5,758,072 (the "'072 patent"),[4] a related patent to the '967 patent, and one that contains claims that are "not patentably distinct" from claim 1 of the '967 patent. (*Id.* at ¶¶ 197-204) Mr. Scifo is alleged to have not disclosed to the examiner of the '967 patent application the existence of the '072 patent application, and vice versa (as again, the applications were examined by different examiners). (*Id.* at ¶¶ 200-01, 203) It is asserted that: (1) office actions rejecting the claims of the '967 patent application were material to the patentability of the '072 patent application (and vice versa), but that Mr. Scifo did not disclose any such office actions to the respective examiners; and (2) Mr. Scifo intentionally did not disclose the notice of allowance of the '967 patent to the examiner of the '072 patent, and because the claims of the co-pending applications covered the same subject matter, the '072 patent would not have issued but for Mr. Scifo's non-disclosure of the existence of the '967 patent. (*Id.* at ¶¶ 205-11) It is asserted that the inequitable conduct associated with '072 patent "stems in part from [Mr.] Scifo's handling of the co-pending '967 Patent application" and so his hiding of information regarding the '967 patent application from the examiner of the '072 patent application "creates an immediate and necessary relation between the inequitable conduct associated with the '072 Patent and the enforcement of the related '967 and '849 Patents." (*Id.* at ¶ 227) Thus, it is alleged that "the inequitable conduct associated with the '072 Patent renders the '967 and '849 Patents unenforceable under the doctrine of inequitable conduct." (*Id.*)

---

[4]     The '072 patent is a division of application Ser. No. 158,026, filed November 26, 1993, which issued as United States Patent No. 5,594,910. (D.I. 103 at ¶ 196) The '072 patent application itself was filed on October 23, 1996, and issued on May 26, 1998.

## II.    STANDARD OF REVIEW

### A.    Motion to Dismiss Under Rule 12(b)(6)

When presented with a Rule 12(b)(6) motion to dismiss for failure to state a claim, a

court conducts a two-part analysis. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir.

2009).  First, the court separates the factual and legal elements of a claim, accepting "all of the

complaint's well-pleaded facts as true, but [disregarding] any legal conclusions." *Id.* at 210-11.

Second, the court determines "whether the facts alleged in the complaint are sufficient to show

that the plaintiff has a 'plausible claim for relief.'" *Id.* at 211 (quoting *Ashcroft v. Iqbal*, 556

U.S. 662, 679 (2009)).  "A claim has facial plausibility when the plaintiff pleads factual content

that allows the court to draw the reasonable inference that the defendant is liable for the

misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544,

556 (2007)).  In assessing the plausibility of a claim, the court must "construe the complaint in

the light most favorable to the plaintiff, and determine whether, under any reasonable reading of

the complaint, the plaintiff may be entitled to relief." *Fowler*, 578 F.3d at 210 (quoting *Phillips

v. Cnty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008)).  As such, a well-pleaded complaint may

not be dismissed simply because "it strikes a savvy judge that actual proof of [the alleged] facts

is improbable, and that a recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556

(internal quotation marks and citation omitted).  Determining whether a claim is plausible is "'a

context-specific task that requires the reviewing court to draw on its judicial experience and

common sense.'" *Fowler*, 578 F.3d at 211 (quoting *Iqbal*, 556 U.S. at 679).

### B.    Motion to Strike Under Rule 12(f)

As was noted above, Defendants have asserted inequitable conduct in two substantively

identical but procedurally distinct forms—as both an affirmative defense and as a counterclaim. Rule 12(b)(6) does not offer a mechanism for dismissing an affirmative defense, and instead refers only to "claim[s]." Fed. R. Civ. P. 12(b)(6). However, pursuant to Rule 12(f), the Court "may strike from a pleading an insufficient defense[.]" Fed. R. Civ. P. 12(f). When ruling on a motion to strike, the Court must construe all facts in favor of the nonmoving party and deny the motion if the defense is sufficient under law. *Senju Pharm. Co., Ltd. v. Apotex, Inc.*, 921 F. Supp. 2d 297, 301 (D. Del. 2013). Further, a court should not grant a motion to strike a defense unless the insufficiency of the defense is clearly apparent. *Id.* (citing *Symbol Techs., Inc. v. Aruba Networks, Inc.*, 609 F. Supp. 2d 353, 356 (D. Del. 2009)).

### C.    Pleading Inequitable Conduct Under Rule 9(b)

An individual associated with the filing and prosecution of a patent application commits inequitable conduct when he or she (1) makes an affirmative misrepresentation of a material fact, fails to disclose material information, or submits false material information to the PTO; (2) with the specific intent to deceive the PTO. *Star Scientific, Inc. v. R.J. Reynolds Tobacco Co.*, 537 F.3d 1357, 1365 (Fed. Cir. 2008); *Micron Tech., Inc. v. Rambus Inc.*, 917 F. Supp. 2d 300, 321-22 (D. Del. 2013). If both of these elements—materiality and intent—are proven by clear and convincing evidence, this equitable defense bars enforcement of a patent. *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1287 (Fed. Cir. 2011); *Micron Tech.*, 917 F. Supp. 2d at 322-23.

A claim of patent unenforceability premised upon inequitable conduct is a claim sounding in fraud. *Senju*, 921 F. Supp. 2d at 306. Under Federal Rule of Civil Procedure 9(b), fraud is a clear exception to the otherwise broad notice-pleading standards. *Id.* A party alleging

unenforceability, therefore, must plead with particularity those facts which support the claim that the patent holder acted fraudulently before the PTO. *Exergen Corp. v. Wal-Mart Stores, Inc.*, 575 F.3d 1312, 1326 (Fed. Cir. 2009); *Senju*, 921 F. Supp. 2d at 306. Just as a claim for inequitable conduct must meet the heightened pleading requirements of Rule 9(b), a defendant is also required to plead this affirmative defense with particularity under Rule 9(b). *Senju*, 921 F. Supp. 2d at 306. As a result, Defendants' counterclaim and affirmative defense for inequitable conduct rise and fall together. *Id.* (citing cases).

In *Exergen Corp. v. Wal-Mart Stores, Inc.*, 575 F.3d 1312, 1328 (Fed. Cir. 2009), the United States Court of Appeals for the Federal Circuit established the standard for evaluating the sufficiency of inequitable conduct allegations. *Exergen* held that:

> [T]o plead the "circumstances" of inequitable conduct with the requisite "particularity" under Rule 9(b), the pleading must identify the specific who, what, when, where and how of the material misrepresentation or omission committed before the PTO. Moreover, although "knowledge" and "intent" may be averred generally, a pleading of inequitable conduct under Rule 9(b) must include sufficient allegations of underlying facts from which a court may reasonably infer that a specific individual (1) knew of the withheld material information or of the falsity of the material misrepresentation, and (2) withheld or misrepresented this information with a specific intent to deceive the PTO.

575 F.3d at 1328-29.

However, roughly 18 months after the Federal Circuit's decision in *Exergen*, an *en banc* Federal Circuit altered and clarified the elements for proving inequitable conduct in *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276 (Fed. Cir. 2011). Unlike *Exergen*, which specifically outlined the requirements for *pleading* inequitable conduct, *Therasense* involved the review of a district court decision as to inequitable conduct made after a bench trial. *Id.* at 1285.

In *Therasense*, the Federal Circuit retained the two-pronged construct requiring a showing of both materiality and intent to deceive. However, in various ways, it elected to "tighten[] the standards for finding both intent and materiality in order to redirect a doctrine that has been overused to the detriment of the public." *Id.* at 1290.

For example, the *Therasense* Court overruled a separate series of decisions that placed the materiality and intent prongs on a "sliding scale," in which a weak showing of intent could be found sufficient based on a strong showing of materiality, or vice versa. *Id.* at 1288, 1290. In addition, as to the first prong regarding materiality, *Therasense* held that absent evidence of "affirmative egregious misconduct," this prong requires a "but-for" showing. *Id.* at 1291-92. In other words, the party making an inequitable conduct claim must show that but for an omission or misrepresentation by the patent applicant, the PTO would not have allowed a patent claim to issue. *Id.*

As for the intent prong, *Therasense* expressly overruled a series of decisions holding that if a misrepresentation or omission at issue amounted to gross negligence or mere negligence, this would be sufficient to satisfy the intent prong; instead, a deliberate decision to make the misrepresentation or omission would be required. *Id.* at 1287-90. Lastly, the Federal Circuit re-emphasized its prior holding that although "a district court may infer intent from indirect and circumstantial evidence . . . ., to meet the clear and convincing evidence standard, the specific intent to deceive must be 'the single most reasonable inference and able to be drawn from the evidence.'" *Id.* at 1290 (quoting *Star Scientific*, 537 F.3d at 1366). At the pleading stage of the case, however, "the claimant need only allege facts from which the Court could *reasonably infer* that the patent applicant made a deliberate decision to deceive the PTO." *Wyeth Holdings Corp.*

*v. Sandoz, Inc.*, Civ. Action No. 09-955-LPS-CJB, 2012 WL 600715, at *7 (D. Del. Feb. 3, 2012) (emphasis in original); *see also Exergen*, 575 F.3d at 1328-29.

## III.  DISCUSSION

In resolving IBM's Motion, the Court will first address two threshold issues regarding its approach to and the potential scope of Defendants' counterclaim.  Next, it will assess IBM's challenges to Defendants' counterclaim premised on Defendants' asserted failure to plead sufficient facts regarding materiality or intent.  Third, it will address IBM's assertion that Defendants have not sufficiently alleged that inequitable conduct from other patent applications "infects" the patents at issue.  And lastly, it will take up the question of whether Defendants' inequitable conduct affirmative defense should be stricken.

