# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| INTERNATIONAL BUSINESS MACHINES CORPORATION, | : | |
| Plaintiff, | : | |
| v. | : | C.A. No. 15-137-LPS |
| THE PRICELINE GROUP INC., KAYAK SOFTWARE CORPORATION, OPENTABLE, INC., AND PRICELINE.COM LLC, | : | REDACTED PUBLIC VERSION |
| Defendants. | : | |

David E. Moore, Bindu A. Palapura, Stephanie E. O'Byrne, POTTER ANDERSON & CORROON LLP, Wilmington, DE

John M. Desmarais, Karim Z. Oussayef, Laurie N. Stempler, Robert C. Harrits, Michael James Xavier Matulewicz-Crowley, Jon Hohenthaner, Kevin McNish, DESMARAIS LLP, New York, NY

   Attorneys for Plaintiff International Business Machines Corporation.

Francis DiGiovanni, Thatcher A. Rahmeier, DRINKER BIDDLE & REATH LLP, Wilmington, DE

Dan D. Davison, NORTON ROSE FULBRIGHT US LLP, Dallas, TX

Richard S. Zembek, Daniel S. Leventhal, Daniel A. Prati, NORTON ROSE FULBRIGHT US LLP, Houston, TX

Gilbert A. Greene, Marwan Elrakabawy, NORTON ROSE FULBRIGHT US LLP, Austin, TX

   Attorneys for Defendants The Priceline Group Inc., Priceline.com LLC, KAYAK Software Corporation, and OpenTable, Inc.

## MEMORANDUM OPINION

September 18, 2017
Wilmington, Delaware

**STARK, U.S. District Judge:**

Pending before the Court are the following 13 motions filed by the parties:

- Plaintiff International Business Machines Corp.'s ("IBM" or "Plaintiff") Motion for Summary Judgment of No Invalidity of the Asserted Claims of U.S. Patent No. 7,072,849 ("the '849 patent") in View of the Salomon Thesis (D.I. 491-2)

- Defendants The Priceline Group Inc. ("Priceline"), Priceline.com LLC, Kayak Software Corporation ("Kayak"), and OpenTable Inc.'s ("OpenTable") (collectively, "Defendants") Motion for Summary Judgment of Indefiniteness of U.S. Patent No. 5,796,967 ("the '967 patent") and the '849 Patent (D.I. 328)

- IBM's Motion for Summary Judgment of No Anticipation of the Asserted Claims of the '967 Patent (D.I. 353)

- Defendants' Motion for Summary Judgment of Noninfringement of the '967 and '849 Patents (D.I. 346)

- IBM's Motion to Strike Certain Portions of David Eastburn's Rebuttal Expert Report (D.I. 382)

- Defendants' Motion for Summary Judgment of Noninfringement of U.S. Patent 5,961,601 ("the '601 patent") and Motion to Exclude Dr. Schmidt's Opinions (D.I. 360)

- IBM's Motion for Summary Judgment of No Anticipation of the Asserted Claims of the '601 Patent (D.I. 349)

- Defendants' Motion for Summary Judgment of Failure to Comply with 35 U.S.C. § 287 for the '601 Patent (D.I. 332)

- Defendants' Motion for Summary Judgment of Noninfringement of U.S. Patent No. 7,631,346 ("the '346 patent") (D.I. 336)

- IBM's Motion for Partial Summary Judgment on Defendants' Affirmative Defenses (D.I. 343)

- Defendants' Motion to Exclude Expert Testimony (Dr. Hausman and Dr. Stewart) (D.I. 340)

1

- IBM's Motion to Preclude Testimony of Defendants' Damages Expert Keith Ugone (D.I. 355)

- Plaintiff's Motion to Strike Certain Portions of Defendants' Rebuttal Expert Reports (D.I. 386)

## I.    BACKGROUND

On February 9, 2015, IBM filed a complaint against Defendants alleging infringement of the '346, '601, '967, and '849 patents (the "asserted patents").  (D.I. 1)  At a high level, the asserted patents can be described as follows.  The asserted claims of the '346 patent relate to a method and system for single sign-on operations in a federated computing environment by triggering interactions between a service provider and an identity provider to automatically authenticate the user without a preexisting account with the service provide.  The asserted claims of the '601 patent relate to a system and method for computers to preserve state while communicating over networks using stateless protocols (i.e., protocols in which the server does not maintain a record of previous communications) by recursively embedding the state information in continuations (e.g., hypertext links) during a conversation.  And the asserted claims of the '967 patent and '849 patent (also known as the "Filepp patents") relate to a method for presenting applications ('967 patent) or advertisements ('849 patent) in interactive services by storing, for future use, the data structures that make up the applications (or advertisements), either on the user's personal computer or remotely at the host server.  The purpose of the '967 patent is to enable a user to navigate through multiple applications in an interactive service.  The purpose of the '849 patent is to provide a method for presenting advertising to a user without distracting the user or disrupting the user's session.

On April 13, 2016, Defendants filed their answer, which contained 15 affirmative

defenses as well as nine counterclaims seeking declaratory judgments of non-infringement and invalidity of the asserted patents and unenforceability of the Filepp patents due to inequitable conduct. (D.I. 77; D.I. 78; D.I. 79; D.I. 80)

Briefing on the pending motions was completed on April 10, 2017. The Court heard oral argument on April 12, 2017. (*See* D.I. 505 ("Tr."))

## II.    LEGAL STANDARDS

### A.    Summary Judgment

Pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986). An assertion that a fact cannot be – or, alternatively, is – genuinely disputed must be supported either by citing to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials," or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A) & (B). If the moving party has carried its burden, the nonmovant must then "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita*, 475 U.S. at 587 (internal quotation marks omitted). The Court will "draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson*

*Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

To defeat a motion for summary judgment, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586; *see also Podobnik v. U.S. Postal Serv.*, 409 F.3d 584, 594 (3d Cir. 2005) (stating that party opposing summary judgment "must present more than just bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue") (internal quotation marks omitted). The "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment;" a factual dispute is genuine only where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249-50 (internal citations omitted); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (stating entry of summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial"). Thus, the "mere existence of a scintilla of evidence" in support of the nonmoving party's position is insufficient to defeat a motion for summary judgment; there must be "evidence on which the jury could reasonably find" for the nonmoving party. *Anderson*, 477 U.S. at 252.

**B.      Excluding Expert Testimony**

In *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993), the Supreme Court explained that Federal Rule of Evidence 702 creates "a gatekeeping role for the [trial] judge" in order to "ensur[e] that an expert's testimony both rests on a reliable foundation and is relevant to

4

the task at hand." The rule requires that expert testimony "help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a). Expert testimony is admissible only if "the testimony is based on sufficient facts or data," "the testimony is the product of reliable principles and methods," and "the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702(b)-(d). There are three distinct requirements for admissible expert testimony: (1) the expert must be qualified; (2) the opinion must be reliable; and (3) the expert's opinion must relate to the facts. *See generally Elcock v. Kmart Corp.*, 233 F.3d 734, 741-46 (3d Cir. 2000).

**III.   DISCUSSION**

    **A.   IBM's Motion for Summary Judgment ("MSJ") of No Invalidity of Asserted Claims of the '849 Patent in View of the Salomon Thesis**

IBM seeks summary judgment that alleged prior art, "Design and Implementation of an Electronic Special Interest Magazine by Gitta Salomon" (the "Salomon Thesis"), cannot invalidate claims of the '849 patent as being anticipated. (D.I. 491-2 at 1) According to IBM, the Salomon Thesis does not, as a matter of law, satisfy the prerequisites for being an anticipatory prior art reference. *See* 35 U.S.C. § 102.

With respect to this motion, while some of the material facts are undisputed, others are not, and the parties also vigorously contest the reasonable inferences to be drawn from the record. In the Court's view, taking the evidence in the light most favorable to Defendants and drawing all reasonable inferences in their favor, the Salomon Thesis could be found to be prior art. Therefore, the Court will not grant IBM's motion for summary judgment of no anticipation.

Some of the undisputed timeline is as follows:

5

- on June 17, 1986, the Salomon Thesis was submitted to the Massachusetts Institute of Technology's ("MIT") Department of Architecture;

- it was cited by others as early as August 15, 1986;

- on August 29, 1986, it was received by MIT's Architecture and Planning Library;

- on April 13, 1987, it was cataloged and searchable in the Online Computer Library Center ("OCLC"); and

- on May 12, 1987, a physical copy was shelved and accessible in the MIT library.