### A.  Threshold Issues

#### 1.  *BBL v. City of Angola* and the Partial Dismissal of Claims

As was noted above, Defendants base their inequitable conduct counterclaim on several different alleged misrepresentation or omissions—in essence, on a number of different subsets of allegations, or "theories," of inequitable conduct.  These theories involve allegations relating to (1) certain prior art references against the '849 and '967 patents, (D.I. 103 at ¶¶ 101, 104, 108, 126-30, 160-66, 212-218, 223(a), 224); (2) commercialization efforts, (*id.* at ¶¶ 99-100, 102-03, 105-07, 109-117, 121-25, 130-159, 212-222); and (3) co-pending patent applications and office actions related to those applications, (*id.* at ¶¶ 131, 167-211, 223(b)-(c)).

IBM addresses each theory separately, (*see* D.I. 121 at 9-18; D.I. 149 at 4-9), and argues that "Defendants' counterclaim should be dismissed in its entirety" because "Defendants cannot identify any set of allegations (i.e., any of them) where 'a specific individual both knew of

12

invalidating information that was withheld from the PTO and withheld that information with a

specific intent to deceive the PTO,'" (D.I. 149 at 2 (quoting *Delano Farms Co. v. California*

*Table Grape Comm'n*, 655 F.3d 1337, 1350 (Fed. Cir. 2011))).  Defendants, for their part, assert

that "[t]he inequitable conduct counterclaims must be evaluated as a whole under Rules 12(b)

and 9(b)," (D.I. 138 at 7), and that "'Rule 12(b)(6) doesn't permit piecemeal dismissals of parts

of claims[,]'" (*id.* at 5-6 (citing *BBL v. City of Angola*, 809 F.3d 317, 325 (7th Cir. 2015))).  In

other words, Defendants seem to contend that if any one theory of inequitable conducts passes

muster under Rule 9(b), then all of Defendants' theories set out in the counterclaim should

survive, even if some are clearly insufficiently pleaded.

    For that proposition, Defendants cite primarily to *BBL, Inc. v. City of Angola*, 809 F.3d

317 (7th Cir. 2015).  (D.I. 138 at 5-6)  In that case, the United States Court of Appeals for the

Seventh Circuit affirmed a lower court's decision to deny a motion for preliminary injunction

based on a First Amendment claim.  In doing so, the Seventh Circuit stated that there was

"reason to question [the district court's] approach" in the case of "split[ting] a single claim into

multiple components based on the elements of the applicable constitutional test." *BBL*, 809 F.3d

at 324-25. The *BBL* Court then stated that a "motion to dismiss under Rule 12(b)(6) doesn't

permit piecemeal dismissals of *parts* of claims; the question at this stage is simply whether the

complaint includes factual allegations that state a plausible claim for relief." *Id.* at 325 (citations

omitted) (emphasis in original).

    For a few reasons, the Court does not agree with Defendants' approach and will address

each of Defendants' disparate inequitable conduct "theories" separately, despite the fact that they

are all lumped together within a single 134-paragraph counterclaim.

First, the Court notes that the relevant statement from *BBL* appears to be dicta, as the Seventh Circuit nevertheless proceeded to affirm the lower court's ruling without further reference to its approach.

Second, the situation that presented itself to the *BBL* Court was of a different nature than that at issue here. There, the plaintiffs raised a First Amendment challenge to the defendant city's ("Angola") zoning ordinance, which indisputably restricted expressive conduct. *See BBL v. City of Angola*, Cause No. 1:13-CV-76-RLM, 2014 WL 26093, at \*12 (N.D. Ind. Jan. 2, 2014), *aff'd*, 809 F.3d 317 (7th Cir. 2015) ("*BBL*"). In order for such an ordinance to comport with the First Amendment, it had to (1) be aimed at reducing negative secondary effects of the expressive conduct; (2) be narrowly tailored to serve that purpose; and (3) leave open reasonable alternative sites for expression. *See BBL*, 809 F.3d at 323. The district court held that Angola was entitled to judgment on the pleadings as to the first two of these three elements, but not as to the third element. *Id.* While it may be wrong to grant a motion for judgment on the pleadings (or a motion to dismiss) as to certain legal elements of a claim, instead of as to the whole claim, that is different than the situation here. Here, IBM is asking the Court to consider granting its Motion as to separate sets of operative facts making up what should be separate claims of inequitable conduct, and nothing in *BBL* expressly speaks to that kind of request.[5]

---

[5]     Defendants' approach to pleading the counterclaim may also violate Federal Rule of Civil Procedure Rule 10(b), which states that "[i]f doing so would promote clarity, each claim founded on a separate transaction or occurrence—and each defense other than a denial—must be stated in a separate count or defense." Fed. R. Civ. P. 10(b); *see also Nicolaysen v. BP Amoco Chem. Co.*, No. CIV.A.01-CV-5465, 2002 WL 1060587, at \*3 (E.D. Pa. May 23, 2002). Defendants' approach here led to a particularly unwieldy counterclaim, one that included references to factually disparate theories that popped up at different points throughout the claim's 134 paragraphs. This made it very difficult for the Court to track what factual allegations went with which theory.

Third, several courts, including this one, have in fact dismissed portions of inequitable conduct counterclaims, or stricken portions of affirmative defenses based on inequitable conduct, while allowing other portions of the claim/defense to survive. *See, e.g.*, *EMC Corp. v. Pure Storage, Inc.*, C.A. No. 13-1985(RGA), 2014 WL 5795557, at *2 (D. Del. Nov. 5, 2014); *CertusView Techs., LLC v. S & N Locating Servs., LLC*, 107 F. Supp. 3d 500, 509-23 (E.D. Va. 2015); *Zvelo, Inc. v. SonicWall, Inc.*, Civil Action No. 06-cv-00445-PAB-KLM, 2013 WL 5443858, at *2-10 (D. Colo. Sept. 30, 2013); *cf. Alza Corp. v. Par Pharm., Inc.*, Civil Action No. 13-1104-RGA (D. Del. May 27, 2014), (D.I. 149, ex. 2 at 3) ("The insufficiency of the present allegations is principally that they allege a mishmash of facts without sorting them out in relation to particular acts of particular individuals.  The Defendants need to identify by name the individuals who did things constituting affirmative misconduct or contrary to the duty of candor, and material to the issuance of the patents, on particular dates, with the intent to deceive the PTO.").[6]  These cases suggest that the Court's approach here is the appropriate way to assess one "claim" that, in reality, includes within it many disparate fact-based theories as to why various individuals connected to IBM are guilty of inequitable conduct.

Fourth, as a practical matter, it seems that following Defendants' proposed path would frustrate the very purpose of Rule 9(b)'s requirement than an inequitable conduct claim be pleaded with particularity.  Defendants' approach could permit a single viable theory to "carry" otherwise wholly deficient theories of liability through to the summary judgment stage, so long

---

[6]      *But see DS Smith Plastics Ltd. v. Plascon Packaging, Inc.*, 15 C 5760, 2016 WL 69632, at *4 (N.D. Ill. Jan. 6, 2016) (denying motion to dismiss portions of an inequitable conduct counterclaim, despite the fact that certain of the defendants' allegations did not satisfy the *Exergen* "who" requirement, because "'a motion to dismiss under Rule 12(b)(6) doesn't permit piecemeal dismissals of *parts* of claims[.]'") (quoting *BBL*, 809 F.3d at 325).

as all of the theories were pressed into a single counterclaim. This would surely undermine Rule 9(b)'s goal of "provid[ing] defendants with notice of the *precise* nature of the claim against them[.]" *Johnson v. Ace Cash Express Inc.*, Civ. Act. No. 13-1186-LPS, 2015 WL 4397482, at *2 (D. Del. July 17, 2015) (emphasis added) (citing *Seville Indus. Mach. Corp. v. Southmost Mach. Corp.*, 742 F.2d 786, 791 (3d Cir. 1984)). Indeed, there are plenty of circumstances in which defendants have broken out their multiple theories of inequitable conduct into separate counterclaims, and where courts have assessed whether each individual counterclaim should rise or fall, depending on whether it satisfies the requirements of Rule 9(b). *See, e.g.*, *EMC Corp. v. Zerto, Inc.*, C.A. No. 12-956-GMS, 2014 WL 3809365, at *3-4 (D. Del. July 31, 2014); *Xpert Universe, Inc. v. Cisco Sys., Inc.*, 868 F. Supp. 2d 376, 379-83 (D. Del. 2012); *Moore U.S.A., Inc. v. Standard Register Co.*, 139 F. Supp. 2d 348, 359-60 (W.D.N.Y. 2001). To countenance Defendants' approach here would penalize the defendants in these other cases for having clearly organized their claims so as to put the respective plaintiffs on notice. It would also give defendants a perverse incentive to lump together every possible disparate theory of inequitable conduct into one unwieldy counterclaim, in the hopes that a single theory with wings would carry other theories past the Rule 12(b)(6) stage, when in fact those other theories should never have gotten off the ground.

With this in mind, the Court will address each of Defendants' inequitable conduct theories in turn in Section III.B, *infra*.