(*See* D.I. 299-15 at ¶ 8; D.I. 496 Ex. 4 at 19, 32; *id.* Ex. 2 at 1, 57)

All of the foregoing activity occurred before the critical date (July 15, 1987) and before the '849 patent's priority date (July 15, 1988). (*See* D.I. 1 Ex. B; D.I. 491-2 at 1) Further, the author of the Salomon Thesis acknowledges help received from others, and notes that the work was supported by a grant from IBM itself, which is evidence from which it may be found that the reference was known to others. (*See* D.I. 299-15)

IBM emphasizes other undisputed facts. The only public copy of the Salomon Thesis was shelved at MIT's Architecture and Urban Planning Library – not a library associated with electrical engineering or computer science, where one skilled in the art would have been far more likely to search, given that the parties agree the person of ordinary skill in the art ("POSA") would have had an electrical engineering background. (*See* D.I. 491-2 at 2; D.I. 491-4 Ex. C at ¶ 38) The text of the Salomon Thesis did not appear in the OCLC, only its title and author. (*See* D.I. 491-4 Ex. A at 25:10-12, 35:6-9, 38:25-39:4) The OCLC was cataloged by year, not subject matter, and was not accessible to the general public, just to library staff. (*See id.* at 28:11-16,

6

35:18-23, 37:21-37:2)

While anticipation is ultimately a question of fact, whether a particular reference is prior

art under § 102 is a question of law for the Court based on underlying fact questions.  *See In re*

*Cronyn*, 890 F.2d 1158, 1159 (Fed. Cir. 1989); *see also N. Telecom, Inc. v. Datapoint Corp.*, 908

F.2d 931, 936 (Fed. Cir. 1990) ("Whether a document is a printed publication is a legal

determination based on underlying fact issues.") (internal quotation marks omitted); *Panduit*

*Corp. v. Dennison Mfg. Co.*, 810 F.2d 1561, 1568 & n.9 (Fed. Cir. 1987).  "If the claimed

invention was 'described in a printed publication' either before the date of the invention, 35

U.S.C. § 102(a), or more than one year before the U.S. patent application was filed, 35 U.S.C. §

102(b), then that prior art anticipates the patent." *Finisar Corp. v. DirecTV Group, Inc.*, 523

F.3d 1323, 1334 (Fed. Cir. 2008).  Here, the Court agrees with Defendants that the underlying

factual disputes (and the reasonable inferences to be drawn from the undisputed facts) could

reasonably be resolved in a manner such that the Salomon Thesis would qualify, as a matter of

law, as prior art.

The Court reaches this conclusion first with respect to § 102(a), as a reasonable factfinder

could find that the Salomon Thesis was "known or used" prior to the effective filing date of the

'849 patent.[1]  For a prior art reference to be "known or used by others" for purposes of § 102(a),

"that knowledge or use must have been available to the public." *Woodland Trust v. Flowertree*

*Nursery, Inc.*, 148 F.3d 1368, 1370 (Fed. Cir. 1998); *see also Minnesota Min. & Mfg. CO. v.*

---

[1] The Court is unpersuaded by IBM's argument that Defendants failed to timely disclose
their contention that the Salomon Thesis "qualifies as prior art to the '849 patent under 35 U.S.C.
§ 102(a) and/or (b) and anticipates and/or renders obvious one or more claims of the '849
patent," as Defendants expressly did so.  (D.I. 496 Ex. 1 at 41-42)

*Chemque, Inc.*, 303 F.3d 1294, 1301 (Fed. Cir. 2002). In the Court's view, a jury could reasonably find that the Salomon Thesis (and therefore the teachings within it) was "available to the public" at the MIT Library, and could have been found by one acting with reasonable diligence, including by working with a librarian to search OCLC for pertinent titles. IBM calls this pure speculation, but the Court believes it is a chain of reasonable inferences one might draw from taking the record evidence in the light most favorable to Defendants.

For largely the same reasons, the Court reaches the same conclusion with respect to § 102(b), as a reasonable factfinder could find that the Salomon Thesis was "published" and/or was a "printed publication." "Because there are many ways in which a reference may be disseminated to the interested public, 'public accessibility' has been called the touchstone in determining whether a reference constitutes a 'printed publication' bar under 35 U.S.C. § 102(b)." *In re Hall*, 781 F.2d 897, 898-99 (Fed. Cir. 1986); *see also id.* at 900 (rejecting contention that "a single cataloged thesis in one university library does not constitute sufficient accessibility"). A "reference is 'publicly accessible' upon a satisfactory showing that such document has been disseminated or otherwise made available to the extent that persons interested and ordinarily skilled in the subject matter or art exercising reasonable diligence, can locate it." *SRI Int'l, Inc. v. Internet Sec. Sys., Inc.*, 511 F.3d 1186, 1194 (Fed. Cir. 2008). A reasonable juror could find the Salomon Thesis to have been publicly accessible and, thus, a printed publication. *See also Hall*, 781 F.2d at 898-99 (holding that dissertation was printed publication because it was indexed, cataloged, and shelved in manner making it "freely . . . available to the faculty and student body of [the] University as well as to the general public" prior to critical date).

8

IBM relies heavily on *In re Cronyn*, 890 F.2d at 1161, in which the Federal Circuit held

that certain student theses did not constitute § 102(b) prior art, since they "were not accessible to

the public because they had not been either catalogued or indexed in a meaningful way." In

*Cronyn*, however, as Defendants point out, the "theses were indexed by student last name only,

not by title, on cards contained in a shoebox in the chemistry department library." (D.I. 495 at 4)

(citing *Cronyn*, 890 F.2d at 1160-61) No matter how "unavailable" one might describe OCLC, it

was significantly more available than the indexing system at issue in *Cronyn*.

IBM also cites *In re Bayer*, 568 F.2d 1357, 1360-61 (C.C.P.A. 1978), which found a

graduate thesis was not a printed publication, under § 102(b), even though it was in a university

library and three faculty members knew about it, because a customary search would not have

rendered it reasonably accessible. In the Court's view, *Bayer* simply illustrates that a fact-

specific question is presented here, on which a reasonable jury could come out for either side.

*See SRI Int'l*, 511 F.3d at 1194-95, 1202 ("[T]he determination of whether a reference is a

'printed publication' under 35 U.S.C. § 102(b) involves a case-by-case inquiry into the facts and

circumstances surrounding the reference's disclosure to the public."); *see also TypeRight

Keyboard Corp. v. Microsoft Corp.*, 374 F.3d 1151, 1157 (Fed. Cir. 2004) (finding that patent

owner was "entitled to a trial to determine if the . . . document is prior art," based on jury's

credibility findings and interpretation of evidence). On this record, summary judgment is not

warranted.

Accordingly, the Court will deny IBM's motion.

**B.      Defendants' MSJ of Indefiniteness of '967 and '849 Patents**

Defendants argue that the asserted claims of the '967 and '849 patents are invalid because

the term "application(s)," which appears in each independent claim, is indefinite as a matter of law. (D.I. 329 at 1)  The Court construed "application(s)" to mean "information events composed of a sequence of one or more pages opened at a screen." (D.I. 234 at 7)  Defendants argue that the patent does not provide an objective standard for delineating one application from another, adding that IBM's expert, Dr. Schmidt, uses subjectivity in purporting to delineate between applications based on the "different endgames that [users] could have in mind."[2] (D.I. 329 at 5)  IBM responds that the specification, prosecution history (including a Covered Business Method ("CBM") review), and extrinsic evidence all support finding the claims not indefinite. (D.I. 398)

A claim is invalid as indefinite if, "read in light of the specification delineating the patent, and the prosecution history, [the claim] fail[s] to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2124 (2014).  A patent does not satisfy the definiteness requirement of § 112 merely because "a court can ascribe *some* meaning to a patent's claims." *Id.* at 2130.  The claims must provide objective boundaries to a POSA. *Id.*; *see also Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1371 (Fed. Cir. 2014).  However, the inherent limitations of language must be taken into account, and "[s]ome modicum of uncertainty is the price of ensuring the appropriate

---

[2] Defendants also argue that the claims are difficult to apply to modern websites because "the Internet is an open system" and, without an index or directory identifying the applications (like those used in closed systems, which consist of a finite number of applications) or an objective process by which the various applications can be identified, there is no way to delineate between them. (D.I. 329 at 6)  At oral argument, IBM argued that this issue is actually one of noninfringement, since indefiniteness is based on how a person of ordinary skill in the art would understand the claim term at the time of the invention. (Tr. at 41)  In any case, because both sides agreed that such an infringement dispute is not relevant to indefiniteness, the Court will not address it further at this time. (Tr. at 17, 54-55, 59-60)

incentives for innovation." *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 789 F.3d 1335, 1341 (Fed. Cir. 2015) (internal quotation marks omitted). In evaluating a claim for indefiniteness, the Court considers the language of the claims, the written description, prosecution history, and, finally, extrinsic evidence, "to the extent it is necessary." *Sonix Tech. Co. v. Publications Int'l, Ltd.*, 844 F.3d 1370, 1378-80 (Fed. Cir. 2017).