### 2. Defendants' Counterclaim May Only Survive as it Pertains to Mr. Scifo

In portions of their pleadings, Defendants have not properly and specifically identified the

"who, what, where, when, and how" of alleged material misrepresentations or omissions, as required to make out an inequitable conduct claim under *Exergen*. This is most clear as to the deficiency of the allegations that are made against persons who are not specifically referred to by their name, or against corporate entities. This relates to Defendants' assertions that (1) certain unnamed "individuals at IBM, who will be identified during discovery," (2) "IBM [and] and its agents[,]" or "Trintex[,]" (3) "prosecuting attorneys[,]" and (4) the "named inventors" all intentionally withheld certain materials from the BPAI during prosecution of the patents-in-suit. (*See* D.I. 103 at ¶¶ 122, 130, 212, 219-21)

IBM argues that Defendants' allegations against such unidentified persons or corporate entities should be dismissed because "[n]one of those allegations identify the specific individuals Defendants allege failed to disclose material information." (D.I. 121 at 8) It contends that such allegations do not meet the heightened pleading standard of Rule 9(b) "because a 'broadly cast net around the inventors and those acting on their behalf does not allow the court to reasonably infer that a specific individual both knew of the invalidating information and had a specific intent to deceive the PTO.'" (D.I. 149 at 3-4 (quoting *Senju*, 921 F. Supp. 2d at 307); *see also* D.I. 121 at 7)

Certain of these allegations clearly do not meet the "who" requirement. To satisfy that requirement, the pleading at issue must clearly identify "*the specific individual* associated with the filing or prosecution of the application issuing as the . . . patent, who both knew of the material information and deliberately withheld or misrepresented it." *Exergen*, 575 F.3d at 1329 (emphasis added). Indeed, the Federal Circuit and this Court have regularly dismissed inequitable conduct claims that failed to meet this burden. *See, e.g.*, *Exergen*, 575 F.3d at 1329

(finding allegations regarding "Exergen, its agents and/or attorneys" deficient) (internal quotation marks and citation omitted); *Senju*, 921 F. Supp. 2d at 307 (finding allegations as to omissions and misrepresentations made by "Senju [Pharma], Kyorin, the inventors and/or those acting on their behalf" deficient) (internal quotation marks and citation omitted); *XpertUniverse*, 868 F. Supp. 2d at 381 (finding "Abraham Zelkin or one or more of the other individuals listed as an inventor" deficient). For this reason, a theory of inequitable conduct based on the actions of various unnamed "individuals at IBM" cannot stand.

Additionally, the law is clear that "only individuals, rather than corporations . . . owe a duty of candor to the PTO." *Avid Identification Sys., Inc. v. Crystal Imp. Corp.*, 603 F.3d 967, 974 n.1 (Fed. Cir. 2010) (citing *Exergen*, 575 F.3d at 1328). As such, to the extent Defendants' allegations are directed against the corporate entities "IBM" and "Trintex," they cannot serve as the basis for an inequitable conduct counterclaim. (*See* D.I. 103 at ¶¶ 122, 130, 212, 219-221)

Defendants' claims against the "named inventors" and the "prosecuting attorneys" *could* be specific enough to meet the "who" requirement, to the extent that they could be understood to accuse each of the members of a known, clearly ascertainable group. *Cf. Invensys Sys., Inc. v. Emerson Elec. Co.*, Case No. 6:12-cv-799, 2014 WL 12599216, at *2 (E.D. Tex. July 9, 2014) (finding "the named inventors" to satisfy the "who" requirement); *Aevoe Corp. v. AE Tech. Co., Ltd.*, No. 2:12-cv-00053-GMN-NJK, 2013 WL 876036, at *6 (D. Nev. Mar. 7, 2013) (finding allegations against "prosecuting attorneys" insufficient, but where the defendant did not call out "the identity of an individual associated with the prosecution of the patent in its counterclaim" and the patent itself did not list the prosecuting attorneys); *Teva Neuroscience, Inc. v. Watson Labs., Inc.*, Civil Action No. 10-5078 (JLL), 2011 WL 741250, at *3 (D.N.J. Feb. 24, 2011)

18

(indicating that amending a complaint to identify the "named inventors whose names are listed on the faces of the patents-at-issue" would satisfy *Exergen*'s "who" requirement).[7]  But even if there were enough information in the pleadings here to identify each of the persons in these groups, the claims against them would still fail.  That is because there are not sufficient facts pleaded to establish, *inter alia*, that the "named inventors" or "prosecuting attorneys" (other than Mr. Scifo) actually had knowledge of the activities that they allegedly failed to disclose.  The closest the allegations come in that regard is as to the "named inventors," when it is alleged that they knew of Prodigy's development, (D.I. 103 at ¶ 120), were involved with public trials and presentations about the system, (*id.* at ¶ 213), and that "*[o]n information and belief*, the named inventors had knowledge of IBM's pre July 15, 1987, commercialization of Prodigy[,]" (*id.* at ¶ 121 (emphasis added)).  Yet what is required here is more than just a vague statement of what Defendants know "on information and belief."  Instead, actual facts have to be pleaded that would allow the inference that each of the named inventors (or, for that matter, each of the prosecuting attorneys other than Mr. Scifo) had knowledge of the relevant commercialization efforts.  *See Brinkmeier v. BIC Corp.*, 733 F. Supp. 2d 552, 565 (D. Del. 2010) ("[Under Rule 9(b)], a plaintiff may plead based upon information and belief, 'but only if the pleading sets forth the specific facts upon which the belief is reasonably based.'") (citation omitted); *Hollander v. Etymotic Research, Inc.*, 726 F. Supp. 2d 543, 551 (E.D. Pa. 2010).  Here they are not, and so any allegations as to these two large groups of persons fail at least the "how" requirement and the

---

[7]    There are six named inventors as to the '967 patent:  Robert Filepp, Kenneth Appleman, Alexander Bidwell, Allan Wolf, James Galambos, and Sam Meo.  (D.I. 1, ex. A)  Each of those are also named inventors as to the '849 patent, along with Francis Young, Duane Tiemann, Mel Bellar and Robert Cohen.  (*Id.*, ex. B)

requirement that the persons have knowledge of the material withheld information.

Defendants *have* specifically (and repeatedly) identified Mr. Scifo, IBM's prosecuting attorney, as an individual who intentionally made material misrepresentations or omissions to the PTO during prosecution of the '967 and '849 Patents. (*See generally* D.I. 103 at ¶¶ 130-227) As such, the Court will proceed to assess the instant theories of inequitable conduct as they relate to Mr. Scifo only.

**B.    Defendants' Theories of Inequitable Conduct**

**1.    Failure to Disclose Allegedly Anticipatory Prior Art**

**a.    Trintex NEXIS Articles[8]**

Defendants allege that before July 15, 1987, the critical date for the Asserted Patents, "Trintex and IBM published articles and made public presentations[9] regarding the technology that it later sought to patent." (D.I. 103 at ¶ 126) They further allege that Mr. Scifo intentionally withheld these materials from the PTO during the prosecution of the patents-in-suit. (*Id.* at ¶ 158-59)

---

[8]    Defendants allege both that the Trintex NEXIS Articles serve as prior art to the '849 patent and '967 patent and would render the '967 patent invalid on this basis, *and* that they provide evidence related to commercialization efforts that would also render both the '849 and '967 patents invalid. (*See, e.g.*, D.I. 103 at ¶¶ 127-28; D.I. 138 at 11 n.4) Here, the Court focuses on the ability of the Trintex NEXIS Articles to serve as the basis for an inequitable conduct claim based on their alleged prior art status; the articles will be discussed further as part of IBM's alleged commercialization efforts in Section III.B.2, *infra*.

[9]    Plaintiffs note that "[w]ith respect to the 'presentations' and 'speeches' that Defendants contend should have been disclosed, Defendants do not identify any specific speech or presentation." (D.I. 121 at 8 n.5 (citing D.I. 103 at ¶¶ 113, 126, 128-30, 213, 217-18)) The Court agrees that "[s]uch unspecified material cannot support an inequitable conduct counterclaim." (*Id.* (citing *Exergen*, 575 F.3d at 1328)) As such, the Court's analysis as to the "Trintex NEXIS Articles" addresses only the articles specifically identified in Defendants' pleadings. (*See* D.I. 103 at ¶¶ 105-06, 109-110, 113, 115, 117, 214)

(1)     **Materiality prong—misrepresentation of material fact**

As noted above, absent affirmative egregious misconduct, which has not been pleaded, but-for materiality must be alleged in order to satisfy the materiality prong of inequitable conduct. *Cf. Therasense*, 649 F.3d at 1292.  Here, IBM alleges that Defendants "have not sufficiently alleged that the Trintex NEXIS Articles were but-for material." (D.I. 121 at 14 n.7)

Defendants pleaded that, through the Trintex NEXIS Articles, "IBM and Trintex publicly used and disclosed the Trintex technology . . . prior to [the critical date of] July 1[5], 1987, in sufficient detail to allow one of ordinary skill in the art to make and use what Trintex, IBM, and the inventors later sought to patent." (D.I. 103 at ¶ 107)  The Ninth Counterclaim also asserts that the BPAI, after independently locating the Trintex NEXIS Articles, "correctly recognized that the Trintex NEXIS Articles . . . were material to patentability, and rejected numerous pending [claims of what became the '849 patent] in light of the Trintex NEXIS Articles. (*Id.* at ¶ 127)  They supplement their position with reference to a portion of the '849 patent's prosecution history from February 2002 (referenced in their pleadings), which reveals that the BPAI recognized "the value of the NEXIS articles for what they teach on their face as prior art[.]"  (D.I. 138, ex. A at 34; *see also* D.I. 103 at ¶ 128)  They further allege that "[t]hese [materiality] findings apply equally to other related patents, including [the '967 patent.]" (D.I. 103 at ¶ 127) And they then assert that but for IBM's withholding of the articles, the '967 patent would not have issued. (*See id.*; *see also* D.I. 138 at 9-10)

IBM's main challenge to materiality here was that "the Trintex NEXIS Articles cannot be the basis for inequitable conduct for the '849 patent because the PTO considered them" at least in 2002. (D.I. 121 at 8 n.5 (citing *id.*, ex. 6 at IBM-PLCN00002064))  It is true that "[i]nequitable

conduct cannot be based on an applicant's failure to cite a prior art reference where the examiner independently cited the same reference."[10]  But as to the '967 patent, which issued in 1998, its examiner never considered any of the Trintex NEXIS Articles.  As such, the articles could conceivably be the basis for an inequitable conduct claim as to that patent.  (*See, e.g.*, D.I. 103 at ¶ 101 ("Printed publications[, namely, the Trintex NEXIS Articles] describing the claimed subject matter of the '967 Patent prior to July 15, 1987, renders that claimed subject matter invalid."); D.I. 138 at 3 (noting that the PTO did not locate the articles until "[y]ears after the '967 Patent issued[.]"))