To find the claim term "application(s)" indefinite as a matter of law on summary judgment, the Court would have to find that, viewing the evidence in the light most favorable to IBM and drawing all reasonable inferences in its favor, there is no genuine issue as to any material fact. *See Chiuminatta Concrete Concepts, Inc. v. Cardinal Indus., Inc.*, 145 F.3d 1303, 1307 (Fed. Cir. 1998). "Because a patent is presumed to be valid, the evidentiary burden to show facts supporting a conclusion of invalidity is one of clear and convincing evidence." *Young v. Lumenis, Inc.*, 492 F.3d 1336, 1345 (Fed. Cir. 2007); *see also Nautilus*, 134 S. Ct. at 2130; *Sonix*, 844 F.3d at 1377.

Viewing the evidence in the light most favorable to IBM, the Court finds that a genuine factual dispute makes summary judgment of indefiniteness inappropriate. The patent explains that "applications" are "information events [that] are composed of a sequence of one or more pages open at screen 414 of monitor 412" and provides examples, such as transactions for "buying goods and services." *See* '967 patent at 9:33-35; *id.* at 3:55-58, 9:53-56, 10:29-31. Moreover, the prosecution history runs to a total of 18 years (between the two patents Defendants are challenging), during which the patents' examiners evinced no difficulty in understanding and

11

applying the term.[3]  (*See* D.I. 398 at 7) (citing evidence)  IBM has also provided expert testimony

to support its view.  (*See* D.I. 401 Ex. 2 at ¶ 18)

Turning to the extrinsic evidence, Defendants place a great deal of weight on the

supposed admission of subjectivity by IBM's expert, Dr. Schmidt.  Dr. Schmidt testified that

whether something is an application "would depend on . . . my endgame." (D.I. 401 Ex. 21 at

626:15-16)  The Court disagrees with Defendants' interpretation of Dr. Schmidt's testimony.  At

a minimum, Defendants' interpretation is not the only interpretation a reasonable factfinder

would be compelled to accept.  Instead, a reasonable factfinder could agree with IBM's

interpretation that Dr. Schmidt's opinion reveals an approach to delineating between applications

based on the ***objective end game of the particular business***, not based on ***a particular user's***

***subjective end game*** in using a business' website.  Further, such a factfinder could conclude that

when Dr. Schmidt speaks subjectively, e.g., "it depends on what my endgame is," he is simply

speaking as a general user using the website in accordance with the services it provides, not

solely of his own personal views.[4]  Moreover, the record appears to be devoid of evidence that a

POSA, after having been told of a particular user's endgame, would have any difficulty

determining if that endgame is an "application."

---

[3] As part of the CBM review, Defendants noted their indefiniteness argument, advising
the PTO that they intended to pursue it further in litigation.  (D.I. 401 Ex. 16 at 24)  However,
Defendants also made clear during the CBM reviews that the PTO could analyze prior art
without defining the term "applications." (Tr. at 38)

[4] The Court is not persuaded by Defendants' contention that IBM has proffered different
tests to delineate between applications.  While IBM has articulated its test using different words,
like "subject matter," "endgames," and "transactions," it has never altered the ultimate process of
delineating between applications – a process which objectively depends on the way distinct
information events (i.e., subject matter, endgames, or transactions) are organized on Defendants'
websites.

Hence, the Court will deny Defendants' motion.

### C.    IBM's MSJ of No Anticipation of the Asserted Claims of the '967 Patent in View of the HyperCard System

IBM seeks summary judgment of no anticipation of the asserted claims of the '967 patent

in light of the Apple HyperCard System (the "HyperCard system" or "the system"). (D.I. 354)

The HyperCard system is "a combination of several components, requiring that HyperCard

software run on a Macintosh computer that is connected to an Apple-Talk network." (*Id.* at 2)

IBM asserts that Defendants cannot show by clear and convincing evidence that the system was

known or in prior use before the effective filing date of the '967 patent because there is no

evidence that the HyperCard system was (1) connected to a network or (2) configured in the

manner that Defendants' expert, David Eastburn, relies on in his anticipation theories. (*Id.*)

According to IBM, the documents on which Mr. Eastburn relies – the first and second editions of

the Goodman Handbook – state only that the HyperCard will at some point in the future be

connected to a network, post-date the effective filing date of the '967 patent, or simply amount to

conjecture. (*Id.* at 6-11) Even if the second edition of the Goodman Handbook did not post-date

the patent, IBM argues that it discloses a different configuration than what Defendants rely on to

show anticipation. (Tr. at 65) In addition, Mr. Eastburn acknowledges that the author of the

Goodman Handbook, Danny Goodman, never actually configured his Macintosh on a network,

further undercutting Mr. Eastburn's opinion that the HyperCard system was ever connected to a

network prior to the '967 patent's effective filing date. (D.I. 354 at 8)

Defendants respond that the HyperCard system was in public use before the effective

filing date and that, at a minimum, this is the type of reasonable inference the Court must draw in

13

favor of the nonmoving party – here, Defendants – because the prior art acknowledges using the system in the configured way, and one could reasonably find that such observation could not occur without someone knowing the system works in that way. (D.I. 381 at 3; Tr. at 76-77) Defendants acknowledge that one of the Goodman references post-dates the effective filing date, but observe that IBM ignores Mr. Goodman's declaration (the "Goodman Declaration") swearing that his description of HyperCard on a network in that reference was equally applicable prior to the effective filing date.[5] (D.I. 381 at 4) Furthermore, Defendants assert that even if the HyperCard system was not *used* before the effective filing date, it was still *known* before then and, therefore, anticipates the claims of the '967 patent under § 102(a). (*Id.* at 5)

"Anticipation is a factual determination that is reviewed for substantial evidence when decided by a jury." *Koito Mfg. Co., Ltd. v. Turn–Key–Tech, LLC,* 381 F.3d 1142, 1149 (Fed. Cir.

---

[5] IBM objects to any reliance on the Goodman Declaration, for reasons including that Mr. Goodman is a paid consultant for Defendants and was never subpoenaed. IBM characterizes the Goodman Declaration as untimely-produced hearsay and further faults Defendants for refusing to produce their communications with Goodman. (D.I. 422 at 3) Moreover, when IBM objected to Defendants' attempts to rely on the Goodman Declaration at a discovery dispute hearing, Defendants purportedly "repeatedly and unequivocally promised not to rely on [it] to show how the prior art functioned," and instead stated that it would only be offered for authentication. (*Id.*; *see also* Tr. at 65) Defendants respond that in the discovery hearing (which was before Judge Burke), they agreed only that they would not use the declaration during trial, but never agreed to refrain from using it to oppose summary judgment. Defendants further contend that Mr. Goodman was properly and timely disclosed in their Rule 26(f) disclosures.

Reviewing the transcript of the discovery hearing, the Court concludes that Judge Burke (like IBM) could well have reasonably understood Defendants to be representing that the Goodman Declaration would not be used for any purpose other than authentication. It is appropriate to hold Defendants to their representations to the Court. Therefore, the Court will not permit them to rely on the Goodman Declaration to attempt to defeat IBM's motion for summary judgment. Nevertheless, even were the Court to consider the Goodman Declaration, it does not show actual use of the HyperCard system in the configurations posited by Defendants' expert, Mr. Eastburn (nor does Mr. Eastburn rely on the Declaration in his invalidity report).

2004). "A patent is invalid for anticipation if a single prior art reference discloses each and every limitation of the claimed invention." *Schering Corp. v. Geneva Pharm.*, 339 F.3d 1373, 1377 (Fed. Cir. 2003). Such disclosure can be explicit or inherent in the prior art. *See Continental Can Co. v. Monsanto Co.*, 948 F.2d 1264, 1268 (Fed. Cir. 1991). However, mere disclosure of each and every limitation of a claim is not enough for anticipation. "An anticipating reference must enable that which it is asserted to anticipate." *Abbott Labs. v. Sandoz, Inc.*, 544 F.3d 1341, 1345 (Fed. Cir. 2008). Furthermore, a single prior art reference must also disclose the limitations as arranged in the claim. *See Net MoneyIN, Inc. v. VeriSign, Inc.*, 545 F.3d 1359, 1371 (Fed. Cir. 2008) ("[U]nless a reference discloses within the four corners of the document not only all of the limitations claimed but also all of the limitations arranged or combined in the same way as recited in the claim, it cannot be said to prove prior invention of the thing claimed and, thus, cannot anticipate under 35 U.S.C. § 102."). As with all challenges to the validity of a patent, the party seeking to invalidate a patent claim bears the burden of proving anticipation by clear and convincing evidence. *See Hybritech Inc. v. Monoclonal Antibodies, Inc.*, 802 F.2d 1367, 1375 (Fed. Cir. 1986).