The problem for Defendants here is not that the PTO considered some of the Trintex NEXIS Articles, but that Defendants' pleadings do not sufficiently articulate how "the omitted information is not cumulative of the information already on the record[,] by identifying the particular claim limitations that are absent from the record." *St. Jude Med., Cardiology Div., Inc. v. Volcano Corp.*, Civil Action No. 12-441-RGA, 2014 WL 2622240, at *1 (D. Del. June 11, 2014) (citing *Exergen*, 575 F.3d at 1329-30 ("Such allegations are necessary to explain both

---

[10]     Defendants note that "not all of the articles cited in the pleadings were part of the articles that the BPAI later found; some of the articles were never before the BPAI[.]"  (D.I. 138 at 11 n.4 (listing those Trintex NEXIS Articles that were not located by the BPAI) (citing D.I. 103 at ¶¶ 105-06, 109, 115, 117); D.I. 138, ex. A at 33 (listing those Trintex NEXIS Articles that were located by the BPAI))  Thus, Defendants suggest, at least some of the Trintex NEXIS Articles can be the basis for an inequitable conduct claim related to the '849 patent.

This is not relevant to this particular theory of inequitable conduct, as Defendants did not appear to allege that the Trintex NEXIS Articles are but-for material to the issuance of the '849 patent based on their prior art status.  (*See* D.I. 103 at ¶ 224 (alleging that "the Trintex NEXIS Articles are material to the patentability *of the '967 Patent*" (emphasis added)); *see also id.* at ¶ 127)  Rather, the relevance of this argument as to the '849 patent seems to be related to Defendants' allegations regarding the Trintex NEXIS Articles as being evidence of invalidating commercialization efforts.

'why' the withheld information is material and not cumulative, and 'how' an examiner would have used this information in assessing the patentability of the claims.")).  Although Defendants assert that the Trintex NEXIS Articles are material to patentability, and that the '967 patent "would not have properly issued [if the articles were disclosed] because the Trintex NEXIS Articles anticipated the claimed subject matter or rendered the claimed subject matter obvious[,]" (D.I. 103 at ¶ 127), they do not offer any specific reasoning as to *how* what was in the articles show that this is the case.

The closest Defendants come to doing so is by stating that "the Trintex NEXIS Articles are material to the patentability of the '967 Patent, at least for the reasons explained by the [BPAI] when [it] discovered them during prosecution of the sibling '849 Patent and in its December 23, 2005 decisions." (*Id.* at ¶ 224 (citing '849 Prosecution History – Feb. 27, 2002 BPAI Opn. at 33-36; '849 Prosecution History – Dec. 23, 2005 BPAI Opn. at 34-61))  But they offer no facts that plausibly demonstrate that any claims of the '967 patent would be anticipated or rendered obvious by the same material that caused the BPAI to initially reject the claims of the '849 patent.  Indeed, the Court has no way of knowing *which* claims of the '967 patent are even alleged to be anticipated or rendered obvious by the Trintex NEXIS Articles.

In light of this, the Court cannot reasonably infer that the failure to disclose certain Trintex NEXIS Articles was "but-for" material to the issuance of claims in the '967 patent, at least on the theory that these articles constitute invalidating prior art.  The Court will assess their materiality as relating to potentially invalidating "commercialization efforts" in Section III.B.2, *infra*.

(2)     **Intent prong—specific intent to deceive the PTO**

23

IBM also argues in its opening brief that Defendants' allegations regarding prior art do not support a finding of intent to deceive the PTO. (D.I. 121 at 3)  In light of the Court's materiality finding here, it need not address this issue.

### b.    Agarwal

Defendants also assert that Mr. Scifo withheld the Agarwal reference—a reference alleged to be prior art to both Asserted Patents and material to the patentability of the '967 patent—from the PTO. (D.I. 103 at ¶¶ 161-66)  IBM contends that Defendants' pleadings are insufficient to permit a reasonable inference of materiality and intent with regard to the '967 patent. (D.I. 121 at 9-11; D.I. 149 at 1, 4-5)

### (1)    Materiality prong—misrepresentation of material fact

IBM argues that "Defendants fail to support their allegations with sufficient facts to permit a reasonable inference that Agarwal is but-for material[,]" in part because "Agarwal is cumulative of information that was before the PTO, and the BPAI's findings support that several relevant claim limitations are absent from Agarwal." (D.I. 121 at 9)

Again, in order for the Court to draw an inference of materiality, Defendants' pleadings must "show that the omitted information is not cumulative of the information already on the record by identifying the particular claim limitations that are absent from the record." *St. Jude Med., Cardiology Div.*, 2014 WL 2622240, at *1. IBM asserts that consideration of Agarwal would *not* have affected the examiner's patentability determination with regard to the '967 patent because "Agarwal is cumulative over thirteen references that the PTO cited during prosecution of the '967 patent." (D.I. 121 at 10)

In its briefing, IBM cites to the respective prosecution histories of the patents-in-suit to

24

demonstrate that "Agarwal . . . does not disclose the claim limitations that the applicants added [to the '967 patent] to overcome the prior art." (*Id.*) Both Agarwal and the '967 patent disclose systems that request and retrieve certain information from "data objects." (*See id.*) In considering Agarwal as a reference against the '849 patent, the BPAI explained that Agarwal requires that "*all* of the . . . information is requested [from a computer network] by the user or the user's application." (D.I. 121, ex. 10 at IBM-PCLN00002618 (emphasis added)) By contrast, the '967 patent was amended to allow for "at least some of [the] objects [to] be stored at the respective reception system[.]" (D.I. 121, ex. 9 at IBM-PLCN00000386 (emphasis omitted)) Thus, the targeted information may be "retrieved from the objects stored at the respective reception system, *or if* unavailable from the objects stored at the respective reception system, *then* from the network[.]" (*Id.* at IBM-PLCN00000387 (certain emphasis added, certain emphasis omitted)) According to IBM, the amendments distinguish the '967 patent's claim language from Agarwal so as to "preclude[] a finding that Agarwal meets the '967 patent claim language[.]" (D.I. 149 at 5) In sum, it argues that Agarwal cannot be material because "Defendants rely on Agarwal for invalidity theories that have been rejected by the BPAI." (*Id.*)

Defendants disagree with this characterization of the relationship between Agarwal and the '967 patent. They plead that "[t]he Agarwal reference is not cumulative of the art that was before the examiner of the '967 patent. Indeed, the Agarwal reference anticipates and/or renders obvious one or more claims of the '967 patent." (D.I. 103 at ¶ 166; *see also id.* at ¶ 223(a)) In support of this allegation, Defendants attached as an exhibit to their pleadings a claim chart that purports to demonstrate the '967 patent's invalidity as being anticipated or rendered obvious by Agarwal. (D.I. 103, ex. 3) That claim chart includes, *inter alia*, specific citations to portions of

Agarwal's specification that Defendants assert disclose that "at least some of [the data] objects may be stored at the respective reception system." (*Id.*, ex. 3 at 17-18 (citing Agarwal, cols. 2:38-40, 4:21-33, 6:3-8)) Defendants thus argue that the issue of whether the '967 patent is invalid in light of Agarwal is a factual dispute, and "IBM's *disagreement* with Defendants' allegations is irrelevant on a motion to dismiss, 'as the court is not required to judge the merits of the parties' respective positions at this stage of the proceedings.'" (D.I. 138 at 15 (emphasis in original) (quoting *Quest Integrity USA, LLC v. Clean Harbors Indus. Servs., Inc.*, Civ. No. 14-1482-SLR, 2015 WL 4477700, at *5 (D. Del. July 22, 2015)))

Here, the Court agrees with Defendants. The fact that the BPAI made certain findings that suggest differences between the '967 patent's claims and Agarwal's claims does not preclude the Court from inferring Agarwal's but-for materiality. Defendants specifically allege that Agarwal is not cumulative and would have anticipated or rendered obvious certain claims of the '967 patent. (D.I. 103 at ¶ 166) And Defendants' detailed claim chart describes, on a limitation-by-limitation basis, how fifteen of the '967 patent's claims are plausibly rendered invalid by Agarwal. (*See* D.I. 103, ex. 3)[11] Defendants have specifically pleaded the materiality of the

---

[11]     In arguing that this is not plausible, beyond pointing to specific claim language from the '967 patent itself, (*see* D.I. 121 at 10; '967 patent, col. 39:45-47), IBM also points to statements made by the BPAI in finding that Agarwal does not teach certain limitations of the '967 patent, (*see* D.I. 121 at 10-11 (citing *id.*, ex. 10 at IBM-PCLN00002617-18)). Because the BPAI's language does not map directly onto the actual language used in the '967 patent's claims, Defendants' claim chart does not, on its face, specifically address all of the BPAI's arguments. But given the fact that the claim chart *does* address, on a limitation-by-limitation basis, each claim that Defendants allege is anticipated (and specifically identifies language in Agarwal's specification that is said to disclose the same limitations), the Court finds that Defendants have specifically alleged materiality, despite the fact that they may not have explicitly addressed *every* reason cited by the BPAI for not crediting Agarwal as an anticipatory reference to the '849 patent. *Cf. Ameranth, Inc. v. GrubHub, Inc.*, CASE NO. 12-CV-739 JLS (NLS), 2012 WL 12847584, at *3 (S.D. Cal. Oct. 4, 2012) ("[T]o the extent that [defendant] has alleged that [plaintiff] failed to

26

Agarwal reference; the merits of their allegations are to be addressed at a later stage. *See Quest Integrity*, 2015 WL 4477700, at *5.