On this motion the Court sides with IBM. First, regarding public use, Defendants' references show that the HyperCard system ***could have been*** configured on a network, but none of Defendants' references show actual use of that combination. *See In re Robertson*, 169 F.3d 743, 745 (Fed. Cir. 1999) ("The mere fact that a certain thing may result from a given set of circumstances is not sufficient" to prove anticipation.); *see also Apple, Inc. v. Samsung Elecs. Co., Ltd.*, 2012 WL 2576136, at *3 (N.D. Cal. July 3, 2012) ("[The expert's] post-hoc, reconstructed interpretation of how a . . . system ***might*** have been construed does not constitute

15

prior art for purposes of anticipation."). Furthermore, the HyperCard system itself is not as simple as just plugging in various components. The components need to be configured in a specific way, and there is no evidence that the system was ever actually configured in that way or used that way prior to the critical date.

Next, for the HyperCard System to anticipate because it is "known," "the knowledge must be publicly accessible" and "the disclosure must be sufficient to enable one with ordinary skill in the art to practice the invention." *Minnesota Min.*, 303 F.3d at 1306. Here, Defendants have not provided substantial evidence that could support a jury finding that the HyperCard System, as disclosed by the first edition Goodman Handbook (the only handbook pre-dating the patent), was enabling, since it only addressed what *could* be done in the future and never discussed any of the configurations that Mr. Eastburn relies on or identifies as a specific network to which the system could connect.

Accordingly, the Court will grant IBM's motion for summary judgment.

**D.     Defendants' MSJ of Noninfringement of the Filepp Patents**

Defendants raise two arguments in support of their request for summary judgment of noninfringement of the '967 and '849 patents: (1) Defendants do not direct or control the "retrieving/fetching and storing" steps of claim 1 of the '967 patent that are performed by the user's web browser or mobile operating system; and (2) Defendants do not meet the "prefetching" and "predetermined amount" limitations of the '849 patent because (a) the patent requires both prefetching and storing to occur *at a store* and (b) these limitations describe "active" caching, but Defendants' applications only perform "passive" caching. (D.I. 347 at 7-10)

With regard to the '967 patent, IBM responds that claim 1 does not require method steps of "retrieving/fetching and storing" objects, but rather, "only describes the required characteristics of the screen display and its parts." (D.I. 396 at 3-4) Even if the "retrieving/fetching and storing" of objects were method steps, IBM asserts that Defendants still perform each step by "send[ing] the display data, including cache directives, to the user's reception system, . . . initiat[ing] the process of storing, retrieving, or pre-fetching and the objects are actually stored, retrieved, and pre-fetched." (*Id.* at 4-5) IBM also argues that infringement is not avoided merely because non-infringing modes of operation are possible. (*Id.* at 5) Thus, Defendants cannot escape liability by claiming that "the user is free to disable caching." (*Id.*) Under a divided infringement analysis, IBM contends that even if the acts of storing and retrieving/fetching objects are performed by another actor, they are still attributable to Defendants because the retrieving/fetching occurs automatically through Defendants' actions. (*Id.* at 6) With regard to the '849 patent, IBM asserts that (1) the Court's construction of "pre-fetching" only requires "storing at a store," not "pre-fetching at a store," and (2) substantial evidence exists that Defendants perform each claim limitation. (*Id.* at 7-10) IBM also points to the experts' competing views, which it insists must be sorted through by a jury. (*Id.* at 9)

When an accused infringer moves for summary judgment of non-infringement, such relief may be granted only if a reasonable factfinder could only conclude that one or more limitations of the claim(s) in question do not read on an element of the accused product, either literally or under the doctrine of equivalents. *See Chimie v. PPG Indus., Inc.*, 402 F.3d 1371, 1376 (Fed. Cir. 2005); *see also TechSearch, L.L.C. v. Intel Corp.*, 286 F.3d 1360, 1369 (Fed. Cir. 2002) ("Summary judgment of noninfringement is . . . appropriate where the patent owner's proof is

17

deficient in meeting an essential part of the legal standard for infringement, because such failure will render all other facts immaterial."). Thus, summary judgment of non-infringement can only be granted if, after viewing the facts in the light most favorable to the patentee, there is no genuine issue as to whether the accused product is covered by the claims (as construed by the Court). *See Pitney Bowes, Inc. v. Hewlett–Packard Co.*, 182 F.3d 1298, 1304 (Fed. Cir. 1999).

As an initial matter, the Court agrees with IBM that the disputed limitations of claim 1 of the '967 patent are not steps in the asserted method, but are instead only phrases that characterize the "generating a screen display" step of the claimed method. *See Summit 6, LLC v. Samsung Elecs. Co.*, 802 F.3d 1283, 1290-91 (Fed. Cir. 2015) (finding claim limitation was "not a step in the claimed method," but instead, only "a phrase that characterizes the claimed pre-processing parameters," as the purported limitation was "not used as a verb . . . , but instead is a part of a phrase that conveys information about" the claimed method parameters); *see also SimpleAir, Inc. v. Google, Inc.*, 2015 WL 5883129, at *2 (E.D. Tex. Oct. 6, 2015) ("[N]ot every term in a claim limitation identifies a separate component that must be present in the claimed system.").

The relevant portion of claim 1 of the '967 patent reads:

> A method for presenting interactive applications on a computer network, . . . the method comprising the steps of:
>
> > a. generating a screen display at a respective reception system for a requested application, the screen display *being generated by* the respective reception system from data objects having a prescribed data structure, at least some of which objects may be stored at the respective reception system, the screen display including a plurality of partitions, the partitions *being constructed from* objects, the objects *being retrieved from* the objects stored at the respective reception system, or if

18

> unavailable from the objects stored at the respective reception system, then from the network, such that at least some of the objects may be used in more than one application . . . .

(Emphasis added)  The Court agrees with IBM that each of the emphasized claim limitations merely describes the characteristics of the screen display.  The only method step is "generating a screen display."  The remaining limitations are not used as verbs and only refer back to the claimed screen display.  For example, in each phrase, use of the term "the" (e.g., "*the* screen display being generated," "*the* partitions being constructed," and "*the* objects being retrieved") "indicates that this portion of the claim limitation is a reference back to the previously claimed" screen display, partitions (included in the screen display), or objects (that make up the partitions). *Summit 6*, 802 F.3d at 1291.  Because none of these are method steps, Defendants need not perform them in order to be liable for infringement, so long as the resulting screen display has the identified characteristics.  *See SiRF Tech., Inc. v. Int'l Trade Comm'n*, 601 F.3d 1319, 1331 (Fed. Cir. 2010) (finding that certain actions, though necessary to claim performance, were not required by claims and, therefore, "the fact that other parties perform these actions does not prelude a finding of direct infringement").

IBM asserts that, regardless of whether the claims are construed as method steps, whether Defendants direct or control the actions (of retrieving/fetching and storing) of third parties under a divided infringement analysis is irrelevant, as sufficient evidence exists to show that Defendants *alone* directly infringe the asserted claims.  Each of the asserted claims of the '967 and '849 patents requires action by a "reception system" of intelligent retrieving/fetching and storing objects.  However, IBM argues, even if the disputed method steps occur at the reception

19

system (i.e., on website browsers or mobile applications at the user's device), Defendants can be liable for direct infringement if they "dictate the performance of the [claimed] steps." *SiRF*, 601 F.3d at 1330-31.

With respect to the '967 patent, because the disputed steps of "retrieving/fetching" and "storing" are not claim limitations, Defendants can be liable for direct infringement as long as they dictate performance of these steps. IBM has raised a genuine factual dispute as to whether Defendants dictate the retrieving/fetching and storing steps of the '967 patent, making summary judgment of noninfringement inappropriate.

However, regarding the '849 patent, the "storing" step *is* a claimed method step. *See SiRF*, 601 F.3d at 1329 ("This is not a situation where a method claim specifies performance of a step by a third party, or in which a third party actually performs some of the designated steps, and thus control or direction of the performance of that step by the accused infringer is required."). IBM has failed to adduce evidence from which a reasonable factfinder could find that Defendants direct or control the web browsers' or mobile applications' performance of the storing step. In fact, Defendants have provided substantial evidence to show that they do *not* direct or control such performance.[6] Therefore, the Court finds that Defendants do not direct or control the storing step and, therefore, will grant summary judgment of noninfringement of the '849 patent.[7]

---

[6] It is undisputed that Defendants' cache control parameters, which IBM points to for the "storing" limitation, can be disabled by the user. In that instance, the web browser or mobile device reception system can still perform the caching; it just will not be directed by Defendants. (Tr. at 83-84) Furthermore, users are not required to enable the caching to use the websites, nor are the browsers or mobile applications contractually required to ensure caching is enabled; users are not penalized for not caching.