### (2)    Intent prong—specific intent to deceive the PTO

IBM does not provide argument regarding Mr. Scifo's intent to deceive the PTO in failing to disclose the Agarwal reference, beyond simply stating that "Defendants . . . provide no facts to support a reasonable inference that Scifo acted with a specific intent to deceive the PTO." (D.I. 121 at 9 (citing *Therasense*, 649 F.3d at 1290)) The Court disagrees.  In the Ninth Counterclaim, Defendants allege that Mr. Scifo: (1) had knowledge of Agarwal and its materiality as early as during prosecution of the '967 patent, (D.I. 103 at ¶ 161); (2) was aware of its materiality "at least as early as October 27, 1997, when the examiner of the '849 patent application rejected certain '849 Patent claims in light of the Agarwal reference[,]" (*id.* at ¶ 164); and (3) never disclosed Agarwal to the PTO despite receiving the '849 rejection several months before the '967 patent issued, (*id.* at ¶ 165).  The Ninth Counterclaim also specifically identifies this withholding as part of a "pattern of intentional withholding of material art with intent to deceive during the prosecution of the '967 Patent[.]" (*Id.* at ¶ 161)  It is reasonable to infer from the alleged conduct of Mr. Scifo that he intended to deceive the PTO. *Cf. Courtesy Prods. L.L.C. v. Hamilton Beach Brands, Inc.*, Civil Action No. 13-2012-SLR-SRF, 2015 WL 6159113, at *7 (D. Del. Oct. 20, 2015); *Quest Integrity*, 2015 WL 4477700, at *5.

As Defendants have sufficiently pleaded materiality and specific intent related to

---

disclose an anticipatory reference to the patent examiner and charted how the reference anticipates the asserted claims of [the patents-in-suit], [defendant] has adequately alleged why the withheld reference is material and not cumulative.").  IBM has pointed to no legal authority suggesting that this conclusion is incorrect.

Agarwal, the Court recommends that IBM's Motion be denied as to that part of the Ninth Counterclaim.

### c.    Conclusion

Defendants have failed to plead with particularity that the Trintex NEXIS Articles anticipated or rendered obvious the claimed subject matter of the '967 patent. Therefore, the Court recommends granting IBM's motion as it pertains to that theory. (D.I. 103 at ¶ 101, 108, 127, 213-21, 224-25)  However, Defendants have met both prongs of the *Exergen* inquiry with regard to their allegations that Mr. Scifo failed to disclose the Agarwal reference. As such, the Court recommends that IBM's Motion be denied as it pertains to these allegations. (D.I. 103 at ¶¶ 160-66, 223(a))

### 2.    Failure to Disclose Commercialization Efforts

Defendants allege that "[p]rior to July 15, 1987, Trintex not only commercially offered to sell but actually commercially sold advertising services to be delivered by performing the processes and using the apparatuses claimed in the '967 Patent and '849 Patent and related patents." (D.I. 103 at ¶ 116)  According to Defendants, such offers to sell and sales render the claimed subject matter of the '849 patent and '967 patent invalid, based on the fact that the patented product was "in public use or on sale" pursuant to the version of 35 U.S.C. § 102(b) ("Section 102(b)") that was applicable prior to passage of the Leahy-Smith America Invents Act. (*Id.* at ¶¶ 100, 103; D.I. 138 at 2-3, 10-14)  Further, they allege that "Paul Scifo . . . withheld and misrepresented . . . IBM client commitments in excess of $1.0 million resulting from IBM's commercialization of the Prodigy system prior to the critical date." (*Id.* at ¶ 131)

### a.    Materiality prong—misrepresentation of material fact

Under Section 102(b), "the on-sale bar applies when two conditions are satisfied before the critical date.  First, the product must be the subject of a commercial offer for sale. . . . Second, the invention must be ready for patenting." *Pfaff v. Wells Elecs., Inc.*, 525 U.S. 55, 67 (1998).  Similarly, "[a] bar under [Section] 102(b) arises where, before the critical date, the invention is in public use and ready for patenting." *Invitrogen Corp. v. Biocrest Mfg., L.P.*, 424 F.3d 1374, 1379 (Fed. Cir. 2005).  IBM argues that the pleaded facts do not plausibly allege that these requirements can be met.  The Court will address the "ready for patenting" requirement before considering the question of whether the relevant "product" was the subject of a commercial offer for sale or in public use.

### (1)    The Court may reasonably infer that the inventions were ready for patenting

Defendants allege that the patented technology "was initially developed by IBM's Trintex venture," (D.I. 103 at ¶ 105), and that prior to the critical date of July 15, 1987, "IBM and Trintex publicly used and disclosed the Trintex technology[,]" and such "public use and disclosure [provided] sufficient detail to allow one of ordinary skill in the art to make and use what Trintex, IBM, and the inventors later sought to patent[,]" (*id.* at ¶ 107).  In order to show that an invention was "ready for patenting," a party may provide "proof of reduction to practice before the critical date . . . or . . . proof that prior to the critical date the inventor had prepared drawings or other descriptions of the invention that were sufficiently specific to enable a person skilled in the art to practice the invention[.]" *Pfaff*, 525 U.S. at 67.

In disputing that "the inventions of the '967 and '849 patents were 'ready for patenting' at the time of the alleged commercial activities[,]" (D.I. 121 at 13; *see also* D.I. 149 at 7), IBM

points to Mr. Scifo's Disclosure Statement submitted to the PTO, in which he described the "first phase of the test and development period" for Prodigy, which "extended from approximately January 1987 through September 1987." (D.I. 121, ex. 1 at IBM-PCLN00000286) Mr. Scifo's description of the Prodigy project during that span indicates, according to IBM, that "the system that would evolve into Prodigy was at its beginning stages." (D.I. 121 at 13) Given that September 1987 was two months after the critical date of July 15, 1987, IBM argues that "Mr. Scifo's declaration . . . demonstrate[s] that the claimed inventions were still undergoing testing and had not yet been reduced to practice." (D.I. 149 at 7) The apparent implication is that any sale or public use of the patented inventions before the critical date must have related to "experimental use" and therefore was not subject to the on-sale or public use bars under Section 102(b). (*Id.*); *see also Delaware Valley Floral Grp., Inc. v. Shaw Rose Nets, LLC*, 597 F.3d 1374, 1379 (Fed. Cir. 2010) ("A patentee that demonstrates experimental use may overcome the application of the on-sale bar."); *Clock Spring, L.P. v. Wrapmaster, Inc.*, 560 F.3d 1317, 1326 (Fed. Cir. 2009) ("[S]omething that would otherwise be a public use may not be invalidating if it qualifies as an experimental use.").

But, as Defendants point out, IBM's *factual disagreement* as to whether the patented inventions were reduced to practice at the time of the alleged commercialization events does not support dismissal of Defendants' counterclaim at the pleading stage. (*See* D.I. 138 at 13) And in the Ninth Counterclaim, Defendants do plead some facts that allow the Court to infer that the inventions were ready for patenting. For example, they point to the BPAI's statement that the Trintex NEXIS Articles, "especially those published before the critical date . . ., raise questions of what else may have been publicly disclosed or on sale that has not been disclosed to the

[PTO.]" (D.I. 103 at ¶ 128; D.I. 138, ex. A at 34)[12]  This statement can be read to indicate that at

least the BPAI believed that the public use/on-sale bar could have been implicated by the

commercial activities referenced in the Trintex NEXIS Articles.  Moreover, Defendants allege

that prior to the critical date, "Trintex not only commercially offered to sell but actually

commercially sold advertising services to be delivered by performing the processes and using the

apparatuses claimed in the '967 Patent and '849 Patent and related patents."  (D.I. 103 at ¶ 116)

They further allege that by June of 1987, Trintex had "amassed around $1.25 million in financial

commitments" from at least three dozen clients, and "had entered into numerous multiyear

agreements with its initial advertising clients."  (*Id.* at ¶¶ 150-51)  The willingness of clients to

make such significant expenditures for services provided through the claimed inventions

supports Defendants' allegation that the inventions had either been (1) reduced to practice, or (2)

were publicly used and disclosed "prior to July 1[5], 1987, in sufficient detail to allow one of

ordinary skill in the art to make and use what Trintex, IBM, and the inventors later sought to

patent."  (*Id.* at ¶ 107)

Based on the pleadings, the Court must accept that the inventions were ready for

patenting by the critical date, as Defendants allege.  (*See* D.I. 138 at 13-14); *Cornell Univ. v.

Illumina, Inc.*, C.A. No. 10-433-LPS-MPT, 2016 WL 3046258, at *9 (D. Del. May 27, 2016)

(explaining that the Court may not address the merits of the evidence at the motion-to-dismiss

stage as to an inequitable conduct counterclaim).  Thus, the statements that Mr. Scifo made in his

---

[12]      IBM suggests that the "BPAI's comments regarding the articles are not relevant
here because the PTO applies a different materiality standard."  (D.I. 121 at 14 n.7 (citing
*Therasense*, 649 F.3d at 1293))  The Court disagrees.  While the Court does not afford
dispositive weight to the BPAI's comments, they are still "relevant" in that they constitute part of
a set of pleaded facts that allow the Court to draw a reasonable inference of but-for materiality.

disclosure to the PTO do not prevent a reasonable inference of the alleged commercialization efforts' but-for materiality.