[7] Defendants also argued that they did not infringe the '849 patent because their advertisements are not "pre-fetched," as required by claim 1, and no "predetermined amount" of

E.    **IBM's Motion to Strike Portions of**
      **David Eastburn's Rebuttal Expert Report**

IBM requests that the Court strike paragraph 527 of David Eastburn's rebuttal expert report because it relies on performance testing documents produced by Defendant OpenTable after the close of discovery. (D.I. 384 at 1)  Mr. Eastburn referred to these documents to support his opinions about the value of the patents-in-suit to the accused websites and mobile applications. (*Id.* at 2)  IBM asserts that it requested the relevant documents throughout discovery – specifically requesting performance testing documents on September 19, 2016 – but did not receive them until six weeks later, on October 31, 2016, and even then only received three one-page documents that failed to indicate how testing was performed or how results were calculated. (*Id.* at 1-2)  IBM further argues that it was not given the opportunity to investigate the documents or question OpenTable's corporate representative, Scott Jampol (whom IBM had deposed on October 13, 2016), about these documents, and adds that OpenTable never produced several other performance testing documents that OpenTable's witnesses testified exist. (*Id.* at 2-3)

Defendants respond that not only is paragraph 527 of Mr. Eastburn's report independently based on testimony from OpenTable witness Mr. Twomey – whom IBM deposed on September 20, 2016 – but also that the disputed documents are important to rebutting IBM's damages expert's assertions. (D.I. 456 at 2-3)  In Defendants' view, IBM was not surprised by, and will not be prejudiced by, the subject of, and reference to, these documents in Mr. Eastburn's report,

---

advertising is stored, as required by claim 8.  Because the Court finds that Defendants cannot be liable for infringement of the '849 patent due to lack of direction or control of the "storing" step, the Court need not address these additional arguments.

21

especially considering the circumstances leading to Defendants' late production of the documents,[8] which include IBM's service of 42 requests for production the week of the production and the search and review of these documents during the last four weeks of fact discovery, while the parties were in the midst of traveling the country to complete 20 depositions. (*Id.* at 4)

The Court agrees with Defendants. In light of the circumstances leading to the late production here, the Court is not persuaded that Defendants acted wilfully or in bad faith. *See Novartis Pharm. Corp. v. Actavis, Inc.*, 2013 WL 7045056, at *11 (D. Del. Dec. 23, 2013) ("Courts have tended to reserve a finding that a party acted willfully or in bad faith for clear, extreme examples of such conduct."). Further, given the timing of IBM's requests for production, the documents were not due until after the depositions of Mr. Twomey and Mr. Jampol, undermining IBM's claims of prejudice. The Court also finds that any remaining prejudice can be remedied through additional depositions – which Defendants do not oppose – should IBM wish to take them.

Therefore, the Court will deny IBM's motion to strike.

## F.    Defendants' MSJ of Noninfringement of the '601 Patent and Motion to Exclude Dr. Schmidt's Opinions

### 1.    Infringement

Each independent claim of the '601 patent requires "identifying all continuations in an output" and "recursively embedding the state information in all identified continuations." Defendants argue they do not infringe the '601 patent because (1) the structured data elements

---

[8] The documents were due October 20, 2016, after depositions of both Mr. Twomey and Mr. Jampol were completed, but Defendants produced them October 31, 2016. (D.I. 456 at 1)

IBM asserts as being "identified" – the JavaScript Object Notation ("JSON") code – are not

"continuations," as they lack "clickable elements" and "are used at a later point in time to

generate the displayed webpage;" (2) every webpage that Defendants produce includes

continuations that are not identified or recursively embedded with state information and, thus,

Defendants do not identify *all* continuations in webpages produced in response to service

requests, as is required by the claims; and (3) IBM cannot show infringement under the doctrine

of equivalents because "identifying less than all continuations" vitiates the word "all" from the

claims.  (D.I. 361 at 3-10)

  IBM responds that "continuation(s)," as construed by the Court, are a "new request which

a client may send to a server, such as, for example, a hyperlink." (D.I. 392 at 3)  Contrary to

Defendants' assertions, IBM argues, continuations are not "clickable elements" that "cannot be

used at a later point in time." (*Id.*)  IBM narrows the issue to "whether the JSON data contains

new requests which a client may send to a server." (*Id.*)  Furthermore, IBM asserts that

Defendants' use of templates (i.e., preformed webpages) as an output to identify continuations

and embed state information, provides a second, independent basis on which a reasonable jury

could find infringement.[9] (*Id.* at 5-6)

  The Court agrees with IBM.  Because a material factual dispute exists with regard to

whether the JSON data or templates constitute "continuations" as construed by the Court,

summary judgment must be denied.  The Court agrees with IBM that Defendants improperly

focus on whether their services identified all continuations *in webpages*, while the claim

---

  [9] Defendants assert that IBM belatedly raised its "templates" theory of infringement for the first time in its answering brief. (D.I. 445 at 3)  IBM, however, included this theory in its Final Infringement Contentions. (*See* D.I. 393 Ex. 6 at ¶¶ 187-96)

language requires identification of "all continuations *in an output*." Thus, whether Defendants' services identified each continuation produced in response to a service request is irrelevant to infringement. For this additional reason, summary judgment of noninfringement must be denied.

With regard to Defendants' doctrine of equivalents argument, IBM asserts that if "substantially all or nearly all" of the continuations are identified, this is a basis for a finding of infringement and does not vitiate the claim language. (D.I. 392 at 9-10) The Court agrees. "There is no set formula for determining whether a finding of equivalence would vitiate a claim limitation, and thereby violate the limitations rule. Rather, courts must consider the totality of the circumstances of each case and determine whether the alleged equivalent can be fairly characterized as an insubstantial change from the claimed subject matter without rendering the pertinent limitation meaningless." *LG Elecs., Inc. v. Bizcom Elecs., Inc.*, 453 F.3d 1364, 1380 (Fed. Cir. 2006), *rev'd sub nom. Quanta Computer, Inc. v. LG Elecs., Inc.*, 553 U.S. 617 (2008). Determining whether infringement under the doctrine of equivalents has been proven is a question of fact for the jury. *See DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 469 F.3d 1005, 1013 (Fed. Cir. 2006). Here, IBM has adduced sufficient evidence from which a reasonable jury could find such infringement.

Therefore, the Court will deny Defendants' motion for summary judgment.

## 2. Expert Opinion

Defendants seek to exclude Dr. Schmidt's opinions because: (1) he did not evaluate 23 services he accuses of infringement; (2) in 22 services that he did evaluate, he did not cite any code that allegedly performs the "identifying" step; and (3) all of the outputs he analyzed were obtained *after* the '601 patent expired, yet he did not provide any basis to explain why that

24

information shows infringement *before* the patent expired.  (D.I. 361 at 11-12)

IBM responds that Dr. Schmidt identified an output and continuations for each accused device and analyzed the claim language by citing to documents and source code describing Defendants' products.  (D.I. 392 at 10)  IBM argues that Dr. Schmidt analyzed template outputs and, where outputs were not available (e.g., due to older versions of outputs or outputs that were not public), he relied on circumstantial evidence, like his knowledge of Defendants' source code, documentation, and screen flows.  (*Id.* at 11)  Similarly, where Dr. Schmidt did not rely on source code, he cited to deposition testimony, technical documentation, testing information, and screen flows.  (*Id.*)  Finally, IBM contends that Dr. Schmidt's analysis of post-expiration information was correlated with information he analyzed in the source code to ensure that the accused instrumentalities functioned in the same way in relation to the relevant claim language, similar to how Defendants' experts analyzed only recent versions of the accused products.  (*Id.* at 11-12)

The Court agrees with IBM that Dr. Schmidt's opinions and analysis are sufficiently detailed and reliable.  Defendants' concerns regarding Dr. Schmidt's testing and analyses go to the weight of his opinion and are more properly addressed on cross-examination and through the introduction of competing evidence.  The Court will deny Defendants' motion to exclude Dr. Schmidt's opinions.