> (2)     **Defendants have specifically pleaded that the patented product was the subject of a commercial offer for sale or in public use**

IBM asserts that the patented product was not the subject of a commercial offer for sale or in public use because "Defendants do not allege that the advertising sales had any connection to the claim limitations, including the structure of the network and service delivery." (D.I. 121 at 13 (citations omitted); *see also* D.I. 149 at 6)  Essentially, IBM argues, it is not enough for the claims to simply "'*relate*' to 'delivery of advertisements' in order for the offers for sale to invalidate the patents." (D.I. 149 at 7 (emphasis in original) (quoting D.I. 138 at 12))  Rather, in order for the alleged commercialization efforts to constitute commercial offers "'of the patented invention[,]' . . . 'the invention that is the subject matter of the offer for sale must satisfy each claim limitation of the patent.'" *Plumtree Software, Inc. v. Datamize, LLC*, 473 F.3d 1152, 1163 (Fed. Cir. 2006) (quoting *Scaltech, Inc. v. Retec/Tetra, LLC*, 269 F.3d 1321, 1329 (Fed. Cir. 2001)).

Defendants, in response, first note that the claims at issue in the two patents here are all method claims, (D.I. 138 at 13 (citing *Medicines Co. v. Hospira, Inc.*, 827 F.3d 1363, 1375 (Fed. Cir. 2016); *In re Kollar*, 286 F.3d 1326, 1333 (Fed. Cir. 2002)), which means that Defendants had to plead, at a minimum, that the methods or processes described in the patents were the subject of a commercial offer for sale or in public use as of the critical date, *see Plumtree*, 473 F.3d at 1162; *Scaltech*, 269 F.3d at 1327.  As to whether Defendants *have* done that, Defendants certainly flatly stated a few times in the Ninth Counterclaim that they had: "Trintex's offers to

sell advertising services to third parties were commercial offers to sell, including commercial offers to actually perform the processes later claimed in the '967 Patent and '849 Patent[.]" (D.I. 103 at ¶ 114; *see id.* at ¶ 116) But more than that, Defendants also alleged that: (1) information about the Trintex project was sufficient, when it became known to the PTO, for the BPAI to initially reject claims during prosecution of the '849 patent, (*id.* at ¶¶ 126-29); and (2) IBM itself has asserted that the technology patented in the '967 and '849 patents is embodied in the Prodigy online service, (*id.* at ¶ 142; *see also* D.I. 138 at 10 (citing D.I. 121 at 4)). These factual allegations are enough to support Defendants' statement that what was being offered for sale or publicly used amounted to the patented methods at issue.

### b.      Intent prong—specific intent to deceive the PTO

The Court next assesses whether Defendants have specifically pleaded facts relevant to the intent prong. As to Mr. Scifo, IBM asserts that:

> Defendants . . . have not alleged any facts that Scifo knew of the advertising sales and partnerships surrounding the alleged commercialization efforts and withheld information about those sales with intent to deceive the PTO. Defendants make no factual allegations that Scifo was involved in the alleged commercialization efforts or knew anything about the extent of the advertising clients or financial commitments made in association with the launch of Prodigy.

(D.I. 121 at 13-14) The Court disagrees with IBM's assessment.

Defendants allege that Mr. Scifo was aware of the pre-critical date commercialization of Prodigy/Trintex, particularly through his investigation of the development and commercialization of the Prodigy service that resulted in the Disclosure Statement he submitted to the PTO that described that subject matter. (*See, e.g.*, D.I. 103 at ¶¶ 133, 137, 143, 153, 158) But they allege

that Mr. Scifo drafted the Disclosure Statement "*in such a way as to be misleading by omitting the details*" of pre-critical date commercialization of Prodigy, (*id.* at ¶ 154 (emphasis added); *see also id.* at ¶ 157), and that he thus "withheld and misrepresented, *with the intent to deceive the [PTO]*, IBM client commitments in excess of $1.0 million resulting from IBM's commercialization of the Prodigy system prior to the critical date[,]" (*id.* at ¶ 131) (emphasis added). And IBM's contrary contention that what Mr. Scifo did say in the Disclosure Statement shows that he satisfied his duty of candor, (*see* D.I. 121 at 14-15), amounts to a fact dispute—it does not render Defendants' pleading inadequate.[13] These allegations allow for the reasonable inference that Mr. Scifo had the intent to deceive the PTO with regard to commercialization efforts.

### c.   Conclusion

---

[13]     The fact dispute, in essence, is over whether Mr. Scifo's Disclosure Statement provided an accurate description of the commercial status of the claimed invention prior to the critical date of July 15, 1987. Defendants allege that Mr. Scifo misled the PTO by focusing on *post*-critical date fees and purchases that amounted to smaller amounts of money than the alleged $1.25 million in pre-critical date financial commitments. (*See* D.I. 138 at 12; *compare* D.I. 121, ex. 1 at IBM-PCLN00000295, *with* D.I. 103 at ¶¶ 131, 150) They further assert that Mr. Scifo minimized the alleged commercialization efforts by describing all pre-critical date commercial activity as "minimal and wholly incidental to the experimental nature of testing." (D.I. 103 at ¶ 157)

For its part, IBM argues that Mr. Scifo's declaration "was truthful with respect to the underlying facts and figures[,]" and seems to assert that Mr. Scifo provided context for the commercial activities by referring both to the fees generated *and* deficit incurred by IBM in the years leading up to the critical date. (D.I. 149 at 6 (citing D.I. 138, ex. E))

At this stage, the Court need not resolve this dispute. Rather, it must only determine whether Defendants have pleaded facts allowing it to reasonably infer that Mr. Scifo specifically intended to deceive the PTO. They have done so.

With regard to the alleged commercialization efforts, as to their allegations regarding Mr. Scifo, Defendants have satisfied the Rule 9(b) pleading requirements.  As such, the Court will recommend denial of IBM's Motion as it pertains to this theory.  (D.I. 103 at ¶¶ 100, 103, 106, 109-25, 131-59, 212-22)

### 3.    Failure to Disclose Co-Pending Patent Applications and Related Office Actions

Defendants next assert two theories of inequitable conduct stemming from Mr. Scifo's failure to disclose co-pending patent applications that he prosecuted, including PTO actions related to those applications.  First, they allege that "Scifo hid office actions rejecting similar claims in co-pending applications from the examiner of the '967 Patent with the intent of deceiving the Patent Office."  (*Id.* at ¶ 167)  These co-pending applications include the '849 patent application, the '632 patent (the parent patent of the '967 patent) application, and the '072 patent application.  As was previously noted, both the '967 patent and the '849 patent are divisionals of the '632 Patent.  (*Id.* at ¶ 169)  Defendants allege that, due to the similarities amongst the claims of these patents, Mr. Scifo's failure to disclose certain rejections of claims of the '849 patent application, '632 patent application, and '072 patent application had a material impact on the issuance of the '967 patent.  (*Id.* at ¶¶ 172, 207, 223(b))

Second, Defendants allege that by hiding the prosecution of co-pending applications, Mr. Scifo avoided double patenting rejections of the '967, '849, and '072 patents.  (*Id.* at ¶ 131, 198, 211, 223(c))

### a.    The '849 Patent

#### (1)    Materiality prong—misrepresentation of material fact

### (a)   Rejection of claims

Although the '967 and '849 applications were pending simultaneously, they were, as previously noted, examined by different examiners at the PTO. (*Id.* at ¶ 171) Defendants assert that "[w]here, as here, the rejections of similar co-pending claims before different examiners . . . are material, they must be disclosed." (D.I. 138 at 16 (citing *Dayco Prods., Inc. v. Total Containment*, 329 F.3d 1358, 1368 (Fed. Cir. 2003); *Larson Mfg. Co. of South Dakota, Inc. v. Aluminart Prods. Ltd.*, 559 F.3d 1317, 1337-38 (Fed. Cir. 2009))) Thus, Defendants argue, Mr. Scifo "was required to disclose the related adverse decision in co-pending applications[]" such as those relating to the '849 patent application. (D.I. 138 at 16 (citing *McKesson Info. Sols., Inc. v. Bridge Med., Inc.*, 487 F.3d 897 (Fed. Cir. 2007); *Li Second Fam. Ltd. P'ship v. Toshiba Corp.*, 231 F.3d 1373 (Fed. Cir. 2000))) The similarity between the claims of the '967 patent and '849 patent, as evidenced by a claim chart attached to Defendants' pleadings, (D.I. 103, ex. 4), is thus alleged to demonstrate that "information that is material to the patentability of one is material to the patentability of the other[,]" (*Id.* at ¶ 172).

IBM attacks the value of the case law cited by Defendants, stating that "[a]ll of those cases predate the adoption of the 'but-for' materiality standard in *Therasense* and apply a more permissive materiality standard that directly contradicts current law." (D.I. 149 at 8) IBM is correct that pre-*Therasense*, a court could make a finding of materiality even if the relevant information would not necessarily invalidate the claims under consideration. *See, e.g.*, *McKesson*, 487 F.3d at 925. As such, the Court agrees that the cases cited by Defendants "do not excuse Defendants from demonstrating 'but-for' materiality under the current law." (D.I. 149 at 8)

On that score, Defendants have specifically alleged that the '849 and '967 patents "claim obvious variations of the same alleged invention. In support of this contention, they point to the above-referenced claim chart, which purports to demonstrate that "at least some of the claims of the '967 and '849 Patents are not patentably distinct from each other." (*Id.* at ¶ 191 & ex. 4) However, unlike Defendants' claim chart that plausibly demonstrated that Agarwal anticipated the '967 patent, (*see* Section III.B.1.b.(1)., *supra*), the production of this chart does not allow the Court to draw a reasonable inference of materiality.