### G.    IBM's MSJ of No Anticipation for the Asserted Claims of the '601 Patent

IBM seeks summary judgment that none of the asserted claims of the '601 patent are anticipated under 35 U.S.C. § 102 by the Unleashed reference ("Unleashed").  (D.I. 350 at 1)  Defendants and IBM agree that, under the Court's construction of "continuations," Unleashed

does not anticipate the claims of the '601 patent. (*Id.* at 5-6; D.I.395 at 1)  The parties dispute, however, whether Unleashed anticipates the claims under IBM's interpretation of "continuations." (D.I. 350 at 8-10; D.I. 395 at 1)  Specifically, Defendants argue that because IBM applies a different interpretation of "continuations" – and not the Court's construction – in its infringement analysis, that interpretation must also apply to assessing Defendants' anticipation defense, which results in Unleashed anticipating each limitation of the asserted claims.  (D.I. 395 at 1)

IBM responds that Defendants and their expert, Dr. James Olivier, misinterpret IBM's infringement theory.  They further contend that Dr. Olivier's methodology is incorrect and fails to show that Unleashed can meet the claim limitations.  (D.I. 350 at 7-9)  IBM also points out that the code Dr. Olivier relied on in his analysis does not function correctly (a fact with which Dr. Olivier agreed) and, even if it did operate correctly, it utilizes a different approach than the claims of the '601 patent and, thus, cannot anticipate them.  (*Id.* at 10-11; D.I. 420 at 5)

Claims must be construed the same way for both infringement and invalidity.  *See HSM Portfolio LLC v. Elpida Memory Inc.*, 160 F. Supp. 3d 708, 719 (D. Del. 2016) ("A patent may not, like a 'nose of wax,' be twisted one way to avoid anticipation and another to find infringement.") (quoting *Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1351 (Fed. Cir. 2001)).  Parties – and their experts – are also obligated to apply the Court's constructions to disputed claim terms.  *See Transamerica Life. Ins. Co. v. Lincoln Nat. Life Ins. Co.*, 2009 WL 88367, at *9 (N.D. Iowa Jan. 8, 2009) ("[N]o party should be allowed to argue to the jury claim constructions that are contrary to the court's claim constructions or to reassert to the jury constructions that the court has already expressly or implicitly rejected.") (citing *Sulzer*

*Textil A.G. v. Picanol N.V.*, 358 F.3d 1356, 1366 (Fed. Cir. 2004)).  Therefore, regardless of Defendants' interpretation of IBM's "construction," both IBM and Defendants – as well as their witnesses – – must apply the Court's constructions, and must apply the same constructions for both infringement and invalidity purposes.

Thus, the Court will grant IBM's motion, as Defendants concede that Unleashed does not anticipate the asserted claims when one applies (as the parties and their experts must) the Court's construction of "continuations."

### H.  Defendants' MSJ for Failure to Comply with 35 U.S.C. § 287 for the '601 Patent[10]

Defendants assert that 35 U.S.C. § 287 bars IBM from recovering damages for infringement of the '601 patent because IBM failed to meet its obligations to show that it provided either actual or constructive notice to Defendants or required its licensees to mark licensed products.  (D.I. 333 at 8)  It follows, in Defendants' view, that IBM's damages cannot be recovered for any period prior to the dates of actual notice of alleged infringement, specifically October 13, 2011 for Priceline, December 9, 2014 for OpenTable, and February 9, 2015 – the date of the filing of the suit– for Kayak.  (*Id.*)

IBM responds that § 287 does not require a patentee to conduct "a seemingly infinite analysis of its licensees' products," especially in situations where, as here, "the potential universe of products prohibits the patentee from analyzing whether any products practice the patented claims."  (D.I. 402 at 6)  To IBM, then, the burden is placed first on Defendants to identify

---

[10] Defendants previously moved for summary judgment of laches.  They withdrew this portion of the motion in light of the Supreme Court's decision in *SCA Hygiene Prods. v. First Quality Baby Prods.*, 580 U.S. ___, 137 S. Ct. 954 (2017).  (D.I. 490)

products that require marking and, only thereafter, is a patentee burdened with proving compliance with § 287. (*Id.*)

Section 287(a) of the Patent Act limits the damages that a patent owner may recover in an infringement action. A patent owner who fails to mark its products, or fails to require its licensees to mark their products, cannot recover damages relating to infringement occurring prior to the date that the alleged infringer receives actual notice of the alleged infringement. *See* 35 U.S.C. § 287(a) ("In the event of failure so to mark, no damages shall be recovered by the patentee in any action for infringement, except on proof that the infringer was notified of the infringement and continued to infringe thereafter, in which event damages may be recovered only for infringement occurring after such notice. Filing of an action for infringement shall constitute such notice."). The Federal Circuit has interpreted the statute as allowing a patentee to recover damages from the earlier of the time when it began marking products in compliance with § 287(a) or the time when the patentee gave an alleged infringer actual notice of its alleged infringement. *See Am. Med. Sys., Inc. v. Med. Eng'g Corp.*, 6 F.3d 1523, 1537 (Fed. Cir. 1993) ("In light of the permissive wording of the present statute, and the policy of encouraging notice by marking, we construe section 287(a) to preclude recovery of damages only for infringement for any time prior to compliance with the marking or actual notice requirements of the statute.").

The Court agrees with IBM that it was not required to plead compliance with § 287. *See MobileMedia Ideas, LLC v. Apple Inc.*, 209 F. Supp. 3d 756, 763 (D. Del. 2016). Instead, the initial burden is on Defendants to "come forward with particular unmarked products allegedly triggering § 287." *Id.* Defendants have failed to meet this burden.

28

Defendants point to three IBM licenses, involving ███████████████████████ ████. But Defendants have failed to show that any of these licensees made products that practice the '601 patent. Defendants emphasize the ████ license and an IBM presentation that ████████████████████████████████████████████████. However, this ███████████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████. Moreover, IBM's corporate witnesses have testified that ███████████████████████████████ ████████). (*See* D.I. 345 Ex. V at 97)[11]

No reasonable factfinder could find that Defendants have, on the present record, met their burden of showing that IBM products or IBM-licensed products practiced the '601 patent and required marking.[12] Therefore, the Court will deny Defendants' motion.

## I.    Defendants' MSJ of Noninfringement of the '346 Patent

Defendants predicate their request for summary judgment of noninfringement of the '346 patent on three grounds: (1) the accused systems do not meet the "triggering" limitation of claim

---

[11] Summary judgment is also unwarranted because even Defendants recognize there are factual disputes as to whether IBM's licensees practice the '601 patent. (D.I. 423 at 4) (citing D.I. 403 at 2-3) ("IBM's own documents show, and at least create a fact issue as to whether, several of its licensees practice the '601 patent."); *see also In re Mobile Telecomms. Techs.*, LLC, 2017 WL 1053099, at *6 (D. Del. Mar. 20, 2017) (finding that patentee was not required to plead compliance with § 287 where alleged infringer's marking contentions amounted to mere speculation that some predecessor-in-interest or licensee may have practiced patent).

[12] Defendants filed a supplemental letter on April 10, 2017, asserting that under *Unwired Planet, LLC v. Apple Inc.*, 2017 WL 1175379, at *5 (N.D. Cal., Feb 14, 2017), the burden on the alleged infringer is "at most," the "burden of plausibly identifying products subject to the marking requirement." Even taking this as a correct statement of the law, the Court concludes that Defendants have failed to meet their burden.

1; (2) the accused systems do not meet the "determination" limitation required by claims 5 and

10; and (3) IBM exhausted its rights as to ██████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████. (D.I. 337)

First, regarding the "triggering" limitation, Defendants argue that the '346 patent

discloses and claims prompting a user to select an identity provider "[i]ndependent of triggering

an authentication process on the user's behalf." (D.I. 337 at 2)  To Defendants, merely

prompting a user to select an identity provider, i.e., "presenting the user with various sign-in

options," does not meet the claim limitation of "triggering a single sign-on operation on behalf of

the user." (*Id.* at 3)  Defendants also assert that because the user and ████████████████ are

active participants during the sign-in process, and there is no evidence to attribute their actions to

Defendants, Defendants cannot be liable for direct infringement.  (*Id.*)

IBM responds that: (1) Defendants use their own single sign-on code, ████████████████

████████████████████████████, and therefore, Defendants's code performs the

requisite "triggering," and (2) identifier selection is part of the "triggering" process, not an

independent action.  (D.I. 388 at 1-2)

Summary judgment of non-infringement can only be granted if, after viewing the facts in

the light most favorable to the nonmovant, there is no genuine issue as to whether the accused

product is covered by the claims (as construed by the Court). *See Pitney Bowes*, 182 F.3d at

1304. Due to Defendants' implementation of ████████████████████████████████, a

reasonable factfinder could find that Defendants direct or control the pertinent actions of ████████

████████████. *See Akamai Technologies, Inc. v. Limelight Networks, Inc.*, 797 F.3d 1020, 1022

(Fed. Cir. 2015). Further, while there does not appear to be a dispute as to how Defendants' websites function, the Court finds both parties' experts' opinions as to whether "triggering" encompasses the "identifier" step to be reasonable applications of the claim term. Therefore, summary judgment will be denied.