Although the chart examines claim 1 of the '849 patent on a limitation-by-limitation basis and explains why portions of claim 13 of the '967 patent appear to disclose the same limitations, it does *not* "account for the differences in the claims of the co-pending patents, such as the 'command functions' of the '967 patent claims that the '849 patent claims lack." (D.I. 149 at 7 (citation omitted)) Indeed, as IBM notes, all of the claims of the '967 patent "require 'command functions . . . which are selectable to permit movement between applications.'" (D.I. 149 at 8 n.3 (citing D.I. 1, ex. A, cols. 39-42)) No such functionality is present in the claims of the '849 patent. (*Id.*, ex. B, cols. 39-42) Nothing in Defendants' proffered claim chart addresses this distinction. (*See* D.I. 103, ex. 4)

In light of this, the Court agrees with IBM that "Defendants' allegations do not sufficiently plead materiality" of the office actions "obtained during prosecution of the '849 patent . . . [because] Defendants do not allege how the office actions from the '849 patent prosecution are material and non-cumulative over references disclosed to the PTO during prosecution of the '967 patent." (D.I. 121 at 16 (citations omitted))

### (b) Double patenting

Defendants allege that by "hid[ing] the prosecution of the co-pending ['967 patent and '849 patent] applications from their respective examiners[,] . . . Scifo prevented both examiners from developing an understanding of the claims IBM was seeking so that one or both examiners could issue a proper double patenting rejection." (D.I. 103 at ¶ 131)  They state that "[b]y withholding the existence of the co-pending applications from the other application's examiners, Scifo hid from the examiners the fact that IBM was applying for multiple patents on the same subject matter." (*Id.* at ¶ 192)  More specifically, Defendants contend that by not informing the examiner of the '849 patent of the '967 patent's allowance, he intentionally hid information that resulted in the improper issuance of the '849 patent.  (*See id.* at ¶¶ 188-90, 193-94)[14]

The doctrinal prohibition against double patenting prevents a patentee from using a later-issued patent to effectively extend the period of exclusivity for a single invention set forth in an earlier-issued patent. *Takeda Pharm. Co. v. Doll*, 561 F.3d 1372, 1375 (Fed. Cir. 2009). The proscription against double patenting takes two forms.  The first is statutory double patenting, which stems from 35 U.S.C. § 101 and prohibits a later patent from covering identical subject matter as an earlier patent.  *Id.*  The second is nonstatutory, or "obviousness-type" double patenting.  This is a judicially created doctrine, designed to foreclose claims in separate patents that do not recite the same invention, but that nonetheless claim inventions so alike that granting both exclusive rights would effectively extend the life of patent protection.  *Id.*  Under the

_____

[14]      At times, Defendants actually seem to suggest that the examiners of *both* the '967 and '849 patents could have issued a double patenting rejection.  (*See* D.I. 103 at ¶ 131)  However, as was discussed above, the '849 patent does not recite the "command functions" required by '967 claims.  As such, Defendants have not sufficiently pleaded how the claims of the '849 patent could have served as the basis for a double patenting rejection of the seemingly broader '967 claims.

obviousness-type double-patenting doctrine, a patentee is prohibited "from obtaining an extension of the right to exclude through claims in a later patent that are not patentably distinct from claims in a commonly owned earlier patent." *Eli Lilly & Co. v. Barr Labs., Inc.*, 251 F.3d 955, 967 (Fed. Cir. 2001).

Here, Defendants have sufficiently pleaded facts to allow for the reasonable inference that the '849 patent would not have issued if Mr. Scifo had disclosed the allowance of the co-pending '967 patent application. Although the Court noted above that Defendants' claim chart does not sufficiently plead that every limitation of any of the '967 patent's claims are recited in the '849 patent, the claim chart does plausibly demonstrate the converse. That is, the claim chart shows how each limitation of claim 1 of the '849 patent is similarly recited in claim 13 of the '967 patent. (*See* D.I. 103, ex. 4); *see also Ameranth, Inc. v. GrubHub, Inc.*, CASE NO. 12-CV-739 JLS (NLS), 2012 WL 12847584, at *3 (S.D. Cal. Oct. 4, 2012). In light of this, Defendants' allegations adequately support but-for materiality of Mr. Scifo's failure to disclose the '967 patent.

### (2)    Intent prong—specific intent to deceive the PTO

In its briefing, IBM does not make any arguments about Mr. Scifo's intent, as it regards these issues. (*See* D.I. 121 at 15-16; D.I. 149 at 7-9) As to the double patenting allegation, because Defendants explicitly pleaded Mr. Scifo's intent to deceive through this withholding, (D.I. 103 at ¶ 185), as well as specific facts allowing for the inference of intent, (*see, e.g.*, *id.* at ¶¶ 186-94), the Court finds that Defendants have satisfied the intent prong.

### (3)    Conclusion

The Court will recommend granting IBM's Motion as it pertains to allegations based on

Mr. Scifo's withholding of the co-pending of the '849 patent application and office actions associated with that application from the examiner of the '967 patent application, (*id.* at ¶¶ 167, 170-82, 184, 223(b)), but denying the Motion as it pertains to Defendants' allegations that the '849 patent would have been rejected for double patenting, (*id.* at ¶¶ 131, 185-94).

### b.      The '632 Patent

The Court will recommend grant of IBM's Motion as to the allegations based on office actions rejecting claims of the '632 patent.  The Federal Circuit has indicated that "it can not be inequitable conduct for an applicant not to resubmit, in the divisional application, the information that was cited or submitted in the parent application." *ATD Corp. v. Lydall, Inc.*, 159 F.3d 534, 547 (Fed. Cir. 1998) (citation omitted) ("*ATD Corp.*"); *see also Advanced Cardiovascular Sys., Inc. v. Medtronic Vascular, Inc.*, 485 F. Supp. 2d 538, 546 (D. Del. 2007).  As the '632 patent is the parent to the '967 patent and the '849 patent, office actions from the '632 patent's prosecution cannot serve as the basis for inequitable conduct as to the '967 patent or the '849 patent.

Defendants do not dispute this general rule, but instead argue that "the unique facts of this case make its invocation inappropriate at this stage." (D.I. 138 at 17)  Its argument is as follows: (1) "after the parent '632 patent was allowed, IBM filed a divisional application [for the '967 and '849 patents,]" (*id.* (citing D.I. 138, ex. H (Notice of Allowability for the '632 patent, dated August 13, 1993); D.I. 1, exs. A, B (showing filing dates of November 26, 1993 for the '967 and '849 patents))); (2) then, before the '967 patent or '849 patent was issued, the '632 patent was withdrawn from allowance in part on the basis of U.S. Patent No. 4,805,134 ("Calo" or the "Calo reference"), (D.I. 138 at 17); (3) thus, the Calo reference, which Defendants allege is prior art to the '849 and '967 patents, (D.I. 103 at ¶ 181), did not become part of the '632 patent's file until

*after* the divisional patents were filed, (*see* D.I. 138 at 17); and so (4) this warrants a departure from the "general rule" set out above (such that Calo and the office action based on Calo should have been disclosed to the examiners of the two patents at issue). While the Calo reference was later used to reject claims of the '849 patent, (*see id.* at 17 n.11), Mr. Scifo allegedly did not disclose to the examiner of the '967 patent the rejection of the '632 patent based, *inter alia*, on the Calo reference. (D.I. 103 at ¶ 184) Defendants allege that this rejection was material to the patentability of the '967 patent, (*id.* at ¶ 183), and thus that the unique circumstances of this case allow this to serve as the basis for an inequitable conduct claim.

However, Defendants do not cite any authority for their position that the general rule does not apply here. Moreover, IBM points to at least one case in which an inequitable conduct claim *was* dismissed under very similar circumstances. (D.I. 149 at 9) In *Intex Recreation Corp. v. Team Worldwide Corp.*, 390 F. Supp. 2d 21 (D.D.C. 2005), the plaintiff ("Intex") brought an inequitable conduct claim against the defendant ("TWC") based on a failure to disclose material prior art (the "'726 patent") in the application for the asserted patent. *See Intex*, 390 F. Supp. 2d at 25. The '726 patent *had* been disclosed to the PTO in connection with the application for the parent patent of the asserted patent, but not until four months *after* the application for the asserted patent was filed. (*Id.*; *see also* D.I. 149 at 9 n.5 & exs. 3, 4 (demonstrating that the application for the asserted patent in *Intex* was filed before the disclosure of the allegedly material prior art during its parent patent's prosecution)) Despite the fact that the circumstances in *Intex* were essentially the same as they are in the instant case, the *Intex* Court did not deviate

41

from Federal Circuit law. *Intex*, 390 F. Supp. 2d at 25-26 (citing *ATD Corp.*, 159 F.3d at 547).[15]

The Court has no basis to deviate from the legal principle set out by the Federal Circuit in

*ATD Corp.* As such, the Court will recommend dismissal of Defendants' Ninth Counterclaim to

the extent that it relies on rejections of the '632 patent application's claims. (D.I. 103 at ¶¶ 168-

69, 183-84, 223(b))

c.   **The '072 Patent Application**

(1)   **Materiality prong—misrepresentation of material fact**

(a)   **Rejection of claims**

Defendants allege that Mr. Scifo also prosecuted the '072 patent, and that he did not

disclose to the examiner of the '967 patent application the existence of the co-pending '072 Patent

application (and vice versa), nor the office actions rejecting claims of those patents. (D.I. 103 at

¶¶ 197, 201, 203, 206, 208) Further, they allege that "[o]ffice actions rejecting the claims of the

'967 Patent application were material to the patentability of the '072 Patent" and vice versa. (*Id.*

at ¶¶ 205, 207)

IBM asserts that "Defendants do not sufficiently allege materiality of th[e] co-pending

applications" in that they "do not account for the '967 patent claim limitations that are absent

from the '072 patent (or vice versa)." (D.I. 121 at 17) Defendants' allegations are substantially

similar to their allegations regarding office actions related to the '849 patent application and their

materiality as to the issuance of the '967 patent. (*See supra* Section III.B.3.a.(1)) Here,

Defendants do not provide a claim chart, and do not otherwise plead specific facts that account

---

[15]     With that said, it does not appear that the *Intex* Court specifically addressed the
issue raised by Defendants here, nor that any party argued to the *Intex* Court what Defendants
argue here.

for the differences between the two patents identified by IBM.[16]  As such, the Court finds that the

materiality prong has not been met as to allegations relating to the co-pending '072 patent

application.