Because claims 5 and 10 are dependent upon claim 1, the Court does not address Defendants' remaining arguments as to those claims.

Defendants next argue that IBM's claims for infringement are exhausted because (1) ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ███████████████████████████. (D.I. 337 at 5) IBM responds that its licenses to ██████████████████████████████████████████████████████████, and there is no evidence that any product Defendants use meets this requirement. (D.I. 388 at 4) Further, IBM asserts that Defendants have not shown that any ██████████████ product Defendants use is a "patented item" – as each lacks several limitations of the claims of the '346 patent – or a "substantial embodiment" – as the ██████████████████ features "are akin to 'identity providers' in prior art systems, which both (1) have non-infringing uses and (2) do not practice runtime account creation in a federated environment." (*Id.*)

The Court concludes that even if Defendants' implementation of the ██████████████ software was authorized, Defendants have failed to show that the software alone is a patented item or substantial embodiment. The Court will, therefore, deny summary judgment.

31

**J.     IBM's MSJ on Defendants' Affirmative Defenses**

IBM seeks partial summary judgment on Defendants' affirmative defenses of marking, single recovery, license, no costs, and inequitable conduct.[13]  (D.I. 344 at 1)

First, IBM seeks summary judgment that it has met its marking obligation with respect to the '967, '849, and '346 patents based on the fact that IBM has asserted only the method claims of those patents, which do not give rise to a marking requirement.  (*Id.* at 4)  Defendants do not oppose this portion of IBM's motion and, therefore, the Court will grant it.  (*See* D.I. 403 at 6-9) (refuting IBM's motion only as it relates to '601 patent)

Regarding the '601 patent, IBM asserts that Defendants have failed to meet their initial burden of proving that IBM makes products that it is or was required to mark, or that any third-party licensees had or have made such products.  (D.I. 344 at 4)  Defendants respond that the burden lies instead with IBM to show that it does not produce unmarked patented articles or that it took reasonable efforts to ensure compliance with § 287.  (D.I. 403 at 1-2)  The Court analyzed this issue in regard to Defendants' motion for summary judgment of failure to comply with § 287, and agreed with IBM that before a patentee is burdened with proving actual or constructive notice, the alleged infringer must first identify particular unmarked products triggering § 287. Because Defendants have not identified any such unmarked products, IBM's motion for summary judgment as to marking with respect to the '601 patent will be granted.

Defendants' "single recovery" affirmative defense contends that IBM's claims are barred by the doctrines of full compensation, exhaustion, implied license, and/or first sale based on

---

[13] During oral argument, Defendants withdrew their affirmative defenses of release, covenant not to sue, and laches.  (Tr. at 5)

32

various agreements between ███████████████████████████. (D.I. 103 at ¶ 59;

D.I. 104 at ¶ 59; D.I. 105 at ¶ 59; D.I. 106 at ¶ 59; D.I. 344 at 7-8)  IBM contends that

Defendants failed to demonstrate that IBM received compensation for infringement of the

patents-in-suit from any of these third parties and, further, Defendants failed to show that any of

the accused products are subject to the third-party agreements.  (D.I. 344 at 8)  IBM further

asserts that Defendants failed to show that any products licensed to the third parties infringed the

patents-in-suit – thus, Defendants failed to show that those products are "patented items" that

could trigger exhaustion.  (*Id.* at 9)  IBM also contends that (1) no license agreement exists

between IBM and any Defendant and (2) to the extent Defendants contend they are licensed to

the patents-in-suit through IBM's various third-party agreements, Defendants failed to adduce

sufficient evidence that those agreements extend to Defendants or their products.  (*Id.* at 10)

Defendants respond that "both the facts and [IBM's] own expert" show that IBM's

licensees distribute patented products and that Defendants are authorized acquirers of those

instrumentalities.  (D.I. 403 at 12)  Defendants assert that, hence, IBM has been fully

compensated for and exhausted its right to assert it claims against Defendants' use of the licensed

products.  (*Id.* at 13)  Defendants add that IBM's licensees' web browsers infringe each step of

the asserted claims, and, thus, the licensees' web browsers are licensed products that the

licensees were authorized to distribute, including to Defendants.  (*Id.* at 15-16)

The Court concludes that the record reveals genuine disputes of material fact with respect

to Defendants' affirmative defenses of single recovery and license.  A reasonable jury could

agree with IBM that the evidence does not satisfy either of these defenses, but alternatively such

a jury could agree with Defendants that it does.  Summary judgment is not warranted.

As to the defense of no costs, IBM asserts that Defendants have not identified any claims that IBM failed to disclaim before filing suit, or even a reason for why IBM would have thought to disclaim any claims. (D.I. 344 at 13) Defendants respond, broadly, that "IBM has not established the validity of each and every asserted claim" and that "this Court has recognized arguably inconsistent authority [surrounding the applicability of § 288] from the Supreme Court and the Third Circuit, among others, construing the predecessor statute to § 288." (D.I. 403 at 17) (internal quotation marks omitted) The Court agrees with IBM.

Section 288 only requires a disclaimer before the commencement of suit. This Court and the Federal Circuit have repeatedly found this to mean that a claim must first be found invalid before a patentee is required to disclaim under § 288. *See Bradford Co. v. Jefferson Smurfit Corp.*, 2001 WL 35738792, at *1, 7 (Fed. Cir. Oct. 31, 2001); *Cordance Corp. v. Amazon.com, Inc.*, 631 F. Supp. 2d 484, 503 (D. Del. 2009); *Sonos, Inc. v. D&M Holdings, Inc.*, 2016 WL 4249493, at *4 (D. Del. Aug. 10, 2016). As it is undisputed that no claims of the asserted patents have yet been determined to be invalid, the Court will grant IBM's motion.[14]

Lastly, with respect to inequitable conduct related to the '967 and '849 patents, IBM contends that Defendants cannot meet their burden to prove specific intent. (D.I. 344 at 13-14) Defendants allege that IBM and Trintex (an IBM venture with Sears and CBS) representatives, the inventors, and IBM's prosecuting attorneys engaged in inequitable conduct by "withh[olding] crucial information regarding pre-critical date activities, commercial offers for sale, and public

---

[14] The Court acknowledges that it previously denied a motion to strike on the grounds that this is an unsettled area of law. *See Cadence Pharm., Inc. v. Paddock Labs., Inc.*, 2012 WL 4565013, at *3 (D. Del. Oct. 1, 2012). However, the Court now has before it a motion for summary judgment, and there is also now additional precedent on which the Court may draw.

34

use of the services to be performed by Trintex and embodying the '967 and '849 Patents from the Patent Office during the prosecution," "despite the Patent Office's repeated request for all such information." (D.I. 345 Ex. C at 5-6)  Defendants insist that they "identified dozens of statements made during patent prosecution, offers to sell, actual sales, public uses, public disclosures, public trials, public interviews, and public presentations . . . that were not disclosed to the Patent Office," from which (collectively) the Court could find intent to deceive. (D.I. 403 at 20-21)

Following the completion of briefing, Judge Burke issued a Report and Recommendation – to which neither party objected, and which has been adopted – denying in part IBM's motion to dismiss and strike inequitable conduct counterclaims and defenses. (D.I. 498, D.I. 504)  The Court will do the same with respect to IBM's motion for summary judgment.  Therefore, the Court will deny IBM's motion with respect to Defendants' inequitable conduct contentions related to IBM's prosecuting attorney, Paul Scifo, and specifically, Mr. Scifo's withholding of the Agarwal reference, his failing to disclose Trintex commercialization efforts, and his hiding the prosecution of the co-pending '967 and '849 patent applications from their respective examiners (thereby avoiding a double patenting rejection). (D.I. 498 at 17-18, 26, 35, 38)  There is sufficient evidence in the record to allow these contentions to remain in the case.  However, the Court will grant IBM's motion with respect to Defendants' remaining inequitable conduct arguments.

**K.**    **Defendants' Motion to Exclude Testimony of Dr. Hausman and Dr. Stewart**

Defendants seek to exclude the expert testimony of Dr. Jerry Hausman, arguing that his methodology is faulty because he relied on an arbitrary rule of thumb and/or the Nash Bargaining

solution. (D.I. 341 at 2-6)  Defendants also assert that Dr. Hausman ignored or deemed irrelevant

facts such as (1) IBM's negotiation practice and actual licenses to the patents-in-suit,

(2) Defendants' technology licenses, and (3) IBM's real-world license negotiations with Priceline

before filing this lawsuit.  (*Id.* at 6-7)  Further, Defendants argue that Dr. Hausman relied on the

wrong hypothetical negotiation date, improperly applied the entire market value analysis without

apportionment, and relied on faulty studies by Dr. Stewart that analyzed the "wrong universe" of

people and did not involve any particular technology, industry, or party at issue in the case.