### (b)    Double patenting

Defendants assert the same double patenting theory with respect to the '072 and '967

patents that they assert as to the '967 and '849 patents.  (D.I. ¶¶ 196-204, 209-11)  More

specifically, they allege that "[a]t least claim 1 of the '072 Patent is not patentably distinct from

claim 1 of the '967 Patent.  Claim 1 of the '072 Patent, therefore, renders claim 1 of the '967

Patent invalid under the doctrine of double patenting."  (*Id.* at ¶ 198)  As he did not disclose the

existence of the '072 patent application to the examiner of the co-pending '967 patent application

(and vice versa), Defendants allege that Mr. Scifo did not give the examiners of the respective

applications the information necessary to determine whether the patents should be rejected under

the doctrine of double patenting.  (*Id.* at ¶¶ 201-04)  They assert that "because these co-pending

applications were for claims covering the same subject matter[, they] preclude issuance of both

patents[,]" and "the '072 Patent would not have issued but-for Scifo's withholding the existence

of the '967 Patent and its prosecution from the examiner of the '072 Patent application."  (*Id.* at

¶¶ 210-11)

The Court finds that the double patenting theory has been insufficiently pleaded here as to

the '072 and '967 patents.  Defendants have not sufficiently pleaded facts to allow for the

---

[16]    For example, like the '849 patent, the '072 patent does not appear to disclose the
"command function" limitations claimed by the '967 patent.  And claim 1 of the '072 patent
requires "objects collectively including data and executable program instructions for generating
the applications[,]" (D.I. 121, ex. 11, col. 92:50-52); this requirement "is not present in claim 1
of the '967 patent[,]" (D.I. 121 at 17; *see also* D.I. 1, ex. A, col. 39:35-61).

reasonable inference that the patents at issue cover identical subject matter or are not patentably distinguishable. The Court therefore finds that the materiality prong has not been met.

### (2)    Intent prong—specific intent to deceive the PTO

Defendants specifically plead that Mr. Scifo did not disclose the existence of the co-pending '072 patent application to the examiner of the '967 patent application, and vice versa, and that these withholdings were material to the issuance of the respective patents.  (D.I. 103 at ¶¶ 196-211)  Therefore, they argue, "it is reasonable to infer that Scifo intentionally withheld the '967 Patent and its prosecution with an intent to deceive the patent office."  (*Id.* at ¶ 210)  IBM does not argue that the intent prong has not been met as to these allegations, but because the materiality prong has not been satisfied, the allegations cannot stand.

### (3)    Conclusion

For the reasons set out above, the Court will recommend granting IBM's Motion as it pertains to the allegations related to the '072 patent and its prosecution.

### d.    Conclusion as to Failure to Disclose Co-Pending Patent Applications and Related Office Actions

As to Defendants' allegations regarding co-pending applications and related office actions, the Court will recommend granting IBM's Motion, (D.I. 103 at ¶¶ 131, 167-84, 195-211, 223(b)-(c)), except as it pertains to Defendants' theory that the '849 patent should have been rejected for double patenting, (*id.* at ¶¶ 185-94).

### C.    Defendants Have Not Adequately Pleaded Infectious Unenforceability

Defendants allege that "the inequitable conduct associated with the '967 Patent renders the '849 Patent unenforceable under the doctrine of inequitable conduct" and that "the inequitable

conduct associated with the '072 Patent renders the '967 and '849 Patents unenforceable under the

doctrine of inequitable conduct." (D.I. 103 at ¶¶ 226-27)  These amount to allegations under an

"infectious unenforceability" theory.  *See, e.g., Baxter Int'l, Inc. v. McGaw, Inc.*, 149 F.3d 1321,

1327 (Fed. Cir. 1998).  Under this theory, the inequitable conduct associated with one patent may

render a related patent unenforceable if the inequitable conduct as to one patent bears "an

immediate and necessary relation" to the enforcement of the related patent.  *See, e.g., Hoffman-*

*La Roche, Inc. v. Promega Corp.*, 319 F. Supp. 2d 1011, 1017 (Fed. Cir. 2004); *Consol.*

*Aluminum Corp. v. Foseco Int'l Ltd.*, 910 F.2d 804, 810-11 (Fed. Cir. 1990).  An "immediate and

necessary relation" requires that "the inequitable conduct that occurred earlier in the chain [of

issued patents] 'must be related to the targeted claims of the ultimately-issued patent or patents

sought to be enforced.'"  *eSpeed, Inc. v. Brokertec USA, L.L.C.*, 417 F. Supp. 2d 580, 595 (D.

Del. 2006) (quoting *Semiconductor Energy Lab., Inc. v. Samsung Elecs. Co.*, 24 F. Supp. 2d 537,

543 (E.D. Va. 1998)).  That patents share a parent is not sufficient to establish infectious

unenforceability.  *See Nilssen v. Osram Sylvania, Inc.*, 440 F. Supp. 2d 884, 900 (N.D. Ill. 2006)

("[M]ere similarity in subject matter, mere citation to the unenforceable patent, and sharing a

patent application are insufficient to invalidate a patent issued from a chain of applications in

which inequitable conduct has been found as to an application within that chain.").

As determined above, (*see supra* Section III.B), Defendants have adequately alleged

inequitable conduct in some way related to the '967 and '849 patents (but not as to the '072

patent).  Thus, the remaining question would be whether Defendants have sufficiently alleged

"an immediate and necessary relation" between any inequitable conduct associated with the '967

patent and the '849 patent, such that the conduct associated with the '967 patent "infects" the '849

45

patent. But here, it appears that Defendants' infectious unenforceability theory is based solely on the co-pending prosecution of the two patents. (*See* D.I. 138 at 20) And since the Court has not found any inequitable conduct associated with the '967 patent based on the handling of co-pending applications, it cannot infer that any inequitable conduct associated with the '967 patent "permeated the prosecution of the ['849 patent] . . . and render[ed it] unenforceable." *Consol. Aluminum*, 910 F.2d at 812.

### D. The Inequitable Conduct Affirmative Defense Should be Stricken-in-Part

As noted above, Defendants' inequitable conduct affirmative defense rises and falls with its inequitable conduct counterclaim. *See Senju*, 921 F. Supp. 2d at 306. As such, the affirmative defense will be stricken only to the extent that the counterclaim is dismissed.

### IV. CONCLUSION

For the reasons set out above, the Court recommends that the Motion be GRANTED-IN-PART and DENIED-IN-PART. Specifically, the Court recommends that the Motion be GRANTED to the extent that it pertains to (1) allegations against any corporate entities or individuals other than Mr. Scifo, (2) allegations based on the Trintex NEXIS Articles' prior art status, (D.I. 103 at ¶ 127), (3) allegations based on the failure to disclose co-pending patent applications and related office actions (other than the theory that the '849 patent should have been rejected for double patenting), (D.I. 103 at ¶¶ 131, 167-84, 195-211, 223(b)-(c)), and (4) infectious unenforceability, (*id.* at ¶¶ 226-27). The Court recommends that the Motion be DENIED as it pertains to Mr. Scifo's alleged failure to disclose (1) the Agarwal reference, (*id.* at ¶¶ 160-66, 223(a)), (2) commercialization efforts, (*id.* at ¶¶ 100, 102-03, 105-07, 109-117, 121-25, 130-159, 212-222), and (3) the co-pending '967 patent application as the potential basis for a

46

double patenting rejection of the '849 patent, (*id.* at ¶¶ 131, 185-94).

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), Fed. R. Civ. P. 72(b)(1), and D. Del. LR 72.1.  The parties may serve and file specific written objections within fourteen (14) days after being served with a copy of this Report and Recommendation. Fed. R. Civ. P. 72(b)(2).  The failure of a party to object to legal conclusions may result in the loss of the right to de novo review in the district court.  *See Sincavage v. Barnhart*, 171 F. App'x 924, 925 n.1 (3d Cir. 2006)*; Henderson v. Carlson*, 812 F.2d 874, 878–79 (3d Cir. 1987).

The parties are directed to the Court's Standing Order for Objections Filed Under Fed. R. Civ. P. 72, dated October 9, 2013, a copy of which is available on the District Court's website, located at http://www.ded.uscourts.gov.

Dated: April 10, 2017

Christopher J. Burke
UNITED STATES MAGISTRATE JUDGE