(*Id.* at 9, 11-14)

IBM responds that Dr. Hausman properly examined and applied the *Georgia Pacific*

factors, apportioned the value of the patented technology, and limited his reliance on Dr.

Stewart's survey solely to his consideration of non-infringing alternatives – which was the

purpose of Dr. Stewart's study.  (D.I. 407)  In addition, IBM asserts that the hypothetical

negotiation date Dr. Hausman relied on, February 2009, is the earliest known date of

infringement.  (*Id.* at 10)  IBM also explains that Dr. Hausman acknowledged alternative

hypothetical negotiation dates, but testified that they would not change his ultimate reasonable

royalty opinion.  (*Id.* at 11 n.41)  IBM asserts, thus, that Defendants' criticisms go solely to the

weight, not admissibility, of Dr. Hausman's testimony.  (*Id.* at 5)

The Court agrees with IBM and finds Dr. Hausman's analysis of the *Georgia Pacific*

factors a reliable methodology.  Dr. Stewart's survey is sufficiently reliable as it was intended

only to evaluate non-infringing alternatives, even though it did not involve the technology at

issue or specifically identify Defendants' web or mobile services.[15] The Court will, therefore, deny Defendants' motion.

However, the Court orders IBM to supplement Dr. Hausman's report with his explanation and basis for his conclusion that, regardless of which hypothetical negotiation date is used, his reasonable royalty analysis would remain the same. Defendants may file a response to this supplemental report and, if they wish, may depose Dr. Hausman on this issue.

### L.     IBM's Motion to Preclude Testimony of Damages Expert Keith Ugone

IBM seeks to exclude the testimony of Defendants' damages expert, Keith Ugone, arguing that he used an unreliable method to determine a reasonable royalty and, further, that his application of the method was unreliable. (D.I. 356 at 1)  IBM particularly attacks Dr. Ugone's "scaling methodology," a method of scaling the royalties associated with each of IBM's previous licensees based on the ratio between each Defendant's covered revenue (i.e., the revenue implicated by purported infringing activity) and the licensee's covered revenue. (*Id.* at 5) Arguing that this method is unreliable, IBM asserts that (1) Dr. Ugone relied on non-comparable agreements, (2) his method is falsely predicated on the assumption that the royalty-to-revenue ratio from one licensee can be used as a basis for a different licensee, and (3) the method is one-

---

[15] Defendants filed a supplemental letter with the Court on April 10, 2017, asserting that *Parallel Networks Licensing, LLC v. Microsoft Corp.*, 2017 U.S. Dist. LEXIS 29613, at *7-11 (D. Del. Feb. 22, 2017), supports its position that Dr. Stewart's survey, and Dr. Hausman's reliance on it, is unreliable. (D.I. 497)  In *Parallel Networks*, the Court found a survey unreliable due, in part, to its failure to represent a sample population. *Id.* at 8.  Specifically, the Court found the expert there "d[id] not consider whether the survey respondents reflected a representative sample of the desired population" and "did not account for the fact that there is an analytical gap between what he sought to determine . . . and the population he used to reach his conclusions . . . ." *Id.* at 9.  In contrast, here, Dr. Stewart explained why and how he chose the population surveyed. (D.I. 407 at 14-15)

37

sided, because Dr. Ugone only focused on IBM's – not the licensees' or Defendants' – point of view in entering into the negotiations. (*Id.* at 6-15) IBM also contests Dr. Ugone's application of the method, asserting that he uses an arbitrary time-frame, makes unsupported assumptions to calculate covered revenue, and employs internal inconsistencies by occasionally using in his calculations a licensee's "total revenue" instead of "covered revenue." (*Id.* at 16-24)

Defendants respond that IBM's complaints implicate matters of credibility for the jury to decide and do not present matters of admissibility for the Court. (D.I. 389 at 4) Defendants insist it is "undeniably acceptable to rely on existing licenses to prove a reasonable royalty." (*Id.*) Furthermore, Dr. Ugone examined numerous IBM licenses and IBM negotiating policies in his analysis, including licenses ███████████████████████████████████ ." (*Id.* at 10) Defendants also assert that, to the extent Dr. Ugone failed to account for specific values of cross-licenses, IBM misused discovery "as a substantive shield and procedural sword" and failed to produce, or identify, specific documents evidencing values of the cross-licenses. (*Id.* at 15) Further, while Dr. Ugone did use "total revenue" instead of "covered revenue" in some analyses, Defendants' position is that IBM itself ███████████████████████████████ and, in other instances, failed to produce evidence of how it calculated covered revenue. (*Id.* at 20)

The Court agrees with Defendants. Dr. Ugone's methodology based on comparable licenses is sufficiently reliable, especially considering that the licenses he analyzed involved the same patents asserted here. IBM's concerns with Dr. Ugone's methodology go to the weight and not the admissibility of his opinions. The Court will deny IBM's motion.

38

### M.    IBM's Motion to Strike Portions of Defendants' Rebuttal Expert Reports

IBM requests that the Court strike certain portions of Defendants' rebuttal expert reports – the Eastburn Report, the Olivier Report, and the Ugone Report – that rely on conversations with a witness Defendants initially failed to disclose: Rajkumar Chandrasekaran, an OpenTable employee.[16]  (D.I. 387 at 1)  IBM argues that it is prejudiced by Defendants' experts' reliance on conversations with Mr. Chandrasekaran because IBM was never given the opportunity to investigate the basis or context of the information Mr. Chandrasekaran provided and IBM's experts were unable to address Mr. Chandrasekaran's statements in their reports.  (*Id.* at 2-3)

Defendants respond that Mr. Chandrasekaran was not disclosed in Defendants' Rule 26(a) Initial Disclosures on March 9, 2016 only because he had just been hired about six weeks earlier and Defendants had no intention of asking him to testify.  (D.I. 458 at 4)  Moreover, the *Pennypack* factors do not apply because Rule 26(e) recognizes that supplementation to Initial Disclosures is only required "if the additional or corrective information [initially omitted] has not otherwise been made known to the other parties during the discovery process or in writing."  (*Id.* at 2-3)  In Defendants' view, IBM was put on notice of Mr. Chandrasekaran through document production, organizational charts, and the testimony of two OpenTable deponents (at least one month before the close of fact discovery).  (*Id.*)

A failure to disclose under Rule 26(a) "may lead to [the] exclusion of the materials in question" under Rule 37(c)(1).  *Lambda Optical Solutions, LLC v. Alcatel–Lucent USA Inc.*, 2013 WL 1776104, at *2 (D. Del. Apr. 17, 2013).  In relevant part, Rule 37(c)(1) provides that

---

[16] Defendants amended their disclosures on February 9, 2017, after the end of fact discovery, to add Mr. Chandrasekaran.

39

"[i]f a party fails to provide information . . . as required by Rule 26(a) . . . , the party is not allowed to use that information . . . to supply evidence on a motion, at a hearing, or at a trial, unless the [party's violation] was substantially justified or is harmless."

In determining whether a failure to disclose was substantially justified or harmless, and deciding whether to strike potentially critical evidence, courts consider the following factors: (1) the importance of the information withheld; (2) the prejudice or surprise to the party against whom the evidence is offered; (3) the likelihood of disruption of the trial; (4) the possibility of curing the prejudice; (5) the explanation for the failure to disclose; and (6) the presence of bad faith or willfulness in not disclosing the evidence (the "Pennypack factors"). *See Konstantopoulos v. Westvaco Corp.*, 112 F.3d 710, 719 (3d Cir. 1997) (citing *Meyers v. Pennypack Woods Home Ownership Ass'n*, 559 F.2d 894, 904-05 (3d Cir. 1977)). Exclusion of "critical evidence" is an "extreme sanction, not normally to be imposed absent a showing of willful deception or flagrant disregard of a court order by the proponent of the evidence." *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 791-92 (3d Cir. 1994) (internal quotation marks omitted). The determination of whether to exclude evidence is committed to the discretion of the Court. *See id.* at 749.

The Court agrees with Defendants that they did not commit a discovery violation. IBM was put on notice of Mr. Chandrasekaran through discovery, and IBM deposed the individual who was his predecessor in his current position. *See In re Joy Global, Inc.*, 423 B.R. 445, 451 (D. Del. 2010) ("[I]nadvertent failure to disclose the name of a potential witness known to all parties or the failure to list as a trial witness a person listed by another party is 'harmless.'"). Moreover, there is no indication that Defendants' failure to disclose Mr. Chandrasekaran initially

40

was the product of bad faith. Whether or not the *Pennypack* factors are applied, the conclusion is the same: IBM's motion to strike will be denied.

## IV.     CONCLUSION

An appropriate Order follows